UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NANCY BROOKS AND JOAN SILVERMAN,

                           :

              Plaintiffs,                     Civil Action

                           :         No. 05-10994-WGY

      v.

                           :

AIG SUNAMERICA LIFE ASSURANCE
COMPANY,                          :

              Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANT AIG SUNAMERICA'S MOTION TO DISMISS</u>

 

James R. Carroll
Michael S. Hines
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
(617) 573-4800

Counsel for Defendant
AIG SunAmerica Life Assurance Company

Dated:  July 25, 2005

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    THE COMPLAINT SHOULD BE DISMISSED
      BECAUSE WHOLLY CONCLUSORY ALLEGATIONS
      DO NOT STATE WITH SUBSTANTIAL CERTAINTY FACTS
      SUFFICIENT TO STATE A CLAIM FOR BREACH OF CONTRACT . . . . . . . . . . . . 4

II.   COUNTS II, III & IV SHOULD BE DISMISSED FOR THE INDEPENDENT
      REASON THAT PLAINTIFFS DO NOT ALLEGE THE BAD FAITH, UNFAIR
      OR UNLAWFUL CONDUCT NECESSARY TO MAINTAIN THOSE CLAIMS . . . . . 7

      A.    Plaintiffs' Claim For Breach Of The Implied Covenant Of Good Faith
            And Fair Dealing Fails Because There Are No Allegations Of Bad Faith  . . . . . . 8

      B.    The Ch. 93A Claim Should Be Dismissed Because Plaintiffs Have
            Not Alleged Any Conduct Other Than A Purported Breach Of Contract . . . . . . . 9

      C.    Plaintiffs' Conclusory Allegations Of "Unlawful" And "Unfair"
            Conduct Fail To State A Claim Under California's Unfair Competition Law . . . 10

            1.    Conclusory Allegations Of Breach Of Contract
                  Are Insufficient To State A Claim Of "Unlawful" Conduct  . . . . . . . . . . 11

            2.    Conclusory Allegations Of "Unfairness" Fail To State A Claim . . . . . . . 12

III.  PLAINTIFFS' PURPORTED CH. 93A AND UCL CLAIMS ARE
      ALSO BARRED BY THE APPLICABLE STATUTES OF LIMITATION  . . . . . . . . 13

      A.    The Discovery Rule Does Not Toll The Limitations Period . . . . . . . . . . . . . . . . 14

            1.    The Discovery Rule Is Inapplicable To UCL Claims  . . . . . . . . . . . . . . . 14

            2.    The Discovery Rule Does Not Toll The Ch. 93A Limitation
                  Period Because Plaintiffs Have Failed To Allege Reasonable Diligence  14

B.    Plaintiffs Do Not Allege Facts Sufficient To Toll The
Limitations Period Pursuant To A Fraudulent Concealment Theory . . . . . . . . . . 16

1.    Plaintiffs Have Not Adequately Pled
Fraudulent Concealment Under Massachusetts Law . . . . . . . . . . . . . . . 16

2.    Plaintiffs Have Not Adequately Pled
Fraudulent Concealment Under California Law  . . . . . . . . . . . . . . . . . . 17

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## TABLE OF AUTHORITIES

**CASES**                                                                      **PAGE(S)**

Accuimage Diagnostics Corp. v. Terarecon, Inc.,
    260 F. Supp. 2d 941 (N.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.,
    267 F.3d 30 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Aulson v. Blanchard, 83 F.3d 1 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Beddall v. State St. Bank & Trust Co.,
    137 F.3d 12 (1st Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Bernardo v. Planned Parenthood Fed'n of Am.,
    9 Cal. Rptr. 3d 197 (Cal. Ct. App. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,
    973 P.2d 527 (Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

Chambers Steel Engraving Corp. v. Tambrands, Inc.,
    895 F.2d 858 (1st Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Christensen v. Kingston Sch. Comm., 360 F. Supp. 2d 212 (D. Mass. 2005) . . . . . . . . . . . . . . . 8

Churchill Vill., LLC v. General Electric Co.,
    169 F. Supp. 2d 1119 (N.D. Cal. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Cmty. Cause v. Boatwright, 177 Cal. Rptr. 657 (Cal. Ct. App. 1981) . . . . . . . . . . . . . . . . . . 17

Doyle v. Hasbro, Inc., 103 F.3d 186 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Eggert v. Merrimac Paper Co., Inc. Leveraged ESOP,
    311 F. Supp. 2d 245 (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Equip. & Sys. For Indus., Inc. v. Northmeadows Constr. Co.,
    798 N.E.2d 571 (Mass. App. Ct. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Gregory v. Albertson's, Inc., 128 Cal. Rptr. 2d 389 (Cal. Ct. App. 2002) . . . . . . . . . . . 10, 11, 12

Herring v. P.A. Vadala, 670 F. Supp. 1082 (D. Mass. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 9

In re Segue, Inc. Sec. Litig., 106 F. Supp. 2d 161 (D. Mass. 2000) . . . . . . . . . . . . . . . . . . . . . 2

<u>Khoury v. Maly's of Cal., Inc.</u>, 17 Cal. Rptr. 2d 708 (Cal. Ct. App. 1993) . . . . . . . . . . . . . 10, 12

<u>Klein v. Earth Elements, Inc.</u>, 69 Cal. Rptr. 2d 623 (Cal. Ct. App. 1997) . . . . . . . . . . . . . . . . . 11

<u>LaChapelle v. Berkshire Life Ins. Co.</u>, 142 F.3d 507 (1st Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 2

<u>Madan v. Royal Indem. Co.</u>, 532 N.E.2d 1214 (Mass. App. Ct. 1989) . . . . . . . . . . . . . . . . . . . 9

<u>Moore v. Hammond, Martin, Walsh & Smith, Ins. Brokers, Inc.</u>,
      Civ. A. No. 093776, 2002 WL 27138 ( Cal. Ct. App. Jan. 10, 2002) . . . . . . . . . . . . . . . 17

<u>Nat'l Rural Telecomms. Coop. v. DirecTV, Inc.</u>,
      319 F. Supp. 2d 1059 (C.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>S. Bay Chevrolet v. General Motors Acceptance Corp.</u>,
      85 Cal. Rptr. 2d 301 (Cal. Ct. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>Salois v. Dime Sav. Bank</u>, 128 F.3d 20 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

<u>Salois v. Dime Sav. Bank</u>, Civ. A. No. 95-11967-PBS,
      1996 WL 33370626 (D. Mass. Nov. 13, 1996), <u>aff'd</u>, 128 F.3d 20 (1st Cir. 1997) . . . . . 15

<u>Snapp & Assocs. Ins. Servs., Inc. v. Robertson</u>,
      96 Cal. App. 4th 884 (Cal. Ct. App. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

<u>Stop Youth Addiction, Inc. v. Lucky Stores, Inc.</u>,
      950 P.2d 1086 (Cal. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

<u>Stutz Motor Car of Am., Inc. v. Reebok Int'l Ltd.</u>,
      909 F. Supp. 1353 (C.D. Cal. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

<u>Whitinsville Plaza, Inc. v. Kotseas</u>, 390 N.E.2d 243 (Mass. 1979) . . . . . . . . . . . . . . . . . . . . . . . 9

<u>Williams v. Astra USA, Inc.</u>, 68 F. Supp. 2d 29 (D. Mass. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 6

<u>Winsmann v. Choate Health Mgmt., Inc.</u>, Civ. A. No. 97-6561,
      1998 WL 282901 (Mass. Super. Ct. May 29, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**STATUTES** **PAGE(S)**

Cal. Bus. & Prof. Code § 17200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Cal. Bus. & Prof. Code § 17208 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Mass. Gen. Laws ch. 4, § 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Mass. Gen. Laws ch. 66, § 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Mass. Gen. Laws ch. 93A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Mass. Gen. Laws ch. 260, § 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**OTHER AUTHORITIES** **PAGE(S)**

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Mass. Regs. Code tit. 950, § 32.00 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## PRELIMINARY STATEMENT

Plaintiffs Nancy Brooks' and Joan Silverman's (collectively, "plaintiffs") entire case against defendant AIG SunAmerica Life Assurance Company ("AIG SunAmerica"), formerly Anchor National Life Assurance Company, is premised on an error of law that may be fairly resolved on this motion. The case hinges on a single conclusory "information and belief" allegation of a breach of contract:

> 20. Upon information and belief, the [Cost Of Insurance] Rate Increases were not made 'in accordance with any procedures and standards on file with the Insurance Department of the jurisdiction in which' any of the Mutual Life Block of Policies were delivered.

(Complaint ¶ 20 (the "Complaint") (emphasis omitted).)[1] Plaintiffs' speculative pleading asserted on "information and belief" that AIG SunAmerica breached the terms of a life insurance contract by increasing monthly cost of insurance ("COI") rates in violation of <u>unidentified</u> "procedures and standards" does not plead with the requisite "substantial certainty" facts sufficient to state a claim for a breach of contract. Because all Counts are dependent upon the same inadequate allegation of breach, the Complaint fails as a matter of law and should be dismissed.

Independent of the dispositive failure to plead a breach of contract, plaintiffs' claims based upon (i) the implied covenant of good faith and fair dealing, (ii) Mass. Gen. Laws ch. 93A ("ch. 93A") and (iii) the California Unfair Competition Law (the "UCL") should be dismissed for the additional reason that plaintiffs do not allege facts sufficient to support those claims. There are simply no allegations of bad faith conduct, a necessary predicate to maintain a claim for breach of the implied covenant of good faith and fair dealing. As for plaintiffs'

---

[1]    The Complaint asserts claims for: breach of contract (Count I); breach of the implied covenant of good faith and fair dealing (Count II); violation of Mass. Gen. Laws ch. 93A (Count III); and violation of the California Unfair Business Practices Act (Count IV).

purported ch. 93A claim, an allegation of breach of contract, standing alone, does not, as a matter of law, state a claim under ch. 93A.  The UCL claim similarly fails and ought to be dismissed because to state such a claim, plaintiffs must allege an <u>independently</u> actionable statutory or regulatory violation.  The Complaint here fails to do that.

Finally, the ch. 93A and the UCL claims should be dismissed because they are also time-barred.  Each of those claims is governed by a four-year limitations period, and -- as the face of the Complaint makes plain -- both are untimely.  Plaintiffs' conclusory allegations of "fraudulent concealment" and the applicability of the "discovery rule" are insufficient to toll the limitations period.  In addition, plaintiffs' allegations make clear that they have had knowledge of all the purported facts asserted in the Complaint for many years.  In fact, plaintiffs have not alleged the discovery of any "new" facts since the expiration of the limitations period.  Accord-ingly, the applicable statutes of limitations are not tolled and plaintiffs' ch. 93A and UCL claims are time-barred.

## **ALLEGATIONS**[2]

Plaintiffs allege that they are trustees of the Irrevocable Trust of Donald L. Silverman (the "Trust") and executrices of the Estate of Donald L. Silverman.  (Compl. ¶ 2.)  The Mutual Benefit Life Insurance Company ("Mutual Benefit") originally issued a life insurance policy (the "Original Policy") to Donald L. Silverman ("Mr. Silverman") on May 1, 1984.  (<u>Id.</u>)  Mr. Silverman was the insured on the Original Policy, as well as the Original Policy's owner and

---

[2]    Although plaintiffs' well-pleaded allegations are taken as true solely for purposes of this Rule 12(b)(6) motion, the bald assertions, unsubstantiated conclusions and unsupported characterizations set forth in the Complaint are to be disregarded.  <u>See, e.g.</u>, <u>LaChapelle v. Berkshire Life Ins. Co.</u>, 142 F.3d 507, 508 (1st Cir. 1998) (affirming dismissal); <u>Aulson v. Blanchard</u>, 83 F.3d 1, 3 (1st Cir. 1996) (affirming dismissal); <u>In re Segue, Inc. Sec. Litig.</u>, 106 F. Supp. 2d 161, 165 (D. Mass. 2000) (dismissing complaint).

2

beneficiary. In March 1991, Mr. Silverman changed the ownership and beneficiary of the Original Policy to the Trust.

In 1994, with Mutual Benefit in financial distress, the New Jersey Commissioner of Insurance assumed control of Mutual Benefit. The New Jersey Commissioner adopted a rehabilitation plan (the "Rehabilitation Plan") in which substantially all of Mutual Benefit's assets, and certain liabilities, were assigned to MBL Life Assurance Corporation ("MBL Life"). (Id. ¶ 15.) The New Jersey Superior Court approved the Rehabilitation Plan in May 1994. (Id.)

In connection with the court-approved Rehabilitation Plan, Mutual Benefit policy owners could either (i) opt-out of the Rehabilitation Plan, in which case they would receive 55% of the cash surrender value of their policies as of a date certain, or (ii) opt-in to the Rehabilitation Plan, in which case their policies would be restructured, and the full value of the policies would be maintained and transferred to MBL Life. (Id. ¶ 16.) In 1994, Mr. Silverman elected to retain the full value of the Original Policy, and opted into the Rehabilitation Plan. In 1999, in a transaction approved by the New Jersey Commissioner and supervised by the New Jersey Superior Court pursuant to the Rehabilitation Plan, AIG SunAmerica acquired the MBL Life polices that MBL Life had acquired from Mutual Benefit, including Mr. Silverman's Restructured

Policy (the "Policy").[3]  (Id. ¶ 17.)  With respect to monthly COI rate increases, the Policy

provides:

> The monthly cost of insurance rate is based on the sex, age, and
> rate class of the insured.  Monthly cost of insurance rates will be
> determined by us annually, by class, based on future expectations
> as to investment earnings, mortality, persistency, and expenses,
> including taxes.  Any change in rates will be in accordance with
> any procedures and standards on file with the Insurance Depart-
> ment of the jurisdiction in which this policy is delivered.  Such cost
> of insurance rates will not be greater than those shown in the table
> of maximum monthly cost of insurance rates on page 15.

(Ex. A at ¶ 14.)  Mr. Silverman died on June 27, 2001, and AIG SunAmerica duly paid to the

Trust $857,901.86, representing the Policy's full death benefit plus interest.

## ARGUMENT

I. **THE COMPLAINT SHOULD BE DISMISSED
BECAUSE WHOLLY CONCLUSORY ALLEGATIONS
DO NOT STATE WITH SUBSTANTIAL CERTAINTY FACTS
SUFFICIENT TO STATE A CLAIM FOR BREACH OF CONTRACT**

Plaintiffs do not -- because they cannot -- identify a single contractual provision

that AIG SunAmerica purportedly breached.  To the contrary, plaintiffs concede -- as they must --

that AIG SunAmerica did <u>not</u> increase the monthly COI rate beyond the maximum allowed under

the Policy -- the only provision explicitly governing COI rate increases.  (Compl. ¶ 21.)  Indeed,

at all times during the life of the Policy the monthly COI rates were far less than the contractual

---

[3]     The Policy is attached hereto as Exhibit A.  Copies of documents such as this, that are
central to plaintiffs' claims but were not attached to the Complaint, may be reviewed on a motion
to dismiss without converting the motion into one for summary judgment.  <u>Alternative Energy,
Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 267 F.3d 30, 33 (1st Cir. 2001) ("When the complaint
relies upon a document, whose authenticity is not challenged, such a document 'merges into the
pleadings' and the court may properly consider it under a Rule 12(b)(6) motion to dismiss.");
<u>Beddall v. State St. Bank & Trust Co.</u>, 137 F.3d 12, 16-17 (1st Cir. 1998) ("When, as now, a
complaint's factual allegations are expressly linked to -- and admittedly dependent upon -- a
document . . . the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).").

maximum, and during 1999 through 2002, the time period at issue here, the monthly COI rates were <u>more than 30%</u> below the maximum allowed under the Policy.[4]

Instead of identifying an explicit breach, plaintiffs attempt to invent one with a conclusory allegation that AIG SunAmerica failed to follow <u>unidentified</u> "procedures and standards on file with the Insurance Department of the jurisdiction in which [the Policy was] delivered." (Compl. ¶ 20.)[5] But plaintiffs' "information and belief" allegation of breach of contract premised upon AIG SunAmerica's alleged failure falls far short of pleading facts sufficient to state a claim for breach of contract. (<u>Id.</u>) Because plaintiffs' entire case depends upon that insufficient allegation, the Complaint fails as a matter of law and should be dismissed.

In order to state a claim for breach of contract, a plaintiff must state with "substantial certainty" the facts establishing, among other things, a defendant's failure to perform

---

[4]

| Year | Monthly COI Rate (<i>See</i> Compl. ¶ 18) | Maximum Monthly COI Rate (<i>See</i> Ex. A at 15)* | % Difference |
|---|---|---|---|
| 1999-2000 | $6.52 | $9.47 | 31.2% |
| 2000-2001 | $7.12 | $10.42 | 31.7% |
| 2001-2002 | $7.95 | $11.47 | 30.7% |

*Mr. Silverman's date of birth was August 30, 1917; he was therefore 82 years old when the monthly COI rate was allegedly increased in 1999.

[5]    All four Counts of the Complaint rely upon this same conclusory allegation of breach: "SunAmerica breached those contracts by making COI Rate Increases in violation of the terms of the policies" (Compl., Count I ¶ 27); "SunAmerica breached the implied covenant of good faith and fair dealing contained in each Class Member's insurance policy by making the COI Rate Increases" (<u>id.</u>, Count II ¶ 30); "[b]y making unauthorized COI Rate Increases, SunAmerica committed an unfair or deceptive act or practice within the meaning of MGLC 93A" (<u>id.</u>, Count III ¶ 33); "SunAmerica's conduct in making unauthorized COI Rate Increases constitutes and [sic] unlawful and/or unfair business practice within the meaning of the California Unfair Business Practices Act" (<u>id.</u>, Count IV ¶ 38).

5

a duty arising out of the contract.  Doyle v. Hasbro, Inc., 103 F.3d 186, 194-95 (1st Cir. 1996) (affirming dismissal of breach of contract claim and holding allegation that defendants "failed to meet their contractual requirement" insufficient to state a claim).  See also Williams v. Astra USA, Inc., 68 F. Supp. 2d 29, 37 (D. Mass. 1999) (holding that to state a breach of contract claim under Massachusetts law, plaintiff "must describe with 'substantial certainty' . . . the specific obligation or promise breached" by defendant); Winsmann v. Choate Health Mgmt., Inc., Civ. A. No. 97-6561, 1998 WL 282901, at *2-3 (Mass. Super. Ct. May 29, 1998) (dismissing breach of contract claim on the ground that the conclusory assertion that defendant "breached its contrac-tual agreement with the plaintiff" was insufficient to state a claim) (attached hereto as Exhibit B).

The Complaint here does not satisfy this standard.  Plaintiffs' conclusory allegation that AIG SunAmerica violated unidentified "procedures and standards" does not come close to pleading facts with "substantial certainty" demonstrating the purported breach.  Wil-liams, 68 F. Supp. 2d at 37.  What procedures and standards were purportedly violated?  Did AIG SunAmerica violate a statute or regulation?  The Complaint does not say.  Did AIG SunAmerica violate a provision in the Rehabilitation Plan or a Division of Insurance directive?  Again, the Complaint is silent.  Indeed, plaintiffs' allegation of breach pled "[u]pon information and belief" is not supported by any factual assertions.[6]  Put simply, the Complaint does not state a claim for breach of contract and, accordingly, all claims should be dismissed.  See id. at 33 ("a complaint must allege sufficient facts to provide the defendant fair notice of the nature of the claim and the grounds upon which it rests") (emphasis added) (quotation omitted).

---

[6]    See Eggert v. Merrimac Paper Co., Inc. Leveraged ESOP, 311 F. Supp. 2d 245, 257 (D. Mass. 2004) (dismissing claims of breach of fiduciary duty on the ground that those claims "contain[ed] conclusory allegations pled 'on information and belief' which [were] unsupported by facts").

6

Not only does plaintiffs' speculative pleading not give the requisite notice to AIG SunAmerica as to how the Policy was purportedly breached, but the inability to identify those "procedures and standards" is particularly troubling here, since those records would presumably be in the public record. The Complaint alleges that the "procedures and standards" are "on file with the Insurance Department of the jurisdiction in which the [P]olicy is delivered;" in this case, the Massachusetts Division of Insurance. (Compl. ¶ 19.) Documents created or received by the Massachusetts Division of Insurance are available for public review and inspection. See Mass. Gen. Laws ch. 4, § 7(26)(a-m) (defining public records); Mass. Gen. Laws ch. 66, § 10 (providing for inspection of public records); Mass. Regs. Code tit. 950, § 32.00 et seq. Plaintiffs' failure to inspect the public record prior to filing the Complaint -- something they were obligated to do -- is itself grounds for dismissal. (Were they to make such an inspection, plaintiffs would find that AIG SunAmercia did not violate "procedures and standards" of any sort.)

II.    **COUNTS II, III & IV SHOULD BE DISMISSED FOR THE INDEPENDENT REASON THAT PLAINTIFFS DO NOT ALLEGE THE BAD FAITH, UNFAIR OR UNLAWFUL CONDUCT NECESSARY TO MAINTAIN THOSE CLAIMS**

Even if the Complaint states a claim for breach of contract -- and it does not -- plaintiffs' purported claims based upon alleged violations of (i) the implied covenant of good faith and fair dealing (Count II), (ii) ch. 93A (Count III) and (iii) the UCL (Count IV) all fail for the independent reason that the Complaint does not allege facts sufficient to support those claims. The Complaint is based upon one conclusory allegation of breach of contract, nothing more. A single allegation of breach of contract, however, is inadequate to state a claim for breach of the implied covenant of good faith and fair dealing, or a violation of either the Massachusetts or California consumer protection statutes.

7

A.    **Plaintiffs' Claim For Breach Of The Implied Covenant Of Good Faith**
      **And Fair Dealing Fails Because There Are No Allegations Of Bad Faith**

Count II purports to assert a claim for breach of the implied covenant of good

faith and fair dealing.  (Compl. ¶¶ 29-31.)  But plaintiffs do not allege facts (even in conclusory

fashion) necessary to support that claim.

To state a claim for breach of the implied covenant of good faith and fair dealing,

plaintiffs must plead conduct "implicating a dishonest purpose, consciousness of wrong, or ill

will in the nature of fraud." Equip. & Sys. For Indus., Inc. v. Northmeadows Constr. Co., 798

N.E.2d 571, 575 (Mass. App. Ct. 2003) (affirming dismissal of claim asserting breach of the

implied covenant of good faith and fair dealing on the grounds that "there was nothing in the

complaint from which one might draw that [the alleged breach of contract] was done in bad

faith"); see also Christensen v. Kingston Sch. Comm., 360 F. Supp. 2d 212, 226 (D. Mass. 2005)

(dismissing breach of implied covenant of good faith and fair dealing claim and holding that such

a claim "requires conduct taken in bad faith").  An allegation of a breach of the implied covenant

of good faith and fair dealing is "distinct" from a breach of contract claim and "require[s]

additional factual allegations of unfairly leveraging the contract terms for undue economic

advantage." Id. at 229.

The Complaint here does not even attempt to plead additional factual allegations

to support an inference of bad faith.  Instead, the Complaint conclusorily relies on its inadequate

breach of contract allegation, stating that "SunAmerica breached the implied covenant of good

faith and fair dealing . . . by making the COI Rate Increases."  (Compl. ¶ 30.)  But that is

insufficient to state a claim for breach of the implied covenant of good faith and fair dealing

under Massachusetts law.  As this Court succinctly stated in Christensen: "[n]o claim for

8

breaching an implied covenant of good faith and fair dealing need be pled unless the factual circumstances actually warrant the additional claim." 360 F. Supp. 2d at 229. No such claim is warranted here and, as such, should be dismissed.

**B.      The Ch. 93A Claim Should Be Dismissed Because Plaintiffs Have Not Alleged Any Conduct Other Than A Purported Breach Of Contract**

Plaintiffs conclusorily allege that the purported "unauthorized COI Rate Increases" constitute "unfair or deceptive" acts or practices in violation of Mass. Gen. Laws ch. 93A. (Compl. ¶ 33.) Not only are plaintiffs' unsupported assertions of unfair or deceptive conduct inadequate to state a claim,[7] but their ch. 93A claim fails for the independent reason that allegations of breach of contract are insufficient to state a claim under ch. 93A. Madan v. Royal Indem. Co., 532 N.E.2d 1214, 1217-18 (Mass. App. Ct. 1989) ("the mere breach of a contract, without more, does not amount to a ch. 93A violation"); Chambers Steel Engraving Corp. v. Tambrands, Inc., 895 F.2d 858, 861 (1st Cir. 1990) ("[t]he mere breach of a contract, without more, even if one existed, would not violate ch. 93A").

In Whitinsville Plaza, Inc. v. Kotseas, the plaintiff alleged that defendants' violation of the terms of an agreement constituted a ch. 93A violation. 390 N.E.2d 243, 251 (Mass. 1979). The SJC disagreed and affirmed dismissal of that claim, "conclud[ing] that those allegations [were] not sufficient to support a claim under ch. 93A." Id. Similarly, here, plaintiffs have not identified any conduct to support their ch. 93A claim other than their conclusory allegation of breach of contract. Indeed, at best, this is a breach of contract case, and nothing

---

[7]      See Herring v. P.A. Vadala, 670 F. Supp. 1082, 1087 (D. Mass. 1987) (dismissing ch. 93A claim for lack of specificity in allegation identifying the purported unfair or deceptive conduct).

more.  Accordingly, under settled Massachusetts law, plaintiffs' ch. 93A claim has no merit, and should be dismissed.

C.    **Plaintiffs' Conclusory Allegations Of "Unlawful" And "Unfair" Conduct Fail To State A Claim Under California's Unfair Competition Law**

Count IV purports to assert a claim pursuant to the UCL.[8]  (Compl. ¶¶ 37-43.)   In familiar conclusory fashion, the Complaint asserts that AIG SunAmerica acted unlawfully and unfairly, but nowhere alleges facts sufficient to support those blanket assertions.  That is insufficient under California law; accordingly, Count IV should be dismissed.

Section 17200 of the UCL defines unfair competition as any "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  Consequently, a court must determine independently whether the allegations are sufficient to state a cause of action under each of the types of prohibited conduct; in this case, allegations of unlawfulness or unfairness.  Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co., 973 P.2d 527, 540 (Cal. 1999); see also Gregory v. Albertson's, Inc., 128 Cal. Rptr. 2d 389, 392 (Cal. Ct. App. 2002) (affirming dismissal of UCL claim and stating that "[t]here are separate lines of authority construing each of [the] three terms" under the UCL).  In addition, allegations of prohibited conduct "must state with reasonable particularity the facts supporting the statutory elements of the violation."  Khoury v. Maly's of Cal., Inc., 17 Cal. Rptr. 2d 708, 712 (Cal. Ct. App. 1993) (affirming dismissal of UCL claim because the complaint failed to identify a particular section of the statutory scheme which was violated) (emphasis added); Gregory, 128 Cal. Rptr. 2d at 396

---

[8]    Although plaintiffs do not identify the statute by citation, the statute is generally referred to as the Unfair Competition Law, not the Unfair Business Practices Act.  Stop Youth Addiction, Inc. v. Lucky Stores, Inc., 950 P.2d 1086, 1089 n.2 (Cal. 1998).  The Unfair Competition Law is codified in California Business and Professions Code section 17200 et seq.

(following <u>Khoury</u> and holding allegations "too vague and conclusionary" to support a UCL

claim).  Even if the Complaint sufficiently identifies any unlawful or unfair conduct -- and it does

not -- allegations underlying those assertions do not satisfy the "reasonable particularity"

pleading standard of <u>Khoury</u>.  (Compl. ¶ 38.)

  **1.**  **Conclusory Allegations Of Breach Of Contract**
     **<u>Are Insufficient To State A Claim Of "Unlawful" Conduct</u>**

    An "unlawful" business practice "is an act or practice, committed pursuant to

business activity, <u>that is at the same time forbidden by law</u>."  <u>Bernardo v. Planned Parenthood</u>

<u>Fed'n of Am.</u>, 9 Cal. Rptr. 3d 197, 222 (Cal. Ct. App. 2004) (emphasis added).  Thus, to state a

claim for an "unlawful" business practice, a plaintiff must allege that the defendant violated some

law <u>independent</u> of the UCL.  <u>Klein v. Earth Elements, Inc.</u>, 69 Cal. Rptr. 2d 623, 625 (Cal. Ct.

App. 1997) ("While these doctrines do provide for civil liability upon proof of their elements

they do not, by themselves, describe acts or practices that are illegal or otherwise forbidden by

law.").  In other words, to state a claim of unlawful conduct under the statute, a plaintiff must

allege some statutory or regulatory violation.  <u>S. Bay Chevrolet v. General Motors Acceptance</u>

<u>Corp.</u>, 85 Cal. Rptr. 2d 301, 311 (Cal. Ct. App. 1999) ("unlawful" practices proscribed by the

UCL are those acts "'forbidden by law, be it civil or criminal, federal, state, or municipal,

statutory, regulatory, or court-made'").

    As a matter of law, an allegation of breach of contract -- like the lone allegation

asserted here -- <u>does</u> <u>not</u> constitute unlawful conduct actionable under the UCL.  <u>Accuimage</u>

<u>Diagnostics Corp. v. Terarecon, Inc.</u>, 260 F. Supp. 2d 941, 954 (N.D. Cal. 2003) (dismissing

UCL claim and stating that the "scope [of the statute] is restricted to violations of law, <u>not</u>

<u>contract</u>") (emphasis added); <u>see</u> <u>also</u> <u>Nat'l Rural Telecomms. Coop. v. DirecTV, Inc.</u>, 319 F.

11

Supp. 2d 1059, 1074-75 (C.D. Cal. 2003) (summarily dismissing UCL claim on the ground that a breach of contract is not unlawful conduct under the statute).

The complaint here similarly fails and ought to be dismissed. Plaintiffs' entire case is premised upon the allegation that AIG SunAmerica may have breached the Policy. (Compl. ¶¶ 19-20.) At most, this constitutes a breach of contract and is inadequate to support a claim for "unlawful" business practices. Accuimage, 260 F. Supp. 2d at 954.

Even if plaintiffs' allegation that AIG SunAmerica violated "procedures and standards" could be interpreted to allege a violation of an underlying statute or regulation -- and it cannot -- plaintiffs' pleading "[u]pon information and belief" a violation of unidentified "procedures and standards" does not come close to satisfying the reasonable particularity requirement. (Compl. ¶ 20.); Khoury, 17 Cal. Rptr. 2d at 712.

### 2.    Conclusory Allegations Of "Unfairness" Fail To State A Claim

For substantially the same reasons plaintiffs' allegations of "unlawful" conduct fail, their allegations of "unfairness" also are inadequate. The California Supreme Court has defined "unfair" as "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law . . . ." Cel-Tech, 973 P.2d 527 at 544. A finding of unfairness under the UCL must be "tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." Id. California courts have extended this definition to encompass consumer actions, requiring that the alleged unfair conduct be "'tethered' to specific constitutional, statutory or regulatory provisions." Gregory, 128 Cal. Rptr. 2d at 394-95 (noting "a narrower interpretation" of unfair acts or practices in all UCL actions is justified by Cel-Tech);

12

Churchill Vill., LLC v. General Electric Co., 169 F. Supp. 2d 1119, 1130 n.10 (N.D. Cal. 2000) (extending the Cel-Tech "tethered" requirement because the "lack of distinction between competitor and consumer in the language of the UCL renders th[e] definition equally valid in the consumer context").

Plaintiffs have not attempted to identify any violation of constitutional, statutory or regulatory law.  Indeed, plaintiffs do not identify any violation whatsoever.  Instead, they purport to rely on the insufficient allegation that AIG SunAmerica might have violated some non-specific "procedures and standards."  (Compl. ¶ 20.)  Plaintiffs do not even identify what purported "procedures and standards" may have been disregarded, much less do so with the requisite reasonable particularity necessary to maintain a UCL claim.

## III.    PLAINTIFFS' PURPORTED CH. 93A AND UCL CLAIMS ARE ALSO BARRED BY THE APPLICABLE STATUTES OF LIMITATION

Plaintiffs' ch. 93A and UCL claims should be dismissed for the independent reason that those claims are barred by their respective four-year statutes of limitation.  See Mass. Gen. Laws ch. 260, § 5A (providing that claims brought pursuant to ch. 93A must be brought within 4 years of accrual); Cal. Bus. & Prof. Code § 17208 (same).  The limitation periods accrue at the time of the alleged injury, that is, at the time AIG SunAmerica purportedly breached the Policy by increasing the monthly COI rates.  See Salois v. Dime Sav. Bank, 128 F.3d 20, 25 (1st Cir. 1997); Snapp & Assocs. Ins. Servs., Inc. v. Robertson, 96 Cal. App. 4th 884, 891 (Cal. Ct. App. 2002).

Plaintiffs allege that their purported injuries occurred in 1999, 2000 and 2001, more than four years prior to filing the Complaint.  (Compl. ¶¶ 18-21.)  Thus, plaintiffs' ch. 93A and UCL claims are time-barred on their face.  Indeed, by their reliance on allegations of the

"discovery rule" and "fraudulent concealment" to purportedly toll the limitations period (id. ¶¶ 22-23), plaintiffs implicitly concede that their purported ch. 93A and UCL claims are stale. Although plaintiffs allege that AIG SunAmerica "fraudulently concealed" information (id. ¶ 22), and that plaintiffs "could not have known" the facts concerning the alleged breach during the limitations period (id. ¶ 23), those conclusory allegations are inadequate to invoke either tolling doctrine.

**A.    The Discovery Rule Does Not Toll The Limitations Period**

**1.    The Discovery Rule Is Inapplicable To UCL Claims**

It is well-settled California law that the discovery rule is <u>inapplicable</u> to UCL claims, and therefore need not be considered here.  <u>Robertson</u>, 96 Cal. App. 4th at 891 ("The 'discovery rule,' . . . does not apply to unfair competition actions."); <u>see</u> <u>also</u> <u>Stutz Motor Car of Am., Inc. v. Reebok Int'l Ltd.</u>, 909 F. Supp. 1353, 1363 (C.D. Cal. 1995) (holding that the discovery rule is inapplicable to UCL claims and that the "statute begins to run when the cause of action accrues, <u>irrespective of whether plaintiff knew of its accrual</u>") (emphasis added).

**2.    The Discovery Rule Does Not Toll The Ch. 93A Limitation Period Because Plaintiffs Have Failed To Allege Reasonable Diligence**

In an effort to salvage their ch. 93A claim, plaintiffs purport to allege -- in a single paragraph -- the applicability of the discovery rule:

> The named plaintiffs did not know, and in the exercise of reason-
> able diligence could not have known, that SunAmerica made the
> COI Rate Increases in violation of the terms of their [P]olicy
> because SunAmerica has refused to disclose to them the method by
> which it calculates COI Rate Increases and the information is not
> available anywhere else.

14

(Compl. ¶ 23.)  This conclusory allegation fails to toll the limitations period because plaintiffs have not alleged -- because they cannot allege -- any facts demonstrating their reasonable diligence.

The discovery rule operates to toll a cause of action until such time that the plaintiff "knew or, in the exercise of reasonable diligence should have known, the factual basis" of that action.  Salois v. Dime Sav. Bank, Civ. A. No. 95-11967-PBS, 1996 WL 33370626, at *9 (D. Mass. Nov. 13, 1996) (applying Massachusetts law and dismissing ch. 93A claim as time-barred) (attached hereto as Exhibit C), aff'd, 128 F.3d 20 (1st Cir. 1997).  Thus, to avoid dismissal, plaintiffs must allege specific facts to show that they did not, and could not, discover their claims, even in the exercise of reasonable diligence.  Salois, 1996 WL 33370626, at *7 (holding that plaintiffs "failed to allege facts to show reasonably diligent efforts").

The Complaint here does not allege facts sufficient to show plaintiffs acted with reasonable diligence.  To the contrary, the Complaint's non-specific and conclusory allegations of breach of the Policy -- pled "[u]pon information and belief" and grounded on purported "facts" that have been in plaintiffs' possession for many years -- concedes that plaintiffs did nothing to investigate their claims.   (Compl. ¶¶ 18-21.)  Plaintiffs knew of the increased premiums when they occurred, they have had the Policy for many years, and the unidentified "procedures and standards" were presumably available in the public record.  Notwithstanding this knowledge, plaintiffs chose to do nothing.  Indeed, plaintiffs do not even allege that they discovered anything new since their claims became stale.  This same Complaint -- with the identical unsupported allegations -- could have (and should have) been filed many years ago.  Accordingly, the discovery rule is inapplicable.

15

**B.**     **Plaintiffs Do Not Allege Facts Sufficient To Toll The**
           **Limitations Period Pursuant To A Fraudulent Concealment Theory**

Just as plaintiffs have failed to allege the applicability of the discovery rule, they

also have not sufficiently alleged fraudulent concealment under either Massachusetts or Califor-

nia law.  (Compl. ¶ 22.)  In particular, the lack of any factual allegations concerning plaintiffs'

diligence in investigating their claims, coupled with the fact that plaintiffs have had knowledge

of all the facts alleged in their Complaint for many years, defeats their conclusory allegations of

concealment.

**1.**     **Plaintiffs Have Not Adequately Pled**
           **Fraudulent Concealment Under Massachusetts Law**

To avail themselves of a fraudulent concealment theory under Massachusetts law,[9]

plaintiffs must plead facts sufficient to demonstrate that AIG SunAmerica "through actual fraud

or in breach of a fiduciary duty of full disclosure, ke[pt] from [plaintiffs the] knowledge of the

facts giving rise to a cause of action and the means of acquiring knowledge of such facts."

Salois, 128 F.3d at 27 (emphasis added) (quotation omitted).  This analysis "parallel[s] a

reasonable diligence inquiry," and as discussed above, plaintiffs do not even attempt to plead

facts showing such diligence.  Id.  In addition, and as the Complaint makes plain, plaintiffs have

had, for many years, knowledge of all the facts they now attempt to belatedly assert.

---

[9]     Massachusetts law provides for the doctrine of fraudulent concealment:

>    If a person liable to a personal action fraudulently conceals the
>    cause of such action from the knowledge of the person entitled to
>    bring it, the period prior to the discovery of his cause of action by
>    the person so entitled shall be excluded in determining the time
>    limited for the commencement of the action.

Mass. Gen. Laws ch. 260, § 12.

16

**2.   Plaintiffs Have Not Adequately Pled
Fraudulent Concealment Under California Law**

Plaintiffs' allegations fare no better under California law, which requires plaintiffs to plead with particularity, "(i) the substantive elements of fraud, and (2) an excuse for late discovery of the facts." Cmty. Cause v. Boatwright, 177 Cal. Rptr. 657, 664 (Cal. Ct. App. 1981) (affirming dismissal of claims on the grounds that plaintiff failed to adequately allege fraudulent concealment).  As for pleading late discovery, plaintiffs must allege:

> (1) when the fraud was discovered; (2) the circumstances under which [the fraud] was discovered; and (3) that the plaintiff[s] [were] not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put [them] on inquiry.

Id.; see also Moore v. Hammond, Martin, Walsh & Smith, Ins. Brokers, Inc., Civ. A. No. 093776, 2002 WL 27138, at *4-5 (Cal. Ct. App. Jan. 10, 2002) (affirming dismissal of state claims as time-barred and holding that plaintiff's actual knowledge of the facts constituting his claims defeated allegations of fraudulent concealment) (attached hereto as Exhibit D).  In addition to the lack of allegations concerning plaintiffs' reasonable diligence and their indisputable knowledge, the Complaint puts forth only conclusory allegations of concealment and nowhere alleges the "substantive elements of fraud" with the requisite particularity.  Boatwright, 177 Cal. Rptr. at 664.  In short, plaintiffs' allegations of fraudulent concealment are without merit.

17

## **CONCLUSION**

For all of the foregoing reasons, AIG SunAmerica's Motion to Dismiss should be

granted in its entirety.

Dated: July 25, 2005                     Respectfully submitted,
      Boston, Massachusetts

  /s/  James R. Carroll                
James R. Carroll (BBO #554426)
Michael S. Hines (BBO #653943)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
(617) 573-4800

Counsel for Defendant
AIG SunAmerica Life Assurance Company

18

# EXHIBIT A



# Mutual Benefit Life

**Insured:**  **Donald L Silverman**

**Policy Number:**  **AL101958**

For the payment of premiums, we, **The Mutual Benefit Life Insurance Company in Rehabilitation,** insure the life of the Insured named on page 3.

The proceeds of this policy are payable to the beneficiary at the death of the insured before the maturity date. We will pay the proceeds when we receive due proof of the death of the insured. The cash surrender value of this policy is payable to the owner if the insured is living on the maturity date.

## TEN DAY RIGHT TO EXAMINE POLICY

Within 10 days after first receiving this policy, the owner may return it to our home office or to any of our agents. We will then cancel it from the start and refund any premium paid.

**Chief Executive Officer**                    **Secretary**

**Flexible Premium Adjustable Life Policy**
**Adjustable Death Benefit**
**Flexible Premium Payments**
**Cash Surrender Value Payable on the Maturity Date**
**Nonparticipating – No Dividends**

The Mutual Benefit Life Insurance Company in Rehabilitation
520 Broad Street, Newark, New Jersey 07102-318 '

C193                                     1

## READ YOUR POLICY CAREFULLY

This policy is a legal contract between the Policyowner and **The Mutual Benefit Life Insurance Company in Rehabilitation (hereinafter referred to as "MBL").**

| | |
|---|---|
| **Policy Number** | AL101958 |
| **Specified Amount** | $850,000.00   (effective as of April 29, 1999) |
| **Death Benefit** | Option A |
| **Insured** | DONALD L SILVERMAN |
| **Issue Date** | May 1, 1984 |
| **Policy Year Date** | May 1, 1984 |

MATURITY DATE:  May 1, 2012; the latest date to which to coverage may be provided by this policy, except as provided in Section 9. Policy may terminate before maturity date if actual premium payments do not cover the monthly deductions.

PREMIUMS
Planned premium of $41,658.50 payable annually to maturity date.

EXTRA BENEFIT RIDER (S):       This policy does not includ any includes additional benefits added by extra benefit rider (s):

POLICY DATA
Maximum premium expense charge: 7.5% of all premiums paid.
Policy loan interest rate: 8% effective annual rate.
Guaranteed minimum cash value interest rate: 0.327374% per month; 4% effective annual rate.
Maximum monthly expense charge: $4.00 per month.
Service charge for withdrawal of part of the cash surrender value: $25.00.

C193                                  3

4

1149

# A GUIDE

**To the Sections of this Policy**

Section
1   Policy Terms
2   Periodic Report
3   Entire Contract
4   Incontestability
5   Termination
6   Premiums
7   Suicide Exclusion
8   Amount of Proceeds
9   Continuation of Insurance
10   Misstatement of Age or Sex
11   Changes in Specified Amount
12   Change in Death Benefit Option
13   Cash Value
14   Monthly Deduction and Cost of Insurance
15   Lapse
16   Reinstatement
17   Loans
18   Surrender for Cash
19   Withdrawal of Part of the Cash Surrender Value
20   Ownership
21   Beneficiary
22   Payment of Proceeds
23   Payment Options
24   Deferment of Payment

# 1 Policy Terms

*Basic Policy* means this policy apart from any Extra Benefit Rider.

*Extra Benefit Riders* provide benefits in addition to those of the basic policy for an additional cost.

*Policy Anniversary* means any anniversary of the policy year date.

*Policy Years and Policy Months.* The first policy year and the first policy month start on the policy year date. Later policy years start on policy anniversaries. Later policy months start on the same calendar day of the month as the policy year date or on the last day of any month which has no such calendar day.

*Policy Processing Day.* The first day of each policy month is a policy processing day. The first policy processing day is the policy year date.

*Age.* The age of any person insured during any policy year means the age of that person on the birthday nearest the first day of that policy year.

*Grace Period.* If this policy lapses, it will stay in force during a grace period of 61 days after the lapse date. See Section 15 for further details.

*Net Premium* for each premium paid is that premium less the premium expense charge. The premium expense charge will be determined by us, based on changes in future levels of expenses, including taxes. The maximum premium expense charge is shown on page 3 or 4.

*Cash Value* on any date is an amount determined according to Section 13.

*Net Amount At Risk* on any date is the death benefit on that date discounted for interest for one month, less the cash value on that date. The interest rate we will use to discount the death benefit is the guaranteed minimum cash value interest rate shown on page 3 or 4.

*Cash Surrender Value* is the cash value less any loan balance on that date. See Section 19 for further details.

*Loan Balance* is the loan principal plus accrued interest.

*Loan Limit* is the maximum amount that the owner can borrow. See Section 17 for further details.

*Owner.* The owner has all the rights stated in this policy while the insured is alive. The owner is named in the application. The owner may change the ownership as set forth in Section 20.

The *Monthly Deduction* is the amount which we will deduct each month from the cash value. See Section 14 for further details.

*Payment Options* are the different plans which may be used to provide payments over a period of time instead of a one-sum payment. They may be used either for the proceeds or the cash surrender value. See Section 23 for further details.

*Nonparticipating.* This policy is not eligible for dividends or company profits. Any changes to premiums and expense charges will be determined prospectively. We will not recoup prior losses by means of changes to premiums or expense charges.

# 2 Periodic Report

At least once each policy year we will send to the owner a report which shows:

*(a)* the current cash value, cash surrender value, all premiums paid and all charges made since the last periodic report;

*(b)* any outstanding policy loans; and

*(c)* any other information required by the Insurance Department of the jurisdiction in which this policy is delivered.

Additional illustrative reports will be sent upon request.

# 3 Entire Contract

This policy, the policy specifications, any extra benefit riders and the application, (and any supplements thereto) or application for reinstatement, on which coverage is based are the entire contract.

The policy specifications issued with the policy are the initial specifications which are in effect on the issue date. Some of these specifications may change by an action you request or by a change you make. Any of these changes will be reflected in a new policy specifications statement or a written notice which supplements the policy specifications statement and shows the effective date of the change.

We attached a copy of the application to the policy when it was issued. A copy of any supplemental application, application for reinstatement, new policy specifications statement or written notice which supplements the policy specifications statement will be forwarded to you and become part of this policy when the coverage requested by it begins. We will not use any statement to void the policy or deny a claim unless it is in the application, a supplemental application or an application for reinstatement. Statements in a supplemental application or an application for reinstatement will apply only to the coverage effected as a result of that application. We will treat all statements in an application as representations and not as warranties.

MAL  99078 ai-422 855

To protect all the parties to the policy we may require that all requests which affect it be received at our home office in satisfactory written form.

## 4 Incontestability

Any coverage effective on the issue date of this policy will become incontestable after it has been in force during the life of the insured for two years after the issue date.

Any insurance coverage which becomes effective after the issue date or at the time of any reinstatement will become incontestable after it has been in force during the life of the insured for two years after its effective date.

This provision does not apply to any rider which contains its own incontestability provision.

## 5 Termination

Coverage under this policy will terminate when any one of the following events occurs:

(a) The owner requests that coverage terminate. .

(b) The insured dies.

(c) The policy matures on the maturity date shown on page 3, except as provided in Section 9.

(d) The grace period ends and a premium payment sufficient to cover all overdue monthly deductions has not been paid.

(e) The policy is surrendered as provided in Section 18.

## 6 Premiums

The amount and frequency of the planned premium are shown on page 3. Premium payment reminder notices will be sent to the owner.

Each premium is payable at our home office or to our agent in exchange for a receipt.

Upon request, the owner may change the amount and frequency of the planned premium, including a change to monthly payments in lieu of the planned premium. If monthly payments are elected, then no reminder notices will be sent by us for such payments. Unless we agree otherwise, such change may not increase the total planned premium to be paid in any policy year.

During the insured's lifetime, premium payments may be made at any time before the maturity date provided they do not increase the net amount at risk.

## 7 Suicide Exclusion

If the insured commits suicide within two years of the issue date, we will pay only an amount equal to the premiums paid for this policy less the sum of:

(1) any loan balance; and

(2) any partial withdrawals of the cash surrender value.

If the insured commits suicide within two years of the effective date of any increase in the specified amount, the total death benefit proceeds with respect to such increase will be limited to its cost including any expense charges directly related to such increase.

## 8 Amount of Proceeds

The death benefit is payable upon the death of the insured based on the death benefit option in effect at that time.

Under Option A, the death benefit is the greater of:

(1) the specified amount, plus or minus any increases or decreases in the specified amount, shown on page 3 or 4; or

(2) the cash value on that date divided by the net single premium shown in the table on page 15 based on the sex, age, and rate class of the insured on that date.

Under Option B, the death benefit is the greater of:

(1) the specified amount, plus or minus any increases or decreases in the specified amount, shown on page 3 or 4 plus the cash value on the date of death; or

(2) the cash value on that date divided by the net single premium shown in the table on page 15 based on the sex, age, and rate class of the insured on that date.

Items (2) above are intended to assure that this policy qualifies as life insurance under section 7702 of the Internal Revenue Code of 1986, as amended, using the cash value accumulation test. If this adjustment proves to be insufficient the death benefit will be further increased to assure compliance. At no time will the amount of the death benefit under this policy ever be less than the amount needed to ensure such tax qualification.

The amount of proceeds payable at the death of the insured before the maturity date will be the sum on the date of death of:

(a) the death benefit;

(b) any amount payable under an Extra Benefit Rider; and

(c) a refund of that part of any premium received after the policy processing day in the policy month of death which did not increase the death benefit;

reduced by:

(d) any loan balance; and

(e) if death occurs during the grace period, all overdue monthly deductions.

The amount of proceeds payable on the maturity date, if the insured is then alive, will be the cash surrender value of the basic policy on the maturity date.

1152

## 9 Continuation of Insurance

Upon request of the owner, we will continue this policy in force after the maturity date. The death benefit will be equal to the cash value on the maturity date accumulated at a rate of interest not less than the guaranteed minimum rate shown on page 3 or 4 to the date of death.

## 10 Misstatement of Age or Sex

If the age or sex of the insured or of any person insured under this policy or any riders attached to this policy has been misstated, any amount to be paid under this policy will be adjusted. The adjustment will be:

(a) the amount of insurance which the cost of insurance for the policy month would have purchased using the cost of insurance rate for the correct age and sex; less

(b) the amount of insurance actually used in calculating the cost of insurance for the policy month. See Section 14.

There will be no retroactive adjustments made to the cash surrender value.

## 11 Changes in Specified Amount

Upon request, the owner may change this policy as provided in this section. We must receive any such request in writing in a form satisfactory to us. Any change will become a part of this policy as set forth in Section 3.

No agent has the authority to make any changes to or waive any of the terms of this policy.

We will allow an increase in the specified amount from time to time after the first policy year if:

(1) the owner submits a supplemental application satisfactory to us;

(2) the amount of such increase is in accord with our rules and practices at the time it is applied for;

(3) we receive evidence satisfactory to us that the insured is insurable in the same rate class as this policy;

(4) any required premium payment associated with the increase is paid; and

(5) the insured is not disabled under the terms of any disability rider which is a part of this policy.

The increase will become effective on the policy processing day next following the date we approve the increase. The amount of each increase and its premium and effective date will be shown on page 3 or 4.

We will allow a decrease in the specified amount after the first policy year. We will issue a new policy specifications statement at the time of the decrease.

If there have been increases in the specified amount, the decrease will first be applied against such increases in the reverse order of their effective dates.

The decrease will be effective on the policy processing day next following the date the request is received by us.

## 12 Change in Death Benefit Option

Upon request, the owner may change the death benefit option in effect. We must receive any such request in writing in a form satisfactory to us.

If the change requested is from Option A to Option B, the specified amount will be decreased by the amount of the cash value. If the change requested is from Option B to Option A, the specified amount will be increased by the amount of the cash value.

The change will be effective on the policy processing day next following the date the request is received by us.

## 13 Cash Value

A statement of the method of calculation of values has been filed with the insurance official in the jurisdiction in which this policy is delivered. Policy values and benefits are equal to or greater than those required by law.

On the policy year date, the cash value is the first net premium less the monthly deduction for the first policy month.

On a policy processing day after the policy year date, the cash value is:

(a) the cash value on the prior policy processing day less the amount of any withdrawal of part of the cash surrender value during the prior policy month; plus

(b) interest earned during the prior policy month on (a); plus

(c) all net premiums for premiums received since the prior policy processing day; less

(d) the monthly deduction for the current policy month.

On any day other than a policy processing day, the cash value is:

(e) the cash value on the prior policy processing day less the amount of any withdrawal of part of the cash surrender value during the current policy month; plus

(f) interest earned during the current policy month on (e); plus

(g) all net premiums for premiums received since the prior policy processing day.

1153

The guaranteed minimum cash value interest rate we use to calculate the interest on the cash value is shown on page 3 or 4. We reserve the right to declare a current interest rate to be used in lieu of that rate to calculate the interest on all or part of the cash value. If there is an outstanding policy loan, a different current interest rate may be used to calculate the interest on that portion of the cash value which is equal to the loan principal. The current interest rate will be shown in the periodic report. Every interest rate used will be no less than the guaranteed minimum rate.

**14** **Monthly Deduction and Cost of Insurance**
The monthly deduction for each policy month is the sum of:

*(a)* the cost of insurance (see next paragraph) for the basic policy for the policy month; plus

*(b)* the cost of insurance for all extra benefit riders for the policy month; plus

*(c)* the monthly expense charge defined on page 3 or 4.

The cost of insurance for the basic policy for a policy month is the sum on its policy processing day of:

*(d)* the product of:

   *(1)* the net amount at risk on that date; times

   *(2)* the monthly cost of insurance rate on that date; and

*(e)* the flat extra monthly charge shown on page 3 or 4, if any.

The monthly cost of insurance rate is based on the sex, age, and rate class of the insured. Monthly cost of insurance rates will be determined by us annually, by class, based on future expectations as to investment earnings, mortality, persistency, and expenses, including taxes. Any change in rates will be in accordance with any procedures and standards on file with the Insurance Department of the jurisdiction in which this policy is delivered. Such cost of insurance rates will not be greater than those shown in the table of maximum monthly cost of insurance rates on page 15.

The cost of insurance for an extra benefit rider on a policy processing day is the cost of insurance defined in such rider.

**15** **Lapse**
This policy will lapse on the policy processing day that the monthly deduction reduces the cash surrender value to zero or less. Notice of the lapse will be mailed to the last known address of the owner. It will be mailed at least 30 days before the end of the grace period.

If a premium payment sufficient to cover all overdue monthly deductions is not paid by the end of the grace period, all policy rights and benefits will cease at the end of the grace period.

**16** **Reinstatement**
We will reinstate this policy if it has not been surrendered when we receive:

*(a)* a request from the owner within three years of the date of lapse and before the maturity date while the insured is alive;

*(b)* payment of the cost to reinstate;

*(c)* payment or reinstatement of any loan balance; and

*(d)* if required, evidence of insurability satisfactory to us.

The cost to reinstate is a premium large enough to keep this policy in force for at least three months following the date of reinstatement.

The reinstated policy will be in force from the policy processing day following the date the application for reinstatement is approved by us.

We will not require evidence of insurability to reinstate this policy within the 31 days following the end of the grace period if all persons insured are alive. In all other cases, we will require evidence of insurability satisfactory to us.

**17** **Loans**
Upon request, the owner may obtain a loan on the sole security of this policy. The owner cannot borrow more than the loan limit less any existing loan principal.

Interest on the loan principal will accrue daily at the effective annual policy loan interest rate defined on page 3 or 4. Interest will be due at the end of each policy year. Interest not paid within 31 days after the due date will be added to and become a part of the loan principal as of the due date.

The loan limit is the amount which, with loan interest to the next interest due date, is equal to the sum of the policy's cash surrender value computed as of the next policy anniversary, including deductions for cost of insurance and expenses, and assuming no additional premium payments are received by us before such anniversary.

All or part of the loan balance may be repaid at any time while the insured is alive. If the loan balance equals or exceeds the cash value, the policy will lapse, at the end of the grace period, as stated in Section 15.

**18** **Surrender for Cash**
At any time before the death of the insured the owner may surrender this policy for its cash surrender value by sending the policy and a request to our home office. The date of surrender is the date for surrender on which we receive the policy and request at our home office. All rights and benefits will cease on that date.

## 19 Withdrawal of Part of the Cash Surrender Value

At any time while the insured is alive, but not more frequently than twice in any policy year, the owner may withdraw part of the cash surrender value of this policy by sending a written request to our home office. The date of withdrawal is the date it is received by us. The withdrawal amount less the service charge shown on page 3 or 4 will be paid in one sum to the owner.

The cash value of this policy will be reduced on the date of withdrawal by the withdrawal amount. If Death Benefit Option A is in effect at the time of the withdrawal, the specified amount will be reduced by the amount of the withdrawal.

If there have been increases in the specified amount after the policy year date, the reduction will be applied to the amount of such increases in the reverse order of their effective dates.

The withdrawal amount must be at least $500 but less than the cash surrender value of this policy on the next policy anniversary, including deductions for cost of insurance, expenses and loan interest, and assuming no premium payments are received by us between the withdrawal date and such policy anniversary.

## 20 Ownership

Upon written request in a form satisfactory to us, the owner may change ownership, contingent ownership, or both, without the consent of any beneficiary or contingent owner. We must receive any such request before the death of the insured.

The rights of the owner, any contingent owner, and any beneficiary will be subject to the rights of any assignee of this policy. No assignment will affect us until we receive a copy of it at our home office. We will not be responsible for the validity or effect of any assignment. We will pay an assignee in one sum only.

## 21 Beneficiary

Upon request, the owner may change the beneficiary. The owner may also request that all or part of the proceeds be placed under a payment option for a beneficiary who is a natural person and who is to receive payment in his or her own behalf.

We must receive any such request before the death of the insured. When we approve the request, any prior designation of beneficiary and any prior agreement to place the proceeds under a payment option will cease to be in effect.

If all beneficiaries are natural persons who are to receive payments in their own behalf and none of them is alive when the insured dies, we will, unless it is otherwise provided in the last beneficiary request, pay the proceeds to the owner, or if the owner is the insured, to his or her estate.

## 22 Payment of Proceeds

We will pay interest on any policy proceeds from the date of death of the insured to the date of payment or to the date as of which such proceeds are placed under a payment option. The interest rate will be the rate which we then pay on proceeds held under Option 1 or at such higher rate as may be required by law.

We will place the proceeds under Option 1, 2, 3, 4, 5, or 8 as described in Section 23 upon request by a beneficiary who is a natural person and who is to receive proceeds in one sum in his or her own behalf at the death of the insured before the maturity date, or upon request by the owner on the maturity date if the insured is then alive.

Such beneficiary may, if we receive the request before his or her death, name and change the contingent beneficiary who will receive any payment due at such death. In the same manner two such beneficiaries may elect Option 6 or 7, and they or the survivor of them may name and change the contingent beneficiary who will receive any payment due at the death of the survivor.

Payment to the contingent beneficiary will be made in one sum or as agreed with us. If the proceeds have been placed under Option 1 or 2, the amount of any one-sum payment will be the amount then held under Option 1 or 2. If the proceeds have been placed under Option 3, 4, 5, 6, or 7, the amount of any one-sum payment will be the present value of the future minimum payments certain under Option 3, or of the future payments certain under Option 4, 5, 6, or 7.

A natural person who is to receive surrender proceeds in his or her own behalf upon surrender at or after the end of the 5th policy year will have the same rights as those described in this section for a beneficiary.

If a corporation, partnership, or other business entity is the beneficiary at the death of the insured or the maturity date, or is the owner when the policy is surrendered, it may:

*(a)* substitute one or more of the insured, the insured's spouse, and the insured's children to receive the amount then payable;

*(b)* choose to receive payments under a payment option based on the life of the insured, if living; if not, on the life of the spouse of the insured, if living; if not, on the life of a child of the insured; or

MPL  99078 8I-422 650                                                          1155

(c) choose to receive payments under Option 6 or 7 based on the lives of the insured and another natural person.

If Option 1 is chosen under (b) above, the amount held under it will be paid in one sum at the death of the person upon whose life the option is based.

We may offer special payment options which provide higher guaranteed interest rates for fixed periods and are subject to certain conditions on early withdrawal.

# 23  Payment Options
The following payment options are available. As set forth in a request, payments under an option will be made each month or every 3, 6, or 12 months.

*Option 1 — Interest Income* • We will hold the proceeds until withdrawal or until the death of the beneficiary. On each payment date, we will pay interest on the amount held at a rate determined by us but not less than an effective rate of $3\frac{1}{2}$% a year. Each payment will be made at the end of its payment period.

*Option 2 — Level Installments* • We will use the proceeds to make payments of a requested level amount which must total, during a 12-month period, at least $50 for each $1,000 placed under this option. Each payment will be made at the start of its payment period.

On each payment date we will credit interest on the amount held at a rate determined by us but not less than an effective rate of at least $3\frac{1}{2}$% compounded each year.

We will make payments until the amount held on the date on which a payment is due is the same as or less than the level amount. The last payment will then be the amount held.

*Option 3 — Installments for a Fixed Period* • We will use the proceeds to make payments for a fixed period of 30 years or less. Each payment will be made at the start of its payment period.

The minimum payments are based on an effective interest rate of $3\frac{1}{2}$% compounded each year. Any higher rate we may declare will increase such payments.

The table which follows shows the minimum monthly payments for each $1,000 placed under Option 3.

| Number of Years | Minimum Monthly Payment | Number of Years | Minimum Monthly Payment | Number of Years | Minimum Monthly Payment |
|---|---|---|---|---|---|
| 1 | $84.65 | 11 | $9.09 | 21 | $5.56 |
| 2 | 43.05 | 12 | 8.46 | 22 | 5.39 |
| 3 | 29.19 | 13 | 7.94 | 23 | 5.24 |
| 4 | 22.27 | 14 | 7.49 | 24 | 5.09 |
| 5 | 18.12 | 15 | 7.10 | 25 | 4.96 |
| 6 | 15.35 | 16 | 6.76 | 26 | 4.84 |
| 7 | 13.38 | 17 | 6.47 | 27 | 4.73 |
| 8 | 11.90 | 18 | 6.20 | 28 | 4.63 |
| 9 | 10.75 | 19 | 5.97 | 29 | 4.53 |
| 10 | 9.83 | 20 | 5.75 | 30 | 4.45 |

*Option 4 — Life Income (Payments at Least Equal to Proceeds Applied)* • We will use the proceeds to make level payments during the life of the beneficiary. Payments will continue, if the beneficiary dies, to the end of the payment year during which the sum of all payments made equals the proceeds placed under this option. Each payment will be made at the beginning of its payment period. The table which follows shows the minimum monthly payments for each $1,000 placed under Option 4. Upon request, we will quote payments for ages not shown.

*Option 5 — Life Income (Choice of Period Certain)* • We will use the proceeds to make level payments during the life of the beneficiary. If a period certain of 5, 10, or 20 years is chosen, payments will continue to the end of such period even if the beneficiary dies before then. If no period certain is chosen, all payments will cease with the last payment due before the death of the beneficiary. Each payment will be made at the beginning of its payment period. The table which follows shows the minimum monthly payments for each $1,000 placed under Option 5. Upon request, we will quote payments for ages not shown.

| Age of Beneficiary Male | Female | Option 4 | MINIMUM MONTHLY PAYMENT Option 5 | | | |
|---|---|---|---|---|---|---|
| | | | No Years Certain | 5 Years Certain | 10 Years Certain | 20 Years Certain |
| 15 | 21 | $3.21 | $3.22 | $3.22 | $3.22 | $3.21 |
| 20 | 26 | 3.28 | 3.29 | 3.29 | 3.29 | 3.28 |
| 25 | 31 | 3.36 | 3.38 | 3.38 | 3.37 | 3.37 |
| 30 | 36 | 3.46 | 3.48 | 3.48 | 3.48 | 3.47 |
| 31 | 37 | 3.48 | 3.51 | 3.51 | 3.50 | 3.49 |
| 32 | 38 | 3.51 | 3.53 | 3.53 | 3.53 | 3.52 |
| 33 | 39 | 3.53 | 3.56 | 3.56 | 3.56 | 3.54 |
| 34 | 40 | 3.56 | 3.59 | 3.59 | 3.58 | 3.57 |
| 35 | 41 | 3.58 | 3.62 | 3.62 | 3.61 | 3.60 |
| 36 | 42 | 3.61 | 3.65 | 3.65 | 3.64 | 3.62 |
| 37 | 43 | 3.64 | 3.68 | 3.68 | 3.68 | 3.65 |
| 38 | 44 | 3.67 | 3.72 | 3.72 | 3.71 | 3.69 |
| 39 | 45 | 3.71 | 3.75 | 3.75 | 3.75 | 3.72 |
| 40 | 46 | 3.74 | 3.79 | 3.79 | 3.78 | 3.75 |
| 41 | 47 | 3.77 | 3.83 | 3.83 | 3.82 | 3.79 |
| 42 | 48 | 3.81 | 3.87 | 3.87 | 3.86 | 3.83 |
| 43 | 49 | 3.85 | 3.92 | 3.92 | 3.91 | 3.86 |
| 44 | 50 | 3.89 | 3.97 | 3.96 | 3.95 | 3.90 |
| 45 | 51 | 3.93 | 4.01 | 4.01 | 4.00 | 3.94 |
| 46 | 52 | 3.98 | 4.07 | 4.06 | 4.05 | 3.99 |
| 47 | 53 | 4.02 | 4.12 | 4.11 | 4.10 | 4.03 |
| 48 | 54 | 4.07 | 4.18 | 4.17 | 4.15 | 4.08 |
| 49 | 55 | 4.11 | 4.23 | 4.23 | 4.21 | 4.13 |
| 50 | 56 | 4.18 | 4.30 | 4.29 | 4.27 | 4.18 |
| 51 | 57 | 4.23 | 4.36 | 4.35 | 4.33 | 4.23 |
| 52 | 58 | 4.28 | 4.43 | 4.42 | 4.39 | 4.28 |
| 53 | 59 | 4.33 | 4.50 | 4.49 | 4.46 | 4.33 |
| 54 | 60 | 4.41 | 4.58 | 4.57 | 4.53 | 4.39 |
| 55 | 61 | 4.47 | 4.66 | 4.64 | 4.61 | 4.45 |
| 56 | 62 | 4.53 | 4.74 | 4.73 | 4.69 | 4.51 |
| 57 | 63 | 4.60 | 4.83 | 4.82 | 4.77 | 4.57 |
| 58 | 64 | 4.69 | 4.93 | 4.91 | 4.86 | 4.63 |
| 59 | 65 | 4.76 | 5.03 | 5.01 | 4.95 | 4.69 |
| 60 | 66 | 4.83 | 5.14 | 5.12 | 5.05 | 4.76 |
| 61 | 67 | 4.94 | 5.25 | 5.23 | 5.15 | 4.82 |
| 62 | 68 | 5.02 | 5.38 | 5.35 | 5.26 | 4.88 |
| 63 | 69 | 5.10 | 5.51 | 5.48 | 5.37 | 4.95 |
| 64 | 70 | 5.24 | 5.65 | 5.61 | 5.49 | 5.01 |
| 65 | 71 | 5.33 | 5.80 | 5.76 | 5.62 | 5.07 |
| 66 | 72 | 5.42 | 5.96 | 5.91 | 5.75 | 5.14 |
| 67 | 73 | 5.58 | 6.14 | 6.08 | 5.89 | 5.20 |
| 68 | 74 | 5.68 | 6.32 | 6.25 | 6.03 | 5.25 |
| 69 | 75 | 5.78 | 6.52 | 6.43 | 6.18 | 5.31 |
| 70 | 76 | 5.98 | 6.73 | 6.63 | 6.33 | 5.36 |
| 71 | 77 | 6.09 | 6.95 | 6.83 | 6.49 | 5.41 |
| 72 | 78 | 6.20 | 7.18 | 7.04 | 6.65 | 5.46 |
| 73 | 79 | 6.44 | 7.43 | 7.27 | 6.81 | 5.50 |
| 74 | 80 & over | 6.56 | 7.70 | 7.51 | 6.98 | 5.54 |
| 75 | | 6.68 | 7.99 | 7.76 | 7.15 | 5.57 |
| 76 | | 6.97 | 8.29 | 8.02 | 7.32 | 5.60 |
| 77 | | 7.10 | 8.62 | 8.30 | 7.49 | 5.63 |
| 78 | | 7.23 | 8.97 | 8.60 | 7.67 | 5.65 |
| 79 | | 7.60 | 9.34 | 8.90 | 7.84 | 5.67 |
| 80 & over | | 7.74 | 9.74 | 9.22 | 8.01 | 5.69 |

**Option 6—Joint Life Income** (Choice of Period Certain)• We will use the proceeds to make level payments while either of two beneficiaries is alive. We will make the first payment at the start of the first payment period. If a period certain is chosen, payments will continue to the end of the period if both beneficiaries die before the end of such period. If no period certain is chosen, all payments will cease with the last payment due before the death of the survivor. The table which follows shows the minimum payments for each $1,000 placed under Option 6 for two beneficiaries (one male and one female) of the same age. Upon request, we will quote payments for any combination of ages and sexes not shown, or other available certain periods.

| | MINIMUM MONTHLY PAYMENT | | | | MINIMUM MONTHLY PAYMENT | | |
|---|---|---|---|---|---|---|---|
| Age* | No Years Certain | 10 Years Certain | 20 Years Certain | Age* | No Years Certain | 10 Years Certain | 20 Years Certain |
| 40 | $3.42 | $3.42 | $3.42 | 61 | $4.25 | $4.25 | $4.22 |
| | | | | 62 | 4.32 | 4.32 | 4.28 |
| 41 | 3.44 | 3.44 | 3.44 | 63 | 4.39 | 4.39 | 4.35 |
| 42 | 3.47 | 3.47 | 3.47 | 64 | 4.47 | 4.46 | 4.41 |
| 43 | 3.49 | 3.49 | 3.49 | 65 | 4.55 | 4.54 | 4.48 |
| 44 | 3.52 | 3.52 | 3.52 | | | | |
| 45 | 3.55 | 3.55 | 3.55 | 66 | 4.64 | 4.63 | 4.55 |
| | | | | 67 | 4.73 | 4.72 | 4.62 |
| 46 | 3.58 | 3.58 | 3.58 | 68 | 4.83 | 4.81 | 4.69 |
| 47 | 3.61 | 3.61 | 3.61 | 69 | 4.93 | 4.92 | 4.76 |
| 48 | 3.64 | 3.64 | 3.64 | 70 | 5.04 | 5.02 | 4.84 |
| 49 | 3.67 | 3.67 | 3.67 | | | | |
| 50 | 3.71 | 3.71 | 3.71 | 71 | 5.16 | 5.14 | 4.91 |
| | | | | 72 | 5.28 | 5.26 | 4.99 |
| 51 | 3.75 | 3.75 | 3.74 | 73 | 5.42 | 5.38 | 5.06 |
| 52 | 3.79 | 3.79 | 3.78 | 74 | 5.56 | 5.52 | 5.13 |
| 53 | 3.83 | 3.83 | 3.82 | 75 | 5.71 | 5.66 | 5.20 |
| 54 | 3.87 | 3.87 | 3.86 | | | | |
| 55 | 3.92 | 3.92 | 3.91 | 76 | 5.88 | 5.80 | 5.27 |
| | | | | 77 | 6.05 | 5.96 | 5.33 |
| 56 | 3.97 | 3.97 | 3.96 | 78 | 6.24 | 6.12 | 5.39 |
| 57 | 4.02 | 4.02 | 4.00 | 79 | 6.45 | 6.29 | 5.44 |
| 58 | 4.07 | 4.07 | 4.06 | | | | |
| 59 | 4.13 | 4.13 | 4.11 | 80 & over | 6.64 | 6.46 | 5.49 |
| 60 | 4.19 | 4.19 | 4.16 | | | | |

*Age of each beneficiary · (1 Male and 1 Female)

**Option 7—Joint and One-Half Life Income** (Choice of Period Certain)• We will use the proceeds to make payments while the first beneficiary and the second beneficiary) is alive. We will make the first payment at the start of the first payment period. After the death of the first beneficiary, the amount of the payments will be reduced by one-half. If a period certain is chosen, payments will continue to the end of that period and will not be reduced, even if both beneficiaries die before the end of such period. If no period certain is chosen, all payments will cease with the last payment due before the death of the survivor.

The table which follows shows the initial minimum payments for each $1,000 placed under Option 7 for two beneficiaries (a male first beneficiary and a female second beneficiary) of the same age. Upon request, we will quote payments for any combination of ages and sexes not shown, or other available certain periods.

| Age* | MINIMUM MONTHLY PAYMENT | | Age* | MINIMUM MONTHLY PAYMENT | |
|---|---|---|---|---|---|
| | No. Years Certain | 10 Years Certain | | No. Years Certain | 10 Years Certain |
| 40 | $3.60 | $3.59 | 61 | $4.70 | $4.66 |
| 41 | 3.63 | 3.62 | 62 | 4.79 | 4.74 |
| 42 | 3.66 | 3.66 | 63 | 4.89 | 4.83 |
| 43 | 3.69 | 3.69 | 64 | 4.99 | 4.93 |
| 44 | 3.73 | 3.72 | 65 | 5.10 | 5.03 |
| 45 | 3.77 | 3.76 | 66 | 5.22 | 5.13 |
| | | | 67 | 5.34 | 5.24 |
| 46 | 3.81 | 3.80 | 68 | 5.47 | 5.35 |
| 47 | 3.85 | 3.84 | 69 | 5.61 | 5.47 |
| 48 | 3.89 | 3.88 | 70 | 5.76 | 5.60 |
| 49 | 3.93 | 3.92 | | | |
| 50 | 3.98 | 3.97 | 71 | 5.92 | 5.73 |
| | | | 72 | 6.09 | 5.87 |
| 51 | 4.03 | 4.02 | 73 | 6.27 | 6.01 |
| 52 | 4.08 | 4.07 | 74 | 6.46 | 6.16 |
| 53 | 4.14 | 4.12 | 75 | 6.66 | 6.31 |
| 54 | 4.20 | 4.18 | | | |
| 55 | 4.26 | 4.23 | 76 | 6.88 | 6.47 |
| | | | 77 | 7.11 | 6.64 |
| 56 | 4.32 | 4.30 | 78 | 7.36 | 6.80 |
| 57 | 4.39 | 4.36 | 79 | 7.62 | 6.98 |
| 58 | 4.46 | 4.43 | 80 & over | 7.90 | 7.15 |
| 59 | 4.53 | 4.50 | | | |
| 60 | 4.62 | 4.58 | | | |

*Age of each beneficiary - (1 Male and 1 Female)

The amount of the payments under Option 4, 5, 6, or 7 will not be less than the amount shown in the table which applies. If our rates for single premium immediate annuities as of the date of the first payment provide larger payments than those guaranteed in this policy, they will be used as the basis for determining the amount of the payments. The payments will be based on the age at nearest birthday and sex of each person on whose life they are based. We will need proof of date of birth before we can make any payment. If an age or sex on which the payments are based is not correct, we will determine the amount of all payments on the correct basis. If the payments for a longer period certain are equal to those for the requested period, the longer period will be deemed to have been requested.

The tables which appear with Options 3, 4, 5, 6, and 7 show the minimum monthly payment for each option. The amount of each minimum payment to be made during the periods shown below will be computed by multiplying the monthly payment by the factor shown.

| Period | Factor |
|---|---|
| 3 months | 2.991 |
| 6 months | 5.957 |
| 12 months | 11.813 |

We may change the frequency of payments so that the payment is at least $50. We will pay in one sum any amount which results in a minimum payment of less than $100 a year.

**Option 8—Deferred Income •** We will use the proceeds to make payments after a deferral period selected by the beneficiary.

During the deferral period, we will credit interest at a rate to be determined by us, but not less than an effective rate of $3\frac{1}{2}$% a year.

At the end of the deferral period, the proceeds held, including interest, will be used to provide an income under Options 1 through 7 above.

During the deferral period, this option may be surrendered for its then current value.

If the beneficiary dies during the deferral period, the proceeds held at that time, including interest, will be paid to the contingent beneficiary.

Unless such rights have been withheld, the beneficiary may, upon request, withdraw the amount held under Option 1, 2, or 8, or have us make a one-sum payment of the present value of the future minimum payments certain under Option 3 or of the future payments certain under Option 4, 5, 6, or 7. To compute the present value under Option 4, 5, 6, or 7, we will use the interest rate which was used to determine the amount of the payments certain. If we receive a request for the one-sum payment within 90 days after the insured dies and before any payment has been made under Option 4, 5, 6, or 7, we will pay the full amount which was placed under such option.

## 24  Deferment of Payment

We may defer any payment due upon request for a loan, for the cash surrender value, or for a partial withdrawal of the cash surrender value, or for a one-sum payment under a payment option. We may defer payment for the period permitted by law but not for longer than 6 months. We will not defer payment of an amount used to pay premiums to us.

We will not charge or pay interest on a loan for the period for which we defer payment. We will pay interest on the amount of any other payment we defer for more than 30 days at the rate which we then credit on proceeds held under Option 1.

1158

MAL 99078 al-422 855

Maximum Monthly Cost of Insurance Rates and Net Single Premiums, Per $1,000, Based on the 1980 Commissioners Standard Ordinary Smoker/Non-Smoker Mortality and Interest of 4% Per Year.

### MALE NON-SMOKER INSURED-STANDARD ISSUE

| Age | Cost of Insurance Rates | Net Single Premiums | Age | Cost of Insurance Rates | Net Single Premiums |
|---|---|---|---|---|---|
| 0 | $ .35 | $ 81.11 | 50 | $ .41 | $ 381.82 |
| 1 | .09 | 80.42 | 51 | .45 | 394.02 |
| 2 | .08 | 82.64 | 52 | .49 | 406.50 |
| 3 | .08 | 85.02 | 53 | .54 | 419.25 |
| 4 | .08 | 87.51 | 54 | .59 | 432.24 |
| 5 | .08 | 90.13 | 55 | .65 | 445.46 |
| 6 | .07 | 92.90 | 56 | .72 | 458.89 |
| 7 | .07 | 95.82 | 57 | .79 | 472.52 |
| 8 | .06 | 98.92 | 58 | .87 | 486.36 |
| 9 | .06 | 102.18 | 59 | .96 | 500.40 |
| 10 | .06 | 105.59 | 60 | 1.05 | 514.63 |
| 11 | .06 | 109.15 | 61 | 1.16 | 529.01 |
| 12 | .07 | 112.81 | 62 | 1.29 | 543.53 |
| 13 | .08 | 116.55 | 63 | 1.43 | 558.15 |
| 14 | .10 | 120.32 | 64 | 1.59 | 572.83 |
| 15 | .11 | 124.10 | 65 | 1.76 | 587.52 |
| 16 | .12 | 127.91 | 66 | 1.95 | 602.19 |
| 17 | .13 | 131.76 | 67 | 2.16 | 616.85 |
| 18 | .13 | 135.67 | 68 | 2.38 | 631.49 |
| 19 | .14 | 139.69 | 69 | 2.62 | 646.09 |
| 20 | .14 | 143.82 | 70 | 2.89 | 660.67 |
| 21 | .14 | 148.11 | 71 | 3.25 | 675.16 |
| 22 | .14 | 152.58 | 72 | 3.56 | 689.30 |
| 23 | .13 | 157.27 | 73 | 3.97 | 703.41 |
| 24 | .13 | 162.18 | 74 | 4.43 | 717.19 |
| 25 | .13 | 167.33 | 75 | 4.92 | 730.57 |
| 26 | .12 | 172.74 | 76 | 5.45 | 743.55 |
| 27 | .12 | 178.40 | 77 | 6.01 | 756.14 |
| 28 | .12 | 184.32 | 78 | 6.58 | 768.37 |
| 29 | .12 | 190.50 | 79 | 7.19 | 780.31 |
| 30 | .12 | 196.93 | 80 | 7.87 | 792.00 |
| 31 | .12 | 203.63 | 81 | 8.62 | 803.40 |
| 32 | .13 | 210.59 | 82 | 9.47 | 814.49 |
| 33 | .13 | 217.81 | 83 | 10.42 | 825.17 |
| 34 | .13 | 225.30 | 84 | 11.47 | 835.34 |
| 35 | .14 | 233.04 | 85 | 12.59 | 844.96 |
| 36 | .15 | 241.05 | 86 | 13.75 | 854.02 |
| 37 | .16 | 249.33 | 87 | 14.95 | 862.59 |
| 38 | .17 | 257.87 | 88 | 16.16 | 870.74 |
| 39 | .18 | 266.68 | 89 | 17.41 | 878.62 |
| 40 | .19 | 275.75 | 90 | 18.69 | 886.37 |
| 41 | .21 | 285.10 | 91 | 20.05 | 894.16 |
| 42 | .22 | 294.71 | 92 | 21.52 | 902.19 |
| 43 | .24 | 304.61 | 93 | 23.16 | 910.71 |
| 44 | .26 | 314.78 | 94 | 25.26 | 920.04 |
| 45 | .28 | 325.24 | 95 | 28.27 | 930.43 |
| 46 | .30 | 335.98 | 96 | 33.11 | 941.95 |
| 47 | .32 | 347.00 | 97 | 41.68 | 954.50 |
| 48 | .35 | 358.31 | 98 | 58.01 | 967.74 |
| 49 | .38 | 369.92 | 99 | 90.91 | 980.58 |

If this policy was issued in a rated class, the cost of insurance rates shall be multiplied by the basic policy rated class factor shown on page 3.

1160

MAL   99078 al-422 855

1161

1162

Flexible Premium Adjustable Life Policy
Adjustable Death Benefit
Flexible Premium Payments
Cash Surrender Value Payable on the Maturity Date
Nonparticipating - No Dividends

The Mutual Benefit Life Insurance Company in Rehabilitation
520 Broad Street, Newark, New Jersey 07102-3111

# EXHIBIT B

Westlaw.

Not Reported in N.E.2d
8 Mass.L.Rptr. 480, 1998 WL 282901 (Mass.Super.)
**(Cite as: 1998 WL 282901 (Mass.Super.))**

Page 1

⊞

Superior Court of Massachusetts.
Fred WINSMANN, Plaintiff,
v.
CHOATE HEALTH MANAGEMENT, INC., &
others, [FN1] Defendants.

FN1. Marlborough Hospital, James Q. Purdy,
Sunday Bernstein, a/k/a Susan Bernstein, and
Advocates, Inc.

**No. CIV. A. 97-6561.**

May 29, 1998.

MEMORANDUM OF DECISION AND ORDER
ON THE DEFENDANTS' MOTIONS TO DISMISS

BRASSARD, Justice.

*INTRODUCTION*

**\*1** Plaintiff Fred Winsmann (Winsmann), commenced this action against Choate Health Management, Inc. (Choate), James Q. Purdy (Purdy), Marlborough Hospital (Marlborough), Sunday Bernstein (Bernstein) and Advocates, Inc. (Advocates), as a result of Winsmann's termination from his position as a psychiatric screener and psychotherapist at Marlborough. Plaintiff alleges discrete claims against the various defendants for: breach of contract, negligent infliction of emotional distress, defamation, handicap discrimination, and interference with contractual relationship. Marlborough now moves pursuant to Mass. R. Civ. P. 12(b)(6) to dismiss Count II of Winsmann's claim for negligent infliction of emotional distress for failure to state a claim upon which relief may be granted. Choate, Purdy, Bernstein, and Advocates move to dismiss all counts contained in Winsmann's complaint. For the following reasons the defendants' motions to dismiss are allowed in part and denied in part.

*BACKGROUND*

For purposes of this motion, the facts taken in the light most favorable to the plaintiff are as follows:

Marlborough employed Winsmann as a psychiatric screener and psychotherapist between April 5, 1993, and March 10, 1995. Prior to Marlborough's offering the plaintiff a position he was required to undergo a pre-employment physical examination. Upon discovering the plaintiff's diagnosis--Obsessive Compulsive Disorder--the hospital discussed this condition with his treating psychiatrist. In July 1994, Choate contracted with Marlborough to operate and manage the psychiatric services at the hospital.

On occasion, Marlborough would receive indigent patients in which case the defendant, Advocates, would be contacted to evaluate and screen patients for admission to state hospital institutions. On January 3, 1995, the plaintiff became involved in a disagreement with Bernstein, an employee of Advocates, over the scope of the plaintiff's responsibilities and the disposition of a patient. Subsequently, Bernstein complained to Choate, Purdy (an employee of Choate), and Marlborough, that the plaintiff had acted in an unprofessional manner. At this time the plaintiff was enrolled as a graduate student at Massachusetts School of Professional Psychology (the School), pursuing studies leading to a Doctor of Psychology degree.

After receipt of the allegations of the defendants Bernstein and Advocates, the defendant Purdy, on behalf of Marlborough and Choate, wrote to the School regarding the plaintiff alleging unprofessional conduct. Subsequently, the plaintiff was removed from his position. Shortly thereafter, the plaintiff received notice that he was being terminated due to economic circumstances.

*DISCUSSION*

When evaluating the sufficiency of a complaint pursuant to Mass. R. Civ. P. 12(b)(6), the court must accept as true the well pleaded factual allegations of the complaint, as well as any inferences which can be drawn therefrom in the plaintiff's favor. *Eyal v. Helen*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
8 Mass.L.Rptr. 480, 1998 WL 282901 (Mass.Super.)
**(Cite as: 1998 WL 282901 (Mass.Super.))**

*Broadcasting Corp.*, 411 Mass. 426, 429, 583 N.E.2d 228 (1991) and cases cited. "[The] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Nader v. Citron*, 372 Mass. 96, 98, 360 N.E.2d 870 (1977) quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). [A] complaint is not subject to dismissal if it would support relief on any theory of law. *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 89, 390 N.E.2d 243 (1979). All inferences should be drawn in the plaintiff's favor, so as to do substantial justice. *Ourfalian v. Aro MFG. Co., Inc.*, 31 Mass.App.Ct. 294, 296, 577 N.E.2d 6 (1991).

### I. *Marlborough Hospital's Motion to Dismiss Count II of the Plaintiff's Complaint:*

**\*2** Marlborough moves to dismiss Count II of the plaintiff's complaint for negligent infliction of emotional distress on the ground that it is barred by the exclusivity provision of the Massachusetts Workers' Compensation Act, G.L. c. 152, § 24. Common law claims are barred by G.L. c. 152, § 24 only where the "plaintiff is shown to be an employee; his condition is shown to be a 'personal injury' within the meaning of the compensation act; and the injury is shown to have arisen 'out of and in the course of employment.' " *Foley v. Polaroid Corp.*, 381 Mass. 545, 548-549, 413 N.E.2d 711 (1980). Consequently, claims for negligent infliction of emotional distress against an employer are barred by the Workers' Compensation Act. See *Green v. Wyman-Gordon Co.*, 422 Mass. at 559-561, 664 N.E.2d 808 (1996). "[W]hen events occurring at work are a significant contributing cause of emotional or mental disabilities, these events are compensable under the Act ..." *Catalano v. First Essex Savings Bank*, 37 Mass.App.Ct. 377, 380-381, 639 N.E.2d 1113 (1994).

It is undisputed that Winsmann, at all relevant times, was an employee of Marlborough. The condition allegedly occurred during the course of his employment and is a personal injury within the protection of the Act. Accordingly, Winsmann's allegations in Count II against Marlborough fail to state a claim upon which relief may be granted and shall be dismissed.

### II. *Choate Health Management, Inc. and James Purdy's Motions to Dismiss Counts V, VI, VII, VIII, IX, and X.*

Choate moves to dismiss all counts against it in the plaintiff's complaint; Count V (breach of employment contract), Count VI (negligent infliction of emotional distress), Count VII (defamation), and Count VIII (handicap discrimination), for failure to state a claim upon which relief may be granted. Purdy similarly moves on Counts IX (defamation), X (negligent infliction of emotional distress), and Count XI (handicap discrimination). These counts will be discussed seriatim.

#### *Count V--Breach of Contract:*

Choate initially argues that Winsmann's breach of contract claim must be dismissed because Winsmann did not have a contract with Choate nor was he an intended beneficiary of Marlborough's contract with Choate. Specifically, Choate argues that Winsmann has failed to state with any precision what the nature of any contract with Choate might have been. Winsmann maintains that his allegations in paragraphs 44 and 45 are sufficient to state a claim for breach of contract.

In order to satisfy the pleading requirements for breach of contract the "plaintiff[ ] must plead: (1) that the parties had an agreement supported by valid consideration; (2) that plaintiff[ ][was] ready, willing and able to perform; (3) that defendant's breach has prevented [him] from performing; and (4) that plaintiff[ ][was] damaged." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir.1996) citing *Singarella v. City of Boston*, 342 Mass. 385, 173 N.E.2d 290 (1961) and *Petricca v. Simpson*, 862 F.Supp. 13, 17 (D.Mass.1994). Mere allegations that Choate "breached its contractual agreement with the plaintiff" (¶ 44--Complaint), without more, are insufficient to satisfy even Massachusetts' liberal pleadings rules. See e.g. *Independence Park, Inc. v. Board of Health of Barnstable*, 403 Mass. 477, 482, 530 N.E.2d 1235 (1988) (stating plaintiff can withstand a motion to dismiss if he has alleged facts that entitle him to any form of relief, even if he has not alleged the correct legal theory in his complaint.) While the rules do not mandate perfection "it is essential to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                  Page 3
8 Mass.L.Rptr. 480, 1998 WL 282901 (Mass.Super.)
**(Cite as: 1998 WL 282901 (Mass.Super.))**

state with 'substantial certainty' the facts showing the existence of the contract and the legal effect thereof." *Doyle v. Hasbro*, 103 F.3d at 194-195 quoting *Pollock v. New England Tel. & Tel. Co.*, 289 Mass. 255, 194 N.E. 133 (1935).

*3 Winsmann fails to state the nature of the alleged contract with any specificity. The complaint does not allege the terms, duration or time of formation of the alleged contract. Nor does the complaint explain what obligations were imposed on the parties. The plaintiff maintained at oral argument and in opposition to Choate's motion to dismiss that "the allegation will be tested by discovery" and that he has not, as yet, had an opportunity to explore the interrelationship of the entities. The plaintiff, however, is bound by the factual allegations of his complaint and he cannot present evidence that contradicts his pleadings. The conclusory statements contained in Winsmann's complaint are insufficient to satisfy the pleading requirements. Consequently, Count V of the plaintiff's complaint against Choate shall be dismissed.

*Counts VII & IX; Choate & Purdy--Defamation:*

Winsmann alleges that Choate and Purdy defamed him by publishing correspondence that was false and defamatory. Choate and Purdy maintain that these claims should be dismissed because they are based on communications that are privileged as a matter of law. Specifically, the defendants maintain that in the employment context, any statements are protected if the publisher of the statement and the person who receives the statement have a common interest.

In order to prevail on a claim for defamation, a plaintiff must prove that there was a "false and defamatory written communication of and concerning the plaintiff" which was published. *McAvoy v. Shufrin*, 401 Mass. 593, 597, 518 N.E.2d 513 (1988); *Arsenault v. Allegheny Airlines, Inc.*, 485 F.Supp. 1373, 1378 (D.Mass.1980) (there must be a publication of the defamatory remark). "A publication is defamatory when it tends to injure one's reputation in the community and expose him to hatred, ridicule, and contempt." *Brauer v. The Globe Newspaper Co.*, 351 Mass. 53, 55-56, 217 N.E.2d 736 (1966) (citations omitted). "An imputation

of crime is defamatory per se." *Jones v. Taibbi*, 400 Mass. 786, 792, 512 N.E.2d 260 (1987).

It is well established that "a person may possess a conditional privilege to publish defamatory material if the publication is reasonably necessary to the protection or furtherance of a legitimate business interest." *Bratt v. International Business Machines Corp.*, 392 Mass. 508, 512-513, 467 N.E.2d 126 (1984) (citations omitted). Such a privilege may be lost by "unnecessary, unreasonable or excessive publication of the defamatory matter." *Id.* at 515- 516, 467 N.E.2d 126. Consequently, an employer can lose this privilege only if the plaintiff proves that the disclosure resulted from an expressly malicious motive, was recklessly disseminated, or involved a reckless disregard for truth or falsity of the information. *Id.* It is similarly well established that "an employee of a company enjoys a qualified privilege to make disparaging comments about the performance of an employee of another company with which the first company has a business relationship in so far as the comments are relevant to that relationship." *Humphrey v. National Semiconductor Corp.*, 18 Mass.App.Ct. 132, 133, 463 N.E.2d 1197 (1984).

*4 The burden is upon the defendants to show facts which create the qualified privilege. *Id.* at 134, 463 N.E.2d 1197, citing *Bander v. Metropolitan Life Ins. Co.*, 313 Mass. 337, 343, 47 N.E.2d 595 (1943). Once the defendants establish their qualified privilege the burden then shifts back to the plaintiff to prove that the privilege has been abused. *Humphrey*, 18 Mass.App.Ct. at 134, 463 N.E.2d 1197, citing *Retailers Commercial Agency, Inc., petitioner*, 342 Mass. 515, 520, 174 N.E.2d 376 (1961).

This court is confined to evaluating the sufficiency of the complaint. In order for the defendants to show facts which create the qualified privilege, additional materials containing relevant, factual information, would need to be considered. This is not the proper vehicle to attack the plaintiff's defamation claims. See generally *Reardon v. Comm'r of Correction*, 20 Mass.App.Ct. 946, 947, 479 N.E.2d 741 (1985) ("a rule 12(b)(6) motion is ordinarily not the proper vehicle for testing the factual sufficiency of plaintiff's claims;" a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
8 Mass.L.Rptr. 480, 1998 WL 282901 (Mass.Super.)
(Cite as: 1998 WL 282901 (Mass.Super.))

Page 4

motion for summary judgment is more appropriate). Consequently, Counts VII and IX will not be dismissed.

*Counts VI & X; Choate & Purdy--Negligent Infliction of Emotional Distress:*

Winsmann alleges that Choate and Purdy, by their actions, negligently inflicted serious and permanent physical, mental and emotional distress and injury. The defendants argue that the plaintiff's claims are predicated upon his defamation claims and consequently should fail. As indicated supra, plaintiff has adequately stated a claim for defamation. In order to adequately sustain a claim for negligent infliction of emotional distress the plaintiff must allege (1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case. *Payton v. Abbott Labs., 386 Mass. 540, 557, 437 N.E.2d 171 (1982).* The plaintiff has stated each of the above elements in his complaint sufficiently to withstand Choate and Purdy's motions to dismiss.

*Counts VIII & XI; Choate & Purdy--Employment Discrimination:*

G.L. c. 151B, § 4, provides in pertinent part: "It shall be an unlawful practice ... [f]or any employer, personally or through an agent to dismiss from employment ... or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship on the employer's business."

*5 G.L. c. 151B, § 9 provides in part: "the provisions of this chapter shall be construed liberally for the accomplishment of the purposes thereof ..."

To establish a prima facie case of unlawful discrimination on the basis of handicap pursuant to G.L.

c. 151B, a plaintiff who has been terminated from employment must show that: "(1) he suffers from a handicap; (2) he is a 'qualified handicapped person'; and (3) he was fired solely because of his handicap." *Labonte v. Hutchins & Wheeler, 424 Mass. 813, 821, 678 N.E.2d 853 (1997)* citing *Garrity v. United Airlines, Inc., 421 Mass. 55, 60, 653 N.E.2d 173 (1995); Cox v. New England Tel. & Tel. Co., 414 Mass. 375, 383, 607 N.E.2d 1035 (1993).* Once the plaintiff establishes a prima facie case, the burden shifts to the defendants to offer a legitimate nondiscriminatory reason for their action. *Labonte, 424 Mass. at 821, 678 N.E.2d 853.*

Choate argues that Count VIII should be dismissed as it merely contracted with Marlborough to provide management and psychiatric services. Where two parties share control over an individual's employment, however, they may be considered joint employers and held jointly and severally liable for violations of G.L. c. 151B. *Stanley v. Gillette Co.,* 2 Mass. Discrim. L. Rept. 1203, 1205 (1980) citing *Boire v. Greyhound Corp., 376 U.S. 473, 481, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964)* (whether the company possessed sufficient indicia of control to be an employer is essentially a factual issue). Such a determination is inappropriate at this stage of the proceedings. It remains to be seen whether Choate exercised sufficient control over the employment of Winsmann to be categorized as an employer under G.L. c. 151B. This determination involves an examination of the amount of control the employer has over the employee's work and whether the employer has authority to discharge the employee.

Purdy similarly argues that Count XI should be dismissed as he was not Winsmann's employer nor did he work for Marlborough. Specifically, Purdy argues that there is no liability for a supervisor under G.L. c. 151B. As support for this contention Purdy points to the paucity of Massachusetts decisions holding that employees may be held liable for employment discrimination under G.L. c. 151B. Under Title VII, Purdy argues, ten of the eleven federal courts of appeal which have addressed the issue have held that individuals do not qualify as employers under Title VII. In interpreting G.L. c. 151B, the court may look to the interpretation of Title VII of the analogous federal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
8 Mass.L.Rptr. 480, 1998 WL 282901 (Mass.Super.)
**(Cite as: 1998 WL 282901 (Mass.Super.))**

statute for guidance; however, federal cases are not binding. *College-Town, Division of Interco, Inc. v. Massachusetts Commission Against Discrimination,* 400 Mass. 156, 163, 508 N.E.2d 587 (1987).

*6 Title VII and the decisions construing it are not determinative of the questions presented in this case; rather the issue presented is purely one of the interpretation of a Massachusetts statute ... While interpretations of a Federal statute which is similar to the State statute under consideration are often helpful in setting forth all the various policy considerations, such interpretations are not binding on a State court construing its own State statute. *Id.* at 163-164, 508 N.E.2d 587 (citations omitted).

As the federal circuits reflect, there is controversy over whether a supervisor or employee may be held liable personally as the agent of the employer.

Several provisions of G.L. c. 151B provide that it shall be an unlawful practice for any *person* to aid or abet discrimination, to engage in retaliation, or to coerce threaten or interfere with another person's enjoyment of any right granted by the anti-discrimination laws. G.L. c. 151B, §§ 4(4), 4(4A), 4(5). The Supreme Judicial Court has not yet delineated the evidentiary standard necessary to demonstrate liability. See *Harmon v. Malden Hospital,* 19 Mass. Discrim. L. Rept. 157 (1997). It is clear, from a plain reading of the statute, that its terms apply not only to employers acting through their principals and agents, but also to any person who aids and abets discriminatory conduct. *Ruffino v. State Street Bank & Trust Co.,* 908 F.Supp. 1019 (D.Mass.1995).

This court declines to adopt Purdy's argument in favor of dismissal. By alleging in Count XI that Purdy "knew ... that the plaintiff was a person with a diagnosed impairment of Obsessive Compulsive Disorder [and] ... [a]s a result of this knowledge ... discriminated against the plaintiff by removing him from his position" and subsequently terminating him, Winsmann adequately states a claim under G.L. c. 151B for discrimination. A general reading of Count XI states a claim for aiding and abetting by a person under G.L. c. 151B.

This court finds that the wording of the statute is

sufficiently broad to encompass Purdy and Choate. Consequently, at this stage, dismissal of the discrimination claim is inappropriate. See generally *Chapin v. University of Massachusetts at Lowell,* 977 F.Supp. 72 (D.Mass.1997) (statute intended to broaden not narrow rights of employees). The plaintiff has stated a cognizable claim and Counts VIII and IX shall not be dismissed.

III. *Advocates Inc., and Sunday Bernstein's Motions to Dismiss Counts XII, XIII, XIV, and XV:*

Advocates move to dismiss all counts against it in the plaintiff's complaint; Count XII (defamation), Count XIII (negligent infliction of emotional distress), and Count XIV (interference with contractual relationship). Bernstein moves to dismiss both Count XV (defamation), and Count XVI (negligent infliction of emotional distress).

*7 Winsmann alleges that Advocates and Bernstein defamed him by publishing correspondence that was false and defamatory. Advocates and Bernstein maintain that these claims should be dismissed because they are based on communications that are privileged as a matter of law. Specifically, the defendants maintain that in the employment context, any statements are protected if the publisher of the statement and the person who receives the statement have a common interest.

As stated previously, the burden is upon the defendants to show facts which create the qualified privilege. *Id.* at 134, citing *Bander v. Metropolitan Life Ins. Co.,* 313 Mass. 337, 343, 47 N.E.2d 595 (1943). Once the defendants establish their qualified privilege the burden then shifts back to the plaintiff to prove that the privilege has been abused. *Humphrey,* 18 Mass.App.Ct. at 134, 463 N.E.2d 1197, citing *Retailers Commercial Agency, Inc., petitioner,* 342 Mass. 515, 520, 174 N.E.2d 376 (1961).

This court is confined to evaluating the sufficiency of the complaint. In order for the defendants to show facts which create the qualified privilege, additional materials containing relevant, factual information, would need to be considered. This motion is not the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                   Page 6
8 Mass.L.Rptr. 480, 1998 WL 282901 (Mass.Super.)
(Cite as: 1998 WL 282901 (Mass.Super.))

proper vehicle to attack the plaintiff's defamation claims.

In order to adequately sustain a claim for negligent infliction of emotional distress the plaintiff must allege (1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case. *Payton v. Abbott Labs., 386 Mass. 540, 557, 437 N.E.2d 171 (1982).* The plaintiff has stated each of the above elements in his complaint sufficiently to withstand Advocates' and Bernstein's motions to dismiss.

Consequently, Advocates' and Bernstein's motions to dismiss the defamation and negligent infliction of emotional distress claims shall be denied.

*Count XIV; Interference with Contractual Relationship:*

"In an action for intentional interference with a contract, the plaintiff must prove that (1) he had a contract with a third party, (2) the defendant knowingly induced the third party to break that contract, and (3) the plaintiff was harmed by the defendant's action." *United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 812, 551 N.E.2d 20 (1990); *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.,* 410 Mass. 262, 272, 571 N.E.2d 1363 (1991).

Advocates cites *Judd v. McCormack,* 27 Mass.App.Ct. 167, 535 N.E.2d 1284 (1989) as support for its motion to dismiss this claim. The Appeals Court held in *Judd* however, that even though the plaintiff's claim was "one for intentional interference with an advantageous relationship, it [was] based upon what [the plaintiff alleged] to be defamatory, or false and malicious, statements." *Id.* at 174, 535 N.E.2d 1284. The statements were held to be nonactionable statements of opinion and consequently the plaintiff's claim failed. This is not the case here. In Count XIV of his complaint, Winsmann asserts that Advocates improperly interfered with his contract with Marlborough and Choate thereby causing him to suffer physically, mentally and emotionally. Even if

Winsmann's allegation of interference with contractual relationship was based solely on the alleged defamatory statements, such claims, in the present case, have survived Advocates' motion to dismiss.

### ORDER

**\*8** For the reasons set forth above, the Court hereby *ORDERS:*

(1) Marlborough Hospital's motion to dismiss Count II is *ALLOWED.*

(2) Choate Health Management, Inc.'s motion to dismiss is *ALLOWED* as to Count V and *DENIED* as to Counts VI, VII and VIII.

(3) James Purdy's motion to dismiss Counts IX, X and XI is *DENIED.*

(4) Advocates Inc.'s motion to dismiss Counts XII, XIII, and XIV is *DENIED.*

(5) Sunday Bernstein's motion to dismiss Counts XV and XVI is *DENIED.*

8 Mass.L.Rptr. 480, 1998 WL 282901 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Not Reported in F.Supp.
1996 WL 33370626 (D.Mass.)
(Cite as: 1996 WL 33370626 (D.Mass.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
Robert SALOIS and Dianne E. Salois, Ninon R.L.
Freeman, and David M. Leary and
Linda Scurini-Leary, Individually and on Behalf of
Others Similarly Situated,
Plaintiffs,
v.
THE DIME SAVINGS BANK OF NEW YORK,
FSB, Harry W. Albright, Jr., John B. Pettit,
Jr., William J. Mellin, William J. Candee III, William
A. Volckhausen, James E.
Kelly, Ralph Spitzer, Robert G. Turner, Brian
Geraghty, Lawrence W. Peters, E.
Judd Staley III, and John Doe Companies,
Defendants.
No. Civ.A. 95-11967-PBS.

Nov. 13, 1996.

MEMORANDUM AND ORDER

SARIS, J.

### I. *INTRODUCTION*

*1 Plaintiffs filed this proposed class action on September 1, 1995, alleging that the Dime Savings Bank ("Dime") and its employees violated federal and state law with respect to the advertisement, sale, and servicing of the negative-amortization mortgages that it issued in Massachusetts from 1986 to 1989. [FN1] The graduated payment, variable rate mortgages were designed so that the monthly payments would not cover the monthly interest, causing the principal balance to increase over the repayment period. Plaintiffs complain that Dime, on its own and through its subsidiary Dime Real Estate Services of Massachusetts, misrepresented the nature of the mortgages, failed to make the required statutory disclosures, and made the loan documents

sufficiently complicated that the ordinary consumer would be unable to understand the terms of the loan. They also allege that the servicing of the loans was contrary to the loan documents and Massachusetts law.

> FN1. The thirteen count, 277 paragraph, second amended complaint dated February 15, 1996 added new named plaintiffs, Ms. Ninon Freeman and the Leary's. The statute of limitations analysis does not hinge on when the parties were named as plaintiffs. The second amended complaint alleges violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 (RICO) (Count II), the Truth-In-Lending Act, 15 U.S.C. § 1601 *et seq.* (Count III), the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601-2617 (RESPA) (Count IV), the Parity Act, 12 U.S.C. §§ 3801-3806 (Count V), the Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. L. ch. 140D (Count VI), the Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A (Count VII), breach of contract (Count VIII--Recission), breach of the covenant of good faith & fair dealing (Count IX), breach of fiduciary duty (Count X), fraud, deceit, and misrepresentation (Count XI), civil conspiracy (Count XII), and negligent misrepresentation, negligent hiring and supervision, and vicarious liability (Count XIII). Plaintiffs make a jury demand, and seek declaratory judgment (Count I), certification of a class, damages, rescission, injunction against foreclosure, and attorney's fees.

Defendants move to dismiss, arguing that all claims are barred by the statutes of limitations because they were filed over seven years after the execution of the plaintiffs' loan agreements. Plaintiffs respond that the inadequate and misleading disclosures prevented them from discovering their claims despite the exercise of reasonable diligence, and that defendants fraudulently concealed their claims. Defendants also argue that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 33370626 (D.Mass.)
**(Cite as: 1996 WL 33370626 (D.Mass.))**

complaint fails to state a claim on the merits, and that they are not properly subject to the personal jurisdiction of this court.

The Court concludes that all claims arising out of the representations, disclosures, and fees at the time the loans were issued were time-barred. The breach of contract claims that the loans continued to be serviced improperly throughout the repayment period are also time-barred with respect to the specific allegations and attachments to the Second Amended Complaint. Accordingly, defendants' motion for summary judgment is *ALLOWED* without prejudice to the Salois' claim of breach of the settlement agreement.

## II. *FACTUAL BACKGROUND*

Accepting all facts pled in the complaint as true for the purposes of this motion, the Court treats the following facts as undisputed.

The Dime Savings Bank of New York, FSB ("Dime"), a federally chartered savings bank, set up and controlled subsidiaries in states throughout the eastern United States, including Massachusetts. Operating as The Dime Real Estate Services--Massachusetts ("DRES-MA"), defendants conducted loan transactions out of a number of offices in Massachusetts, between July 1, 1986 and December 31, 1989. The bank made more than four thousand mortgage loans in Massachusetts during that time period, totalling in excess of six hundred million dollars. (Compl.¶ 4.) By 1990 DRES-MA was dissolved and/or merged into Dime. (Compl.¶ 12.) Dime continued to service at least some of the loans. (Compl.Ex. F.) The current holders of the outstanding mortgage loans which Dime originated have been designated the "John Doe Companies."

### A. *The Alleged Product and Sales Scheme*

**\*2** In Massachusetts, Dime marketed primarily the "Impact Loan", instructing loan production representatives ("LPRs") who marketed the loans to the public to push the sale of that type of loan to the exclusion of other options. (Compl.¶ 79.) Dime's "Impact Loan" featured both graduated monthly payments and a variable interest rate. It had two additional distinctive features. First, it was designed to negatively amortize. Second, it required very little verification of employment, income, or assets. (Compl.¶¶ 36-37.)

### 1. *Negative amortization*

Monthly loan payments are fully "amortizing" when they cover the monthly interest on the loan and pay down the principal. "Negative amortization" occurs when the monthly payment is insufficient to cover the monthly interest. The unpaid interest is added to the principal, and begins to accrue interest itself. Thus, despite the borrower's regular payments, the principal owed on the loan increases over time. Under the Dime agreements, no payments were applied to the principal until all deferred interest had been paid. (Compl.¶ 53.)

Dime made its loans more attractive to plaintiffs and others by offering a discounted interest rate of 7.5% for the first six months, and a cap of 9.5% for the second six months. (Compl.¶ 57.) Only after that time would the rate charged conform to the Cost of Funds index plus three per cent, as described in the loan agreement, with a cap of 13.875%. (Compl.Ex. C.) Once the interest rate rose, the principal would begin to negatively amortize, unless and until falling interest rates and/or increased monthly payments resulted in a payment which covered the monthly interest. (Compl.¶ 40.)

After the first six months, the monthly statements showed increases in the principal balance "like clockwork." (¶ 40, 62). "Deferred interest" began to appear on the statements in the second year of the loan. (Compl.¶ 62.) Once the principal balance reached 110% of the original principal, the borrower would be required to make fully amortizing payments. (Compl.¶ 42.)

### 2. *Loan verification*

Dime instructed its managers and LPRs to ensure that the loan verification supported the application. As a matter of policy, loan approvals were granted on the basis of the value of the real estate being sold, rather than on the basis of the borrowers' down payment or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
1996 WL 33370626 (D.Mass.)
**(Cite as: 1996 WL 33370626 (D.Mass.))**

financial credentials. (Compl.Ex. X.) In addition, LPRs and attorneys were instructed not to investigate the existence or source of down payment funds and closing costs. (Compl.¶ 86.) In some cases, the down payment would come from a second mortgage on the property being purchased. (Compl.¶ 161.)

### 3. *Marketing*

The complaint alleges that defendants engaged in a calculated scheme to market their loans which included: (1) fraudulent mortgage advertisements, disclosures, and loan documents; (2) federal Truth-in-Lending Disclosure Statements, Loan Commitments, and mortgage loan documents which omitted important information and were sufficiently complicated that the actual material terms would be concealed from all but a few well-trained mortgage analysts; and (3) unfair and/or deceptive marketing tactics such as product tampering and equity skimming. (Compl.¶ 43.) At no time in the "typical" transaction would the LPR tell the borrower the loan was a negative amortization loan. (Compl.¶ 165.)

**\*3** As part of the general scheme of loan sales, Dime told potential borrowers "We always do it this way," and "You don't need an attorney. Dime's attorney will handle things." The Salois' were instructed that they would not need their own attorney, so they did not hire one. (Compl.¶ 162.)

### 4. *Foreclosure*

In the event of foreclosure on a property, Dime would typically debit the entire amount of the mortgage loan as a "tax loss carry forward," and expend a lesser amount to purchase the property. This allowed the bank to avoid the paper loss through a tax savings. (Compl.¶ 103.) From 1990 to 1993, Dime had a foreclosure rate of sixty per cent, the highest rate in the country. (Compl.¶ 104.) In 1993, Dime was able to shield approximately forty-four million dollars of income from any federal corporate income taxes and still had approximately two-hundred thirty-nine million dollars worth of "tax loss carry forward." (Compl.¶ 105.)

### B. *The Plaintiffs' Loans*

There are three loans specifically at issue in this complaint. Ninon R.L. Freeman, who was added as a plaintiff in the amended complaint, obtained a loan from Dime with her then-husband for $150,000 to refinance their Newton, Massachusetts home on November 18, 1986. This loan was paid off in full in December 1993 and Ms. Freeman still resides at that residence.

The Learys put down $70,000 on their first home in Tewksbury and executed a $100,000 loan from Dime on April 15, 1987. This property was foreclosed upon in May 1991. (Compl.¶ 182.)

Robert and Dianne Salois entered a loan agreement with Dime for $145,600 on or about June 16, 1987, when they signed the Adjustable Rate Note and executed a mortgage security interest in the home they were purchasing. They had made a $36,400 down payment, and at the time the initial complaint was filed, still resided in that home. (Compl.¶ 174.)

### 1. *The Loan Documents*

The plaintiffs signed Adjustable Rate Notes as part of their loan application processes. (Compl.Ex. C.) They understood the Adjustable Rate Note to be a final contract between Dime and themselves. They took the Note to be a complete and integrated document. (Compl.¶¶ 174-175.)

The Salois' loan documents are attached to the complaint as a representative example. Under the title "ADJUSTABLE RATE MORTGAGE," appears the following: THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT, WITH LIMITATIONS, AND ALLOWS FOR INCREASES IN THE PRINCIPAL AMOUNT TO BE REPAID (Negative Amortization). The document describes how the interest rate on the mortgage will be calculated throughout the course of the loan. On the second page of the three-page document, under the heading "Additions to My Unpaid Principal (Negative Amortization)", is a section which reads in full,

The amount of my monthly payment could be less than the amount of the interest portion of the Full

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 33370626 (D.Mass.)
**(Cite as: 1996 WL 33370626 (D.Mass.))**

Page 4

Payment Amount after each Interest Change Date. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder will also add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to the principal will be the rate required by Section 4(A) above.

**\*4** Additionally, the Federal Truth in Lending Disclosure Statement, a one-page document signed by both Salois' on May 7, 1987, explained negative amortization under a bold-faced heading directly above their signatures. This section indicates the amount by which the loan principal would increase if monthly payments were insufficient to cover the interest rate differential. (Compl.Ex. L.)

The Adjustable Rate Note provided that in the event of changes in the amount of monthly payments a telephone number of a person who would answer questions would be provided. (Compl.¶ 65, Ex. C.) However, when borrowers, including plaintiffs, called Dime to find out what "deferred interest" was, customer service representatives did not accurately answer their questions. (Compl.¶ 65.)

### 2. *The Correction of the Salois' Note*

On February 29, 1988 and June 1, 1988, Dime sent the Salois' new Adjustable Rate Notes to execute. The new notes were to change what Dime first said was "procedural only", and then said was only a typewriting error. (Compl.¶¶ 184-85.) The original note (Compl.Ex. C.) states the loan was capped at two-per-cent change in interest rate per "Interest Rate Change Date", i.e. per month, as defined by the preceding paragraph of that document. The corrected documents, which plaintiffs allege were not signed until "at least 1988," would have removed the cap on monthly interest adjustments, leaving only the overall 13.875% rate cap. (Compl.Exs.D, E.). The cover letter signed by Dana S. Cohen, Esq. explains that the initial note "incorrectly reflects the limits on your interest rate, by stating that the cap is two (2%) percent per change date." (Ex. D).

The changes were made by crossing out the 2 percent cap and writing in "N/A".

### 3. *The Salois' back charges*

In February 1995, the Salois' were notified that they owed Dime $12,575.95 in back charges, and that if they would make such a payment their account would be fully up-to-date and their loan would be reinstated. (Compl.¶ 191.) The Salois' paid the full amount but on or about March 10, 1995 were notified that $1,115.50 was still outstanding ($15 in returned check fees. $496.95 in unpaid late charges, and $604.05 for a short-fall in the escrow balance). (Compl.¶ 192.)

### D. *The Instant Action*

This action was commenced on September 1, 1995. The Salois' state they were not aware of their claims until advised by their attorney in the last week of September, 1994. (Compl.¶ 153.) Ms. Freeman and the Learys were advised by the same attorney in the summer of 1995. The plaintiffs do not allege facts to explain what prompted them to consult legal counsel.

### III. *DISCUSSION*
### A. *Motion to Dismiss for Failure to State a Claim*

In ruling on a motion to dismiss for failure to state a claim, the Court may look only to the complaint itself, *Harper v. Cserr*, 544 F.2d 1121, 1122 (1st Cir.1976), even if the defendant raises affirmative defenses, *DiMella v. Gray Lines of Boston, Inc.*, 836 F.2d 718, 719-20 (1st Cir.1988). The motion shall be allowed if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

**\*5** The Court must accept all factual allegations in the complaint as true, *United States v. Mississippi*, 380 U.S. 128, 143 (1965), and draw all reasonable inferences in favor of the plaintiff, *Coyne v. City of Somerville*, 972 F.2d 440, 442-42 (1st Cir.1992). Although fraud must be pled with particularity, Fed.R.Civ.P. 9(b), other claims require only "a short

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a). However, the court need not accept "legal conclusions or ... bald assertions" made without factual support. *Resolution Trust Corp. v. Driscoll*, 985 F.2d 44, 48 (1st Cir.1993); *see generally Boston & Maine Corp. v. Town of Hampton*, 987 F.2d 855, 863 (1st Cir.1992) (discussing the tension among First Circuit cases with respect to the particularity required in pleadings).

Defendants move for dismissal of this case on the basis of the affirmative defense of limitation of the action, as well as on the merits. The statute of limitations defense may be addressed in a Rule 12(b)(6) motion when the defense is obvious on the face of the pleadings. *See Aldahonda-Rivera v. Parke Davis & Co.*, 882 F.2d 590, 592 (1st Cir.1989); *see also* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1277 n.13 (1990).

B. *Federal claims*

The plaintiffs' mortgages were issued November 18, 1986, April 15, 1987, and June 16, 1987, and corrected mortgage documents were presented to the Salois' in February and June, 1988. This action was not filed until September 1, 1995, over seven years after the last corrective document was sent. The statutes of limitations on the federal claims range from one year to four years. Therefore, unless the actions accrued at a later date, or were tolled by fraudulent concealment, all federal claims are time-barred. Federal common law determines when the statute begins to run on the federal claims. *See Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 127 (1st Cir.1987).

1. *RICO (Count II)*

RICO imposes civil liability for injury to business or property "by reason of a violation of section 1962," which in turn makes it a crime "for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §§ 1962(c), 1964(c). An act of "racketeering activity" is the commission of one of the crimes enumerated in the statute. § 1961(1).

A "pattern of racketeering activity" requires at least two acts of racketeering activity. § 1961(5).

Because RICO does not include a limitations period, the Clayton Act's four-year period, 18 U.S.C. § 15b, has been held to apply to civil RICO claims. *See Agency Holding Corp. v. Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 2767 (1987). The four-year period begins to run "when a plaintiff knew or should have known of his injury." *Rodriguez v. Banco Central*, 917 F.2d 664, 666 (1st Cir.1990). Once each element of RICO has been satisfied, and the plaintiff has cause to know of the injury, the statute will run. *See id.* at 667. Even an additional predicate act within the limitations period will not save the action. *See id.* at 666-67. As the complaint was filed September 1, 1995, any claims which accrued prior to September 1, 1991, are time-barred.

*6 Plaintiffs allege that the defendants, through DRES-MA, engaged in a pattern of racketeering activities between July 1, 1986, and December 31, 1989, while "developing, marketing, providing, and servicing 'Impact Loans' in Massachusetts." They allege that defendants committed mail and wire fraud by defrauding the plaintiffs and others "into taking mortgage loan(s) with Dime and making down payments and monthly payments that they otherwise would not have entered into or have been obligated to make, in order to benefit the defendants." Under the plaintiffs' theory, then, they sustained injuries when they were defrauded into taking out the mortgages and continuing to make payments under the mortgages.

These RICO injuries were sustained, if at all, when the mortgages were issued, and when payments were made under the mortgages. At least two predicate acts had been committed by the second mortgage payment, and the statute of limitations began to run. [FN2] Plaintiffs argue, however, that the statute of limitations ought to be tolled because they could not have known of the injuries. They argue that their loan documents omitted important information, and were sufficiently complicated that the actual material terms were concealed from all but a few well-trained mortgage analysts.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN2. Even if the two predicate acts were the two corrective loan documents mailed in 1988, the claim is still time-barred.

However, all information necessary to ascertain the cause of action was in the plaintiffs' possession from the time they entered the loan agreements. *See Maggio,* 824 F.2d at 129 (tolling unavailable where plaintiff had ample information at his disposal to suggest cause of action). Any failure to provide a required disclosure would have been discoverable as soon as the loan transaction was completed. *Cf. Lynch v. Signal Finance Co.,* 367 Mass. 503, 507-08, 327 N.E.2d 732, 734 (1975) (rejecting tolling where "plaintiffs knew the terms of the loan and knew what had been disclosed to them and what had not"). The loan documents notified plaintiffs of the possibility of negative amortization, when it would apply, and how it would work. If the LPR's had misrepresented the nature of the loans, the loan documents plaintiffs signed would have put them on notice of the fraud.

Plaintiffs acknowledge that the loan documents revealed the possibility of negative amortization (Compl.¶ 55), but complain that the documents failed to disclose the *certainty* of negative amortization. In the seventh month of the loan, however, the increasing principal began to appear on the bills. In the second year, the deferred interest began to appear. Reasonable diligence would have led the plaintiffs to discover by 1988 that the negative amortization described in the loan documents had begun. *See Aldahonda-Rivera v. Parke Davis & Co.,* 882 F.2d 590, 594 (1st Cir.1989) ("[T]he limitations period will be suspended only upon a clear showing of diligent efforts to discover the cause of the injury ...."); *see also Maggio,* 824 F.2d at 128 ("[W]hether a plaintiff should have discovered the fraud is an objective question requiring the court to determine if the plaintiff possessed such knowledge as would alert a reasonable investor to the possibility of fraud.") (internal quotations omitted).

*7 Plaintiffs have failed to allege facts to show reasonably diligent efforts to understand their loans or to make them understandable. *Cf. Lynch,* 367 Mass. at 508, 327 N.E.2d at 735 (rejecting tolling where "discovery of the nondisclosure may have required

merely the making of mathematical computations from known data or the receipt of information as to the governing legal requirements"). Plaintiffs signed their loan documents when the loans were issued, and received statements every month thereafter. No facts are alleged as to what prompted plaintiffs to consult an attorney, if not their loan documents and monthly statements. As in *Aldahonda-Rivera,* here "the only logical conclusion that can be drawn is that [the plaintiffs] filed [their] complaint [several] years too late because it took [them] that long to consult an attorney." [FN3] 882 F.2d at 593. If the plaintiffs' loan documents and statements prompted them to consult an attorney in 1994 and 1995, unprompted by any new disclosure, there is no reason they could not have consulted an attorney several years earlier.

FN3. The briefs suggest that the Salois' were prompted to seek legal advice because financial circumstances led to their inability to meet their monthly payments.

Plaintiffs further allege that defendants fraudulently concealed the cause of action, such that the statute of limitations should be tolled in their favor. In federal question cases, the fraudulent concealment doctrine "operates to toll the statute of limitations where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part ... until the fraud is discovered." *Maggio,* 824 F.2d at 127 (quoting *Cook v. Avien,* 573 F.2d 685, 694-95 (1st Cir.1978)). Plaintiffs "must demonstrate that (1) defendants engaged in a course of conduct designed to conceal evidence of their alleged wrongdoing and that (2) [the plaintiffs] were not on actual or constructive notice of the evidence, despite (3) their exercise of reasonable diligence." *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.,* 76 F.3d 1245, 1255 (1st Cir.1996), *cert. denied,* 117 S.Ct. 81 (1996). "Furthermore, it is [plaintiffs'] burden under Federal Rule of Civil Procedure 9(b) to plead with particularity the facts giving rise to the fraudulent concealment claim." *Id.*

As discussed above, the explanations of negative amortization in the loan documents, combined with the appearance of increased principal and deferred interest

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 7
1996 WL 33370626 (D.Mass.)
**(Cite as: 1996 WL 33370626 (D.Mass.))**

on the monthly statements by the second year, constituted notice of any misrepresentations with respect to whether or not the loans would negatively amortize. There is no indication that plaintiffs, if they did not understand their loans, exercised reasonable diligence in seeking an explanation. Therefore they cannot take advantage of the federal fraudulent concealment doctrine.

The motion to dismiss is *ALLOWED* with respect to Count II, because it is barred by the four-year statute of limitations and no viable theory for tolling has been advanced.

*2. TILA, Parity Act and RESPA Claims (Counts III, IV, IV)*

**\*8** Claims for rescission under the federal Truth-in-Lending Act (TILA), 15 U.S.C. § 1601 *et seq.,* must be brought within three years of the "consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding the fact that the disclosures required under this section or any other material disclosures required under this chapter have not been delivered to the obligor." 15 U.S.C. § 1635(f). As this language elucidates, nondisclosure is not a continuing violation for purposes of the statute of limitations. *See Moor v. Travelers Ins. Co.,* 784 F.2d 632, 633 (5th Cir.1986) (citing *In re Smith,* 737 F.2d 1549, 1552 (11th Cir.1984)). The last contract was consummated in June 1987 and "corrected" in 1988, and the complaint was not filed until September 1995. To the extent the plaintiffs seek rescission under TILA, the claim is time-barred.

Failure to make the disclosures required by the TILA also creates liability for damages. An action for damages must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). Although the one-year period typically runs from the consummation of the transaction, *King v. California,* 784 F.2d 910, 915 (9th Cir.1986), *cert. denied,* 484 U.S. 802 (1987); *Moor,* 784 F.2d at 633, "the doctrine of equitable tolling may, in the appropriate circumstances, suspend the limitations period until the borrower discovers or had reasonable opportunity to discover the fraud or nondisclosures that

form the basis of the TILA action," *King,* 784 F.2d at 915; *see also Jones v. TransOhio Sav. Ass'n,* 747 F.2d 1037, 1041 (6th Cir.1984). "To clothe himself in the protective garb of the tolling doctrine, a plaintiff must show that the defendant concealed the reprobated conduct and despite the exercise of due diligence, he was unable to discover that conduct." *Moor,* 784 F.2d at 634 (refusing to toll statute because, by the consummation of the loan, plaintiff knew or should have known that the required information had not been disclosed). As discussed above, plaintiffs have failed to plead facts constituting reasonable diligence sufficient to toll the statute of limitations.

Acts in violation of the Alternative Mortgage Transactions Parity Act (Parity Act), 12 U.S.C. § 3801 *et seq.,* are to be treated as violations of TILA. *See* 12 U.S.C. § 3806. The Parity Act claim is therefore time-barred for the reasons stated.

Finally, plaintiffs allege in their Real Estate Settlement Practices (RESPA) claim, 12 U.S.C. § 2601 *et seq.,* that defendants failed to make required disclosures, overcharged for certain services, and took kickbacks at the time the loans were issued. RESPA provides a one-year statute of limitations "from the date of the occurrence of the violation." 12 U.S.C. § 2614. As discussed above, with the notable exception of the alleged kickbacks, most of the missing disclosures or overcharges would have been apparent at the issuance of the loans. In the second-amended complaint, plaintiffs allege for the first time that defendants charged more for the title insurance premium than was paid to the title insurance company and obtained discounts and/or kickbacks from title insurance companies. ¶ 126(c)(vi). Although, to be sure, kickbacks are by their nature fraudulent and secret, the doctrine of equitable tolling does not apply. *Hardin v. City Title & Escrow Co .,* 797 F.2d 1037, 1039 (D.C.Cir.1986). This claim is therefore also time-barred.

**\*9** Accordingly, the motion to dismiss is *ALLOWED* with respect to Counts III, IV, and V.

*C. State claims*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 33370626 (D.Mass.)
**(Cite as: 1996 WL 33370626 (D.Mass.))**

Plaintiffs' state claims accrue according to Massachusetts' "discovery rule" and may be tolled under the Massachusetts doctrine of fraudulent concealment.

### 1. Discovery rule

Under the Massachusetts "discovery rule," an action accrues when the injured party knew or, in the exercise of reasonable diligence, should have known, the factual basis for the cause of action. *See Tagliente v. Himmer,* 949 F.2d 1, 4 (1st Cir.1991) (citing *Maggio,* 824 F.2d at 130); *Puritan Medical Center, Inc. v. Cashman,* 413 Mass. 167, 175, 596 N.E.2d 1004, 1010 (1992). "The standard set forth by the discovery rule is an objective one.... In order for the statute of limitations to be tolled pursuant to the discovery rule, the factual basis for the cause of action must have been 'inherently unknowable' at the time of injury." *Tagliente,* 949 F.2d at 4. The burden is on the plaintiff to prove that in the exercise of reasonable diligence he could not have known of the misrepresentation within the statute of limitations. *Id.* at 5 (citing *Friedman v. Jablonski,* 371 Mass. 482, 485-87, 358 N.E.2d 994, 998 (1976)).

### 2. Fraudulent Concealment

Massachusetts law also provides for the tolling of statutes of limitations by fraudulent concealment. Under Mass. Gen. L. ch. 260 § 12 (1990):

> If a person liable to a personal action fraudulently conceals the cause of action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action.

In Massachusetts, fraudulent concealment requires either (1) an affirmative act of concealment done with intent to deceive, or (2) breach of a fiduciary duty of full disclosure. *Puritan Medical Center v. Cashman,* 413 Mass. 167, 176, 596 N.E.2d 1004, 1010 (1992) (where "a fiduciary relationship exists between plaintiff and defendant ... mere failure to reveal information may be sufficient to constitute fraudulent concealment for the purposes of § 12") (internal quotations and citations omitted). Plaintiffs have not alleged any affirmative acts of concealment.

Instead, plaintiffs argue that Dime owed them fiduciary duties. A fiduciary relationship exists when a party places special trust and confidence in another who knowingly accepts the responsibility. *In re Fordham,* 130 B.R. 632, 648- 49 (Bankr.D.Mass.1991). "[P]laintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature." *Broomfield v. Kosow,* 349 Mass. 749, 755, 212 N.E.2d 556, 560 (Mass.1965); *see also In re Fordham,* 130 B.R. at 649 ("[A]lthough [plaintiffs] avow that they placed trust and confidence in [defendants] they may not abandon all caution and responsibility for their own protection and unilaterally impose a fiduciary relationship."). "Traditionally, Massachusetts courts have viewed a bank's relationship to its customers as one of creditor and debtor, a relationship which imposes no duty to counsel or make disclosures to the customer." *Flaherty v. Baybank Merrimack Valley, N.A.,* 808 F.Supp. 55, 64 (D.Mass.1992).

**\*10** It is true that Dime had a statutory duty, under Mass. Gen. L. ch. 184 § 17B, to inform plaintiffs of their right to obtain separate counsel and to explain that Dime's attorneys represented Dime's interests. Plaintiffs allege these disclosures were never made. However, there is no authority for the proposition that failure to comply with this statutory requirement is sufficient to impose a fiduciary duty upon a bank for the purposes of fraudulent concealment. *Cf. Lynch,* 367 Mass. at 507-08, 327 N.E.2d at 735 (rejecting contention that "breach of the statutory duty imposed by the TILA should be given the same effect as breach of a fiduciary duty" in tolling statute of limitations).

In support of their argument that there was a fiduciary relationship, plaintiffs allege having been told that they did not need their own attorney and that Dime's attorney would "handle things." Significantly, there is no allegation that anyone told plaintiffs that Dime's attorney would represent their interests. Rather, the allegation is that plaintiffs were told an attorney was not necessary for the completion of the transaction. *Cf. Flaherty,* 808 F.Supp. at 61 (holding reliance on attorneys "patently unreasonable" as a matter of law, where the "attorneys clearly represented the banks" and the "plaintiffs failed to communicate, either by words or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 9
1996 WL 33370626 (D.Mass.)
**(Cite as: 1996 WL 33370626 (D.Mass.))**

actions, that they were relying on these attorneys to serve their interests"). The discouragement of the retainer of separate counsel that is alleged here is, without more, an insufficient basis for the formation of a fiduciary relationship between parties to a one-time business transaction.

The cases relied upon by plaintiffs are distinguishable. Both concerned long-time friends and advisors of plaintiffs, who clearly knew they were being relied upon and accepted that trust. In *Broomfield v. Kosow*, 349 Mass. at 757, 212 N.E.2d at 561, for two years there had been "a close business relationship and business friendship between the two men." In *Reed v. A.E. Little Co.*, 256 Mass. 442, 446, 152 N.E. 918, 919 (Mass.1926), plaintiff called upon defendant and asked him to "advise him as a friend in the interest of the plaintiff, in respect to the matters therein contained, and whether it was for the plaintiff's best interest to sign such an agreement." That court found the crucial determinant of a fiduciary relationship to be whether the defendant could exert influence over the person trusting him. Given that there is no such long-standing friendship, or ability to exert influence in the case at bar, the plaintiffs have not alleged sufficient facts to establish a fiduciary relationship between the parties.

Therefore, the Massachusetts statutes of limitations cannot be tolled on the basis of breach of fiduciary duty.

### 3. Massachusetts Consumer Credit Cost Disclosure Act (Count VI)

The requirements of the Massachusetts Consumer Credit Cost Disclosure Act ("MCCCDA"), Mass. Gen. L. ch. 140D, are substantially the same as the requirements of the federal TILA. Plaintiffs allege that Dime violated MCCCDA by failing to give complete and accurate disclosures with respect to the loan. This claim is governed by a four-year statute of limitations. Mass. Gen. L. ch. 140D § 10(f). It is time-barred for the same reasons discussed in the context of the TILA claim. Moreover, "[i]n Massachusetts, one who signs an agreement is presumed to have read and understood its contents." *Lerra v. Monsanto Co.*, 521 F.Supp. 1257, 1262 (D.Mass.1981). Thus plaintiffs cannot rely on the

argument that they were unable to understand their loan documents. The motion to dismiss is *ALLOWED* with respect to Count VI.

### 4. Chapter 93A (Count VII)

**\*11** Chapter 93A makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," Mass. Gen. L. ch. 93A § 2, and authorizes any person injured by such acts to bring an action for damages and/or injunctive relief, ch. 93A § 9(1). Under the Attorney General's regulations enacted under Chapter 93A, an act or practice violates section two if it "fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection," 940 Code Mass. Regs. § 3.16(3), or if it "violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes," § 3.16(4). Chapter 93A claims are subject to a four-year statute of limitations. Mass. Gen. L. ch. 260 § 5A.

Plaintiffs allege first that Dime violated the requirements for "graduate payment mortgages" in Mass. Gen. L. ch. 167E by failing to provide the option to change to a more conventional mortgage, failing to offer a conventional mortgage, and failing sufficiently to explain the terms of the mortgage. These claims, however, accrued and should have been discovered at the time the loan was issued and are therefore time-barred.

Plaintiffs also allege that Dime violated Chapter 93A by "bait and switch" advertising, product tampering, and equity skimming in the development and marketing of its loans. Compl. ¶¶ 200-207. These claims are also barred by the four-year statute of limitations. All the information necessary to discover these claims was in the plaintiffs' possession from the time they entered into the loans. The alleged violation of Mass. Gen. L. ch. 183 § 63, which regulates the fees charged at the time the loan is issued, is also time-barred, as are the alleged violations of Mass. Gen. L. ch. 184 §§ 17B & 17D,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 33370626 (D.Mass.)
(Cite as: 1996 WL 33370626 (D.Mass.))

Page 10

which mandate that certain disclosures be made at the time of the loan. [FN4] As the complaint does not allege that Dime's duty to pay real estate taxes in accordance with Mass. Gen. L. ch. 183 § 62 continued beyond the first year of the loan (Compl.¶ 137), this claim is also time-barred.

> FN4. Defendants correctly point out that Chapter 184, § 17D, did not go into effect until 1988, which was after the issuance of the plaintiffs' loans.

On the other hand, several of plaintiffs' claims are continuing violations that are not barred by the statute of limitations. Plaintiffs allege that Dime violated Mass. Gen. L. ch. 167E § 2(B)(9) by changing the payment amount more than once a year. If the evidence shows that the monthly payment has changed more than once a year within the past four years, this claim is not time-barred. The complaint does not foreclose this possibility. Additionally, plaintiffs allege that Dime violated the requirements for variable rate mortgages in Mass. Gen. L. ch. 167E § 2(B)(10), by changing the rate of interest more than once every six months. As the interest changed five times in 1995, this claim is not time-barred.

*12 However, defendants argue that Chapter 167E doesn't apply to Dime because a federal bank is not subject to regulation by the Massachusetts commissioner of banks. [FN5] Mass. Gen. L. ch. 167E, § 1 (defining bank as a savings bank, co-operative bank, or trust company subject to the supervision of the Commissioner of banks). The second amended complaint does not allege defendants fall within this definition of bank.

> FN5. Dime does not argue that this statute is in applicable due to pre-emption. See generally Grunbeck v. Dime Sav. Bank of New York, FSB, 74 F.3d 331 (1st Cir.1996) (state statute requiring computation of interest on a simple interest basis not pre-empted).

Finally, plaintiffs allege that Dime violated federal fair debt collection protections when, on February 24, 1994, it sent a collection letter on another's letterhead to create the false belief that an entity other than Dime was participating in the collection process. Compl. ¶ 208; see 15 U.S.C. § 1692j ("It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating."). This claim arose on February 24, 1994 and the complaint was filed on September 1, 1995. Therefore, this Court lacks jurisdiction pursuant to 15 U.S.C. § 1692j(b) and § 1692K(d) (permitting federal jurisdiction over claims brought within one year from the date on which the violation occurs). Cf. Mattson v. U.S. West Communications, Inc., 967 F.2d 259, 261 (8th Cir.1992) (holding that the statute of limitations was jurisdictional).

The motion to dismiss Count VII is therefore ALLOWED.

*5. Breach of contract and the covenant of good faith and fair dealing (Counts VIII & IX)*

The plaintiffs also allege that Dime has breached its contract on several occasions. "Actions of contract ... shall, except as otherwise provided, be commenced only within six years next after the cause of action accrues." Mass. Gen. L. ch. 260 § 2.

First, plaintiffs argue that Dime breached its contractual promise to provide "the name and telephone number of a person who will answer any question [they] may have regarding the notice" (Compl.Ex. C, ¶ 4(E)), when its customer service representatives would not accurately answer questions about deferred interest. (Compl.¶ 65.) The complaint states that the plaintiffs called Dime to inquire about the deferred interest "[w]hen 'deferred interest' started appearing on the plaintiffs' monthly payment statements." (Compl.¶ 194.) As the deferred interest appeared on the statements at the latest in mid-1988, seven years before the complaint was filed, this claim is time-barred. If the failure to answer questions over the phone was a breach of contract, plaintiffs had all information necessary to discover their cause of action

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 11
1996 WL 33370626 (D.Mass.)
**(Cite as: 1996 WL 33370626 (D.Mass.))**

as soon as the phone conversations took place.

Next, the Salois' argue that Dime breached its contract in 1988 when it sent them letters requesting that they sign the 'corrective' documents, because the letters materially altered the terms of the loan. (Compl.¶ 253.) However, this claim is barred by the six-year statute of limitations because the Salois were on notice of the precise change in the proposed modified contract by June, 1988.

**\*13** The Salois' also argue that "Dime breached the Adjustable Rate Note by servicing it as if the purported 'corrective' documents had been signed, even before they had been signed." (Compl.¶ 253.) Specifically, they allege that Dime did not comply with the cap on variation in the interest rate that appeared in the original loan documents and instead applied a rate permitted only by the corrective documents. Whether or not this claim would be time-barred, it must be dismissed based on the documents attached to the complaint. Although the complaint alleges that the original note capped the interest rate variation at 2% per year, the attached note makes clear that the interest cap was per "Interest Rate Change Date," or per *month.* (Compl.Ex. C.) Plaintiffs own charts reveal that the interest rate never changed more than 2% per month. (Compl.Ex. Y.)

Plaintiffs' memorandum of law specifies the basis for Ms. Freeman's breach of contract claim. Ms. Freeman alleges that defendants breached the loan which called for a 7.5% rate cap for twelve months. (Exh. A, ¶ 2(D)). However, plaintiff was aware of this no later than 1987. Therefore, her contract claim is time-barred.

Finally, the Salois' allege that in February 1995, Dime agreed with the Salois' that their account would be fully up to date if they paid $12,575.95 by the end of the month. Compl. ¶ 191. After paying the required amount on time, however, the Salois' were informed that additional funds were due. The plaintiffs do not assert this alleged breach of a settlement agreement as a basis for its breach of contract claim. (See ¶¶ 252-259). Even if it had been adequately alleged, it does not involve enough money to support this Court's diversity jurisdiction.

The motion to dismiss Counts VIII and IX is therefore *ALLOWED* without prejudice to filing an action for breach of the settlement agreement in state court. [FN6]

> FN6. There are also conclusory allegations that Dime failed to service the contract properly within the six years prior to the commencement of the suit. This dismissal is without prejudice to any claims of breach of contract based on inadequate servicing not addressed in this opinion.

### 6. Remaining tort claims (Counts X, XI, XII, & XIII)

Finally, plaintiffs bring several tort claims. In Massachusetts, "actions of tort ... shall be commenced only within three years next after the cause of action accrues." Mass. Gen. L. ch. 260 § 2A.

Plaintiffs allege in Count X that Dime breached a fiduciary duty by (1) telling the plaintiffs they could afford the monthly payments when they couldn't; and (2) failing to give proper disclosures. However, as discussed above, the plaintiffs have failed to plead facts sufficient to establish a fiduciary relationship between the parties.

Plaintiffs claim in Count XI that Dime acted fraudulently by misrepresenting (1) whether the loan would be certain to enter negative amortization, (2) whether the plaintiffs could afford the monthly payments on their loan, and (3) whether the corrective notes materially altered the terms of the loan. Next, plaintiffs allege (Count XII) that defendants conspired to wrongfully procure their mortgage notes. Compl. ¶ 268. In their final claim (Count XIII), plaintiffs allege that the defendants' employees negligently induced them to enter into the loan agreements. Compl. ¶ 274. Because the latest of the alleged misrepresentations, conspiracies, and negligent acts occurred in 1988, when the corrective notes were sent, all are barred by the three-year statute of limitations for Massachusetts torts. *See* Mass. Gen. L. ch. 260 § 2A.

**\*14** The motion to dismiss is therefore *ALLOWED* with respect to Counts X, XI, XII, and XIII.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 12
1996 WL 33370626 (D.Mass.)
**(Cite as: 1996 WL 33370626 (D.Mass.))**

IV. *ORDER*

Defendants' motion to dismiss (Docket No. 51) is therefore *ALLOWED* without prejudice to filing a breach of settlement agreement claim in state court.

1996 WL 33370626 (D.Mass.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Not Reported in Cal.Rptr.2d
2002 WL 27138 (Cal.App. 1 Dist.), 67 Cal. Comp. Cases 42
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2002 WL 27138 (Cal.App. 1 Dist.))**

Page 1

►

**Briefs and Other Related Documents**

California Rules of Court, rule 977(a), prohibits courts
and parties from citing or relying on opinions not
certified for publication or ordered published, except as
specified by rule 977(b).  This opinion has not been
certified for publication or ordered published for
purposes of rule 977.


Court of Appeal, First District, Division 3,
California.
G.A. "Skip" MOORE, Plaintiff and Appellant,
v.
HAMMOND, MARTIN, WALSH & SMITH,
INSURANCE BROKERS, INC. et al., Defendants
and
Respondents.
No. A093776.
**(Marin County Super. Ct. No. CV001827).**


Jan. 10, 2002.


Workers' compensation claimant sued former
employer's insurance brokers for negligence,
misrepresentation, and infliction of emotional distress,
alleging brokers' failure to obtain workers'
compensation insurance coverage for construction
project at employer's personal residence. The Superior
Court, Marin County, No. CV001827, sustained
insurance brokers' demurrer without leave to amend, on
statute of limitations grounds. Claimant appealed. The
Court of Appeal, Corrigan, J., held that claimant did not
establish estoppel by fraudulent concealment, as basis
for tolling the limitations period.

Affirmed.


West Headnotes

**[1] Evidence** ☞**43(1)**
157k43(1) Most Cited Cases

**[1] Evidence** ☞**52**
157k52 Most Cited Cases
Court of Appeal would take judicial notice of court
documents properly noticed in the trial court, in
workers' compensation claimant's action against former
employer's insurance brokers for negligence,
misrepresentation, and infliction of emotional distress,
but would not consider the truthfulness or proper
interpretation of their contents.

**[2] Limitation of Actions** ☞**55(2)**
241k55(2) Most Cited Cases

**[2] Limitation of Actions** ☞**55(4)**
241k55(4) Most Cited Cases

**[2] Limitation of Actions** ☞**99(1)**
241k99(1) Most Cited Cases
Workers' compensation claimant's action against former
employer's insurance brokers for negligence,
misrepresentation, and infliction of emotional distress,
alleging brokers' failure to obtain workers'
compensation insurance coverage for construction
project at employer's personal residence, "accrued," for
limitations purposes, when insurer denied the claim for
workers' compensation benefits.

**[3] Limitation of Actions** ☞**104(1)**
241k104(1) Most Cited Cases
To plead estoppel based on fraudulent concealment,
which tolls a statute of limitations, the plaintiff must
allege: (1) when the fraud was discovered;  (2) the
circumstances under which it was discovered;  and (3)
that the plaintiff was not at fault for failing to discover
it or had no actual or presumptive knowledge of facts
sufficient to put him on inquiry.

**[4] Fraud** ☞**41**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d
2002 WL 27138 (Cal.App. 1 Dist.), 67 Cal. Comp. Cases 42
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2002 WL 27138 (Cal.App. 1 Dist.))**

184k41 Most Cited Cases
Because allegations of fraud are serious, and the defendant is entitled to receive sufficient details in order to prepare his defense, the policy of liberal construction of pleadings will not ordinarily be applied to remedy defective allegations of fraud.

**[5] Limitation of Actions ☞104(1)**
241k104(1) Most Cited Cases
Workers' compensation claimant was on inquiry notice, thereby precluding tolling of limitations period by estoppel based on fraudulent concealment, as to potential responsibility of former employer's insurance brokers for negligence, misrepresentation, and infliction of emotional distress regarding failure to obtain workers' compensation insurance coverage for construction project at former employer's personal residence, where claimant had seen and obtained copy of purported insurance certificate listing brokers as "producer," and claimant had been alerted of insurer's contention, in claimant's separate workers' compensation claim against former employer in which insurer opposed former employer's petition to join brokers as defendants, that brokers had misrepresented that former employer's workers' compensation policy covered former employer's residential workers.

**[6] Limitation of Actions ☞104(1)**
241k104(1) Most Cited Cases
The test for determining whether the plaintiff is put upon inquiry notice, thereby precluding tolling of limitations period by estoppel based on fraudulent concealment, must not be based upon an inference that might conceivably be drawn, but rather upon a conclusion which a reasonable person would be required to reach.

**[7] Limitation of Actions ☞104(1)**
241k104(1) Most Cited Cases
Workers' compensation claimant's allegations that he was "led to believe" by former employer, former employer's workers' compensation insurer, and claimant's private investigator that former employer or former employer's construction contractor were the only responsible parties, did not establish claimant's

reasonable care in investigating potential culpability of former employer's insurance brokers for negligence, misrepresentation, and infliction of emotional distress regarding failure to obtain workers' compensation coverage for construction project at former employer's personal residence, and thus, claimant was not entitled to tolling of limitations period by estoppel based on fraudulent concealment.

**[8] Limitation of Actions ☞104(2)**
241k104(2) Most Cited Cases
Assertions by former employer's insurance brokers, to workers' compensation claimant, that brokers were blameless and that the lack of workers' compensation insurance coverage was either the fault of insurer or of former employer, did not constitute fraudulent concealment of brokers' alleged wrongdoing, as basis for tolling limitations period for claimant's action against brokers for negligence, misrepresentation, and infliction of emotional distress regarding failure to obtain workers' compensation coverage for construction project at former employer's personal residence, where claimant had been put on notice of brokers' involvement in former employer's failure to procure insurance.

**[9] Limitation of Actions ☞95(1)**
241k95(1) Most Cited Cases
To obtain the benefit of the late-discovery exception to the statute of limitations, the complaint must allege facts showing that the cause of action could not with reasonable diligence have been discovered within the limitations period.

**[10] Limitation of Actions ☞95(2)**
241k95(2) Most Cited Cases
When a plaintiff is on notice that a potential defendant figured centrally in the events resulting in plaintiff's injury, the fact that the defendant denies culpability does not excuse the plaintiff from further investigation, for purposes of the late-discovery exception to the statute of limitations.

**[11] Limitation of Actions ☞180(1)**
241k180(1) Most Cited Cases
Lack of fraudulent concealment which would toll a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d                                    Page 3
2002 WL 27138 (Cal.App. 1 Dist.), 67 Cal. Comp. Cases 42
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2002 WL 27138 (Cal.App. 1 Dist.))**

limitations period may, in appropriate cases, be decided at the pleading stage.

CORRIGAN, J.

*1 Plaintiff G.A. "Skip" Moore sued his former employer's insurance brokers, Hammond, Martin, Walsh & Smith Insurance Brokers Inc. (Hammond, Martin) and Lyle Martin, alleging they were responsible for the denial of his workers compensation claim. [FN1] Defendants demurred on statute of limitations grounds. Plaintiff contended defendants were estopped from asserting the statute of limitations because they had fraudulently concealed their culpability. The trial court disagreed and sustained the demurrer without leave to amend. We affirm.

> FN1. Plaintiff also sued his employer, James A. Griffin (see *Moore v. Griffin* (June 18, 1999, A080817) [nonpub. opn.]; *Moore v. Griffin* (June 22, 2001, A090452) [nonpub. opn.] ) and filed a workers compensation claim against him.

### Background

In July 1995 James Griffin hired plaintiff to perform construction work on his home. At the work site, plaintiff observed an insurance certificate purporting to provide workers compensation insurance coverage for workers at the site. On September 16, 1995, plaintiff was injured on the job. He subsequently obtained a copy of the certificate of insurance that Griffin had filed with the building department. The certificate identified Republic Indemnity Company of America (Republic) as the insurer and Hammond, Martin as the "producer."

In January 1996 Republic denied plaintiff's workers compensation claim on the ground that its policy had been issued to Industrial Devices Corporation (IDC), a business owned by Griffin and unrelated to the construction work at Griffin's residence. Plaintiff was not an IDC employee.

Later that month plaintiff called Lyle Martin of Hammond, Martin. Martin told plaintiff that neither he

nor his staff had done anything wrong and that any problem was either Republic's fault for wrongfully denying plaintiff's claim or Griffin's fault for failing to properly process his paperwork. Martin also said that Cally Martin did not sign the certificate of insurance. Plaintiff believed these statements and on that basis did not name Hammond, Martin or Martin in his suit against Griffin.

[1] In April 1996 plaintiff filed a personal injury suit against Griffin based on Griffin's failure to procure workers compensation insurance. [FN2] Griffin defaulted, and subsequently moved to set aside the default. In a supporting declaration filed in July 1996, he stated that he had taken "what measures I thought were necessary to obtain workers compensation coverage on the workers who would be at the project. I obtained a certificate of insurance *from my broker* which added my name to the workers comp policy of the business of which I am the principal, Industrial Devices Corporation." (Italics added.) Attached to the declaration was a copy of the certificate, which identified Hammond, Martin as the producer.

> FN2. We take judicial notice of court documents properly noticed below, but do not consider the truthfulness or proper interpretation of their contents. (*AL Holding Co. v. O'Brien & Hicks, Inc.* (1999) 75 Cal.App.4th 1310, 1313, 89 Cal.Rptr.2d 918; see also *Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 83, 86 Cal.Rptr.2d 846, 980 P.2d 398.)

Plaintiff filed a workers compensation claim against Griffin in July 1996. On December 16, 1996, Griffin petitioned to join the broker defendants, Republic and Allied Mutual Insurance Company. The petition alleged: "On June 21, 1995, James Griffin informed his insurance broker, Lyle Martin, of the proposed construction of a personal residence at the Lakeville property. On the same date, ... *Lyle Martin, either in his capacity as the owner of Lyle Martin & Company or in his capacity as a principal in the insurance firm of Hammond, Martin, Walsh & Smith, caused to be issued*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d                                                    Page 4
2002 WL 27138 (Cal.App. 1 Dist.), 67 Cal. Comp. Cases 42
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2002 WL 27138 (Cal.App. 1 Dist.))**

*a certificate of insurance amending a policy of insurance coverage for workers' compensation liability* issued by Republic Indemnity Insurance Company of America covering Industrial Devices Corporation and James Griffin, an individual.... The certificate of insurance by its language 'serves as evidence of coverage, job: 7300 Old Lakeville Road, # 3, Petaluma, CA 94954." (Italics added.)

**\*2** Republic opposed the petition, arguing in a January 1997 response that Griffin erroneously relied on the broker defendants' misrepresentations that the Republic policy covered workers at Griffin's residence. [FN3]

> FN3. Griffin sued the defendant brokers in 1998. That suit settled in 1999.

On October 4, 1999 plaintiff sued defendants for negligence, misrepresentation, and infliction of emotional distress. The complaint, as later amended, alleged that defendants "made representations leading Plaintiff to reasonably believe that they had properly requested appropriate workers' compensation coverage from Republic. It was not until 1998, that Plaintiff learned that Defendants, and each of them, had not appropriately requested or exercised due diligence in attempting to obtain workers' compensation coverage from Republic. Plaintiff was not, and due to defendants' misrepresentations, could not have become reasonably aware until this time that defendants had failed to properly obtain workers' compensation insurance for his benefit."

Defendants demurred. The trial court sustained the demurrer with leave to amend on statute of limitations grounds, ruling that the complaint failed to satisfy the pleading requirements for delayed discovery. [FN4]

> FN4. Defendants also demurred and moved to strike certain claims on other grounds. In light of our resolution of the statute of limitations issue, we need not and do not address those points.

Plaintiff's second amended complaint added the following allegations in support of his delayed discovery claim: "16. In approximately February 1996, plaintiff contacted defendants, specifically plaintiff spoke by telephone with Lyle Martin. Lyle Martin told plaintiff that neither he, nor any of his staff, had done anything wrong. Lyle Martin told plaintiff that there should have been coverage for plaintiff's injury, and that if there was a problem, it was either Republic's fault for wrongfully denying his claim, or Griffin's fault for failing to properly process his paperwork. Plaintiff believed Lyle Martin and based on Lyle Martin's statements, plaintiff did not include defendants in his civil action against Griffin. Plaintiff reasonably believed that defendants were telling the truth that they have no fault in the lack of workers' compensation insurance.

"....

"18. In May 1998, defendant Lyle Martin was deposed by Republic in a separate declaratory relief action. Plaintiff learned of the general nature of the defendants' testimony during the deposition. A few months after the deposition, defendants provided documents to plaintiff's attorney. Based on the documents, and on his understanding of the deposition testimony, plaintiff eventually suspected that defendants' [*sic* ] had lied to plaintiff about their actions and involvement in his situation. But for defendants' repeated misrepresentations, plaintiff would have further investigated defendants' role in his situation. Based on plaintiff's reasonable beliefs in the defendants' misrepresentations, he did not further investigate or pursue defendants as a cause of the lack of workers' compensation insurance."

The trial court again sustained defendants' demurrer on statute of limitations grounds and granted leave to amend. As to plaintiff's negligence and misrepresentation claims, the court ruled that "[a]lthough plaintiff alleges facts showing defendants concealed their 'identity,' he fails to allege facts showing he exercised reasonable diligence in [discovering] their identity ... in that he fails to show that he made any efforts between February 1996 and May 1998 to discover who was responsible." [FN5]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d                                                          Page 5
2002 WL 27138 (Cal.App. 1 Dist.), 67 Cal. Comp. Cases 42
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2002 WL 27138 (Cal.App. 1 Dist.))**

FN5. The court also sustained demurrers to the emotional distress claims on statute of limitations grounds, without leave to amend. Plaintiff did not challenge that ruling, which is now final.

**\*3** The third amended complaint added further allegations intended to bolster plaintiff's delayed discovery claim, as follows:

"17. On or about January 18, 1996, plaintiff called Republic talked with representative Mike discussed the 'Certificate of Insurance' prepared by defendants and who was responsible. At no time did Republic state any wrongdoing by defendants. Mike said it is common for the employer to furnish information to the holder based on his insurance file.

"....
"19. Approximately January 1996, plaintiff thru [*sic*] his attorney hired a private investigator to investigate his injury and who was responsible for lack of coverage. After examining the certificate on file with the Sonoma Building Department, no wrongdoing by defendants was reported.

"20. From 1995 to May 1998, employer Griffin never informed plaintiff that defendants never sent or requested insurance to Republic. Plaintiff made many claims and served litigation documents to employer who had many opportunities to inform plaintiff.

"....
"22. In July 1996, plaintiff filed a workers compensation claim against Griffin. Republic and [A]llied were joined as defendants at the request of Griffin. Honorable Judge David Applen would not join defendants having found no reason to do so. Griffin's answer to petition showed no lack of responsibility or wrongdoing by defendants.

"23. On or about August 14, 1996, plaintiff subpoenaed documents from Republic to be used in an upcoming prove up hearing. The subpoena requested any and all documents relating to claim number 96193047 and Republic policy number 039019372 including documents denying coverage. No information was furnished plaintiff of any wrongdoing by defendants.

"24. On or about December 1996, pursuant to plaintiff's workers compensation claim, Allied Insurance adjustor investigated coverage for plaintiff's injury and never found any lack of responsibility by defendants in securing coverage or facts giving rise to a cause of action against defendants.

"25. On or about April 22, 1997, Republic sued Griffin and plaintiff in a declaratory relief action. Defendants were not made party to this complaint nor was their name even mentioned.

"26. In July 1997 Honorable Judge Richard Gilbert mediated plaintiff's action against Griffin. There was no wrongdoing by defendants reported in Griffin's moving papers by two different law firms or anyone else at fault."

Defendants again demurred. This time the trial court sustained the demurrer without leave to amend, ruling that Plaintiff had failed to state facts showing he exercised reasonable care in attempting to discover the facts he alleged defendants intentionally concealed. Judgment was entered and plaintiff timely appealed.

*Discussion*
A. *Standard of Review*

" '[W]e treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d
2002 WL 27138 (Cal.App. 1 Dist.), 67 Cal. Comp. Cases 42
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2002 WL 27138 (Cal.App. 1 Dist.))**

Page 6

cured by amendment; if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' [Citations.]" (*Stanton Road Associates v. Pacific Employers Ins. Co.* (1995) 36 Cal.App.4th 333, 340-341, 43 Cal.Rptr.2d 1.)

### B. *The Statute of Limitations Bars Plaintiff's Claims*

**\*4** [2] Plaintiff's cause of action against defendants accrued in January 1996, when Republic denied his claim for workers' compensation benefits. (See generally *City of Vista v. Robert Thomas Securities, Inc.* (2000) 84 Cal.App.4th 882, 886-887, 101 Cal.Rptr.2d 237 [cause of action does not accrue until plaintiff suffers damage].) Because he did not file this action until October 1999, the limitations periods for negligence--based claims and intentional misrepresentation would ordinarily bar the action. The question, thus, is whether plaintiff's allegations of delayed discovery and fraudulent concealment are sufficient, at the pleading stage, to estop defendants from asserting the statute of limitations.

### 1. *Delayed Discovery and Fraudulent Concealment*

"The statute of limitations usually commences when a cause of action 'accrues,' and it is generally said that 'an action accrues on the date of injury.' [Citation.] Alternatively, it is often stated that the statute commences 'upon the occurrence of the last element essential to the cause of action.' [Citations.] These general principles have been significantly modified by the common law 'discovery rule,' which provides that the accrual date may be 'delayed until the plaintiff is aware of her injury and its negligent cause.' [Citation.]

"A close cousin of the discovery rule is the well accepted principle ... of fraudulent concealment. [Citation.] 'It has long been established that the defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations, but only for that period during which the claim is undiscovered by plaintiff *or until such time as plaintiff, by the*

*exercise of reasonable diligence, should have discovered it.*' [Citation.] Like the discovery rule, the rule of fraudulent concealment is an equitable principle designed to effect substantial justice between the parties; its rationale 'is that the culpable defendant should be estopped from profiting by his own wrong to the extent that it hindered an "otherwise diligent" plaintiff in discovering his cause of action.' [Citations.]" (*Bernson v. Browning Ferris Industries* (1994) 7 Cal.4th 926, 931, 30 Cal.Rptr.2d 440, 873 P.2d 613, italics added, fn. omitted.)

[3][4] To plead estoppel based on fraudulent concealment, the plaintiff must allege: "(1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it *or had no actual or presumptive knowledge of facts sufficient to put him on inquiry.* [Citation.]" (*Community Cause v. Boatwright* (1981) 124 Cal.App.3d 888, 900, 177 Cal.Rptr. 657, italics added.) "In urging lack of means of obtaining knowledge, it must be shown that in the exercise of reasonable diligence the facts could not have been discovered at an earlier date." (*Baker v. Beech Aircraft Corp.* (1974) 39 Cal.App.3d 315, 321, 114 Cal.Rptr. 171.) Because "allegations of fraud are serious, and the defendant is entitled to receive sufficient details in order to prepare his defense," the policy of liberal construction will not ordinarily be applied to remedy defective allegations. (*Community Cause v. Boatwright, supra,* at p. 901, 177 Cal.Rptr. 657.)

### 2. *Analysis*

#### a. *inquiry notice and reasonable diligence*

**\*5** [5][6] Here, the third amended complaint and the documents properly subject to judicial notice demonstrate that plaintiff had actual knowledge sufficient to put him on inquiry notice years before he filed his complaint. Plaintiff had seen the insurance certificate with Hammond, Martin's name on it at the Griffin residence and later obtained a copy of it. By September 1996 he unquestionably had notice through Griffin's declaration that the broker defendants had

Not Reported in Cal.Rptr.2d
2002 WL 27138 (Cal.App. 1 Dist.), 67 Cal. Comp. Cases 42
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2002 WL 27138 (Cal.App. 1 Dist.))**

Page 7

provided Griffin with the certificate. By January 1997, plaintiff had been alerted to Republic's claim that defendants had misrepresented that Griffin's workers compensation policy covered his residential workers. "[T]he test for determining whether ... the plaintiff is put upon inquiry must not be based upon an inference that might conceivably be drawn, but rather on a conclusion which a reasonable person would be required to reach." (*Baker v. Beech Aircraft Corp., supra,* 39 Cal.App.3d at pp. 323- 324, 114 Cal.Rptr. 171.) On these alleged facts, the only reasonable conclusion is that plaintiff was on inquiry notice of the brokers' potential responsibility for the lack of coverage years before he filed this action.

[7] Plaintiff asserts he nonetheless alleged facts demonstrating reasonable care in investigating that potential culpability. We disagree. The complaint's factual recitations demonstrate that plaintiff simply relied on the activities of others and on the fact that no one told him that defendants might have done something wrong. Allegations that neither Griffin, Republic nor plaintiff's private investigator identified wrongdoing by the broker defendants do not show that Plaintiff made a reasonable, or, for that matter, any, effort to ascertain whether the brokers were at fault. "[W]ithin the applicable limitations period, [a plaintiff] must indeed seek to learn the facts necessary to bring the cause of action in the first place--he 'cannot wait for' them 'to find' him and 'sit on' his 'rights'; he 'must go and find' them himself if he can and 'file suit' if he does. [Citation.]" (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 398, 87 Cal.Rptr.2d 453, 981 P.2d 79.) Despite two opportunities to amend, one searches the complaint in vain for allegations that plaintiff investigated defendants' culpability through discovery or otherwise. Conclusory allegations that he was "led to believe" Griffin or his contractor were the only responsible parties cannot cure that omission.

b. *fraudulent concealment*

[8][9] Finally, plaintiff's attempt to plead fraudulent concealment does not save his action. Plaintiff alleged that Martin said he and his staff were blameless and that the lack of coverage was either Republic's or Griffin's fault. This allegation, as a matter of law, does not amount to a misrepresentation of fact excusing Plaintiff's duty of inquiry. In *Silver v. Watson* (1972) 26 Cal.App.3d 905, 103 Cal.Rptr. 576 (*Silver*), allegations showed notice of the defendant's alleged fraud sufficient to start the statute running. The plaintiff alleged, however, that the defendant had denied culpability, and that those statements had the effect of concealing his wrongdoing. The court disagreed. "To obtain the benefit of the late-discovery exception to the statute of limitations, the complaint must allege facts showing that the cause of action could not with reasonable diligence have been discovered prior to three years before the suit. [Citations.] Manifestly, plaintiff has not attempted to come within this rule. The complaint shows the contrary--namely, that the matter was brought to the board's attention by the indictment and by the letter of December 4, 1966. *The county was clearly on notice from that time forward, and [the defendant's] assertions of innocence thereafter cannot be regarded as 'concealment.'* " (*Id.* at p. 911, 103 Cal.Rptr. 576, italics added.)

*6 [10] *Silver's* reasoning and conclusion are well founded. When a plaintiff is on notice that a potential defendant figured centrally in the events resulting in plaintiff's injury, that the defendant denies culpability does not excuse the plaintiff from further investigation. In this respect plaintiff's reliance on *Balfour, Guthrie & Co. v. Hansen* (1964) 227 Cal.App.2d 173, 38 Cal.Rptr. 525 (*Balfour* ) and *Snow v. A.H. Robins Co.* (1985) 165 Cal.App.3d 120, 211 Cal.Rptr. 271 is misplaced. In contrast to *Silver, supra,* in neither of those cases was the plaintiff on notice of the defendant's participation in the allegedly tortious events. As *Silver* implicitly teaches, and *Balfour* expressly notes (*supra,* at p. 196, 38 Cal.Rptr. 525), only *reasonable* reliance on a defendant's misrepresentation excuses the plaintiff from diligent pursuit of his action. Where the plaintiff is on notice of defendant's involvement and potential culpability, the defendant's mere assertion of innocence does not excuse the plaintiff from his duty of diligent investigation. Here, the complaint unequivocally establishes that Plaintiff was on notice of broker

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d
2002 WL 27138 (Cal.App. 1 Dist.), 67 Cal. Comp. Cases 42
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2002 WL 27138 (Cal.App. 1 Dist.))**

Page 8

defendants' involvement in Griffin's failure to procure insurance. It was, therefore, his obligation to diligently investigate the existence of a cause of action against them. Under these circumstances, defendants' alleged assertions of blamelessness, as in *Silver,* "cannot be regarded as 'concealment.' "

[11] Plaintiff next asserts the issue of fraudulent concealment is a factual question that cannot be decided at the pleading stage. That is not the law. (See *Silver, supra,* 26 Cal.App.3d at p. 911, 103 Cal.Rptr. 576 [sustaining dismissal after demurrer].) Plaintiff derives this proposition from cases in which the facts were susceptible to opposing inferences as to whether the plaintiff had notice of circumstances "sufficient to put a prudent man upon inquiry as to a particular fact." (*Bowman v. McPheeters* (1947) 77 Cal.App.2d 795, 803, 176 P.2d 745; see also *Baker v. Beech Aircraft Corp., supra,* 39 Cal.App.3d at p. 323, 114 Cal.Rptr. 171.) Not so here. The third amended complaint demonstrates as a matter of law that plaintiff was on inquiry notice of the broker defendants' potential culpability years before filing suit. The court correctly rejected his claim of fraudulent concealment claim. [FN6]

> FN6. Making an argument not raised in the trial court, plaintiff also asserts the statute of limitations should have been tolled the statute of limitations while Griffin sued the broker defendants and settled that action without informing him. Because plaintiff failed to raise this issue below, it is waived for purposes of appeal.

### 3. *Denial of Leave to Amend*

Finally, Plaintiff contends he should have been granted leave to amend his complaint to add further allegations supporting fraudulent concealment. His proposed allegations, however, again, add nothing of substance to his claim of fraudulent concealment or reasonable diligence. Accordingly, plaintiff has not met his burden of showing how a further amendment would change the result. (*Cooper v. Leslie Salt Co.* (1969) 70 Cal.2d 627, 636, 75 Cal.Rptr. 766, 451 P.2d 406.) The trial court

did not abuse its discretion in denying leave to amend for a fourth time.

*Disposition*
The judgment is affirmed.

We concur: McGUINESS, P.J. and PARRILLI, J.

 2002 WL 27138 (Cal.App. 1 Dist.), 67 Cal. Comp. Cases 42 Not Officially Published, (Cal. Rules of Court, Rules 976, 977)

**Briefs and Other Related Documents (Back to top)**

• 2001 WL 34120634  (Appellate Brief) Appellant's Reply Brief (Oct. 02, 2001)Original Image of this Document (PDF)

• 2001 WL 34119001  (Appellate Brief) Respondents' Brief (Aug. 24, 2001)Original Image of this Document (PDF)

• 2001 WL 34144221  (Appellate Brief) Appellant's Opening Brief (May. 03, 2001)Original Image of this Document with Appendix (PDF)

• A093776 (Docket)

(Jan. 19, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.