## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## (BOSTON)

**Nancy Brooks and Joan Silverman**, as
Trustees of the Irrevocable Trust of Donald L.
Silverman and as Executrices for the Estate of
Donald L. Silverman

        Plaintiffs,

    v.

**AIG SunAmerica Life Assurance Company**,

        Defendant.

) Civil Action No. 05-10994-WGY

## PLAINTIFFS' OPPOSTION TO DEFENDANT'S MOTION TO DISMISS

Plaintiffs Nancy Brooks and Joan Silverman, on behalf of themselves and all

other similarly situated persons, hereby oppose Defendant's Motion to Dismiss.

### INTRODUCTION

This case raises the issue of how plaintiffs should proceed when they have

investigated the facts available to them with due diligence and believe reasonably and in

good faith that defendant has breached the contract between them by raising premiums

beyond what was authorized and that violated the insurance regulations governing

premium increases, but defendant has failed to disclose the underlying facts necessary to

make a conclusive determination. The Catch-22 for plaintiffs is that if they allege every

claim reasonably available to them, they face the challenge that defendant will seek to

dismiss their complaint on the grounds that it is not sufficiently detailed, but if they limit

their allegations to what information defendant has provided them, they may be precluded

from pursuing the claims they do not bring originally. Because plaintiffs have timely and

adequately alleged claims for breach of contract, breach of the implied duty of good faith

and fair dealing, violation of MGLC 93A, and violation of the California Unfair Business
Practices Act, defendant's motion to dismiss should be denied.

## FACTUAL ALLEGATIONS

Nancy Brooks and Joan Silverman are trustees of the Irrevocable Trust of Donald
L. Silverman and, as his daughters, executrices of the Estate of Donald L. Silverman.
Prior to his death in June 2001, Mr. Silverman was a resident of Swampscott,
Massachusetts and the insured under Mutual Benefit Life of New Jersey ("Mutual Benefit
Life") Policy AL101958, which had a Policy Issue Date of May 1, 1984. At the time of
Mr. Silverman's death in June of 2001, the Irrevocable Trust of Donald L. Silverman
owned Mutual Benefit Life Policy AL101958. Defendant AIG SunAmerica Life
Assurance Company ("SunAmerica"), an Arizona corporation with a corporate
headquarters and principle place of business at 1 SunAmerica Center, Los Angeles, CA
90067, is the successor in interest to Mutual Benefit Life.

Up until approximately 1994, Mutual Benefit Life was a solvent mutual life
insurance company that sold, among other insurance products, "flexible premium"
universal life insurance policies such as the one Mr. Silverman purchased in 1984. On or
about July 16, 1991, Mutual Benefit Life was placed in rehabilitation by the New Jersey
Commissioner of Insurance at least in part because of questions concerning its ongoing
ability to pay claims. In May of 1994, substantially all of Mutual Benefit Life's assets
and liabilities were transferred to MBL Life Assurance Corporation ("MBL Life
Assurance") under a rehabilitation plan adopted by the New Jersey Commissioner of
Insurance and approved by the New Jersey Superior Court (the "Rehabilitation Plan").
Mutual Benefit Life policyholders such as Mr. Silverman were given the choice of either

2

opting out of the Rehabilitation Plan or having their policies temporarily restructured (in ways that are not relevant to this litigation) to a common form policy and transferred to MBL Life Assurance.

On June 30, 1999, pursuant to the Rehabilitation Plan, Anchor National Life Insurance Company ("Anchor"), a SunAmerica company, formally acquired the block of policies that MBL Life Assurance had acquired from Mutual Benefit Life (the "Mutual Benefit Block of Policies"). Also pursuant to the Rehabilitation Plan, the temporary restructuring of the Mutual Benefit Block of Policies into common form policies expired and the original terms of the Class members' policies controlled again. Anchor and/or SunAmerica have administered the Mutual Benefit Block of Policies, including Mr. Silverman's policy, at all times thereafter. (Anchor and SunAmerica are sometimes referred to collectively herein as "SunAmerica.").

From the time it acquired them in 1999 until at least 2002, SunAmerica has increased the COI rates on the Mutual Benefit Block of Policies each year in the following manner (the "COI Rate Increases"):

| Year | COI Increase per $1000 per month ($) | COI Increase (%) |
|------|--------------------------------------|-------------------|
| 1999-2000 | From $5.14 to $6.52 = $1.38 | 24% |
| 2000-01 | From $6.52 to $7.12 = $0.60 | 9% |
| 2001-02 | From $7.12 to $7.95 = $0.83 | 11% |

However, SunAmerica apparently violated the two criteria that it must meet before raising COI Rates. First, as the controlling policy language in the Mutual Life Block of Policies states, **"Any change in [COI] rates will be in accordance with any procedures and standards on file with the Insurance Department of the jurisdiction**

3

**in which the policy is delivered."** (Emphasis added). Second, any COI Rate Increases had to be less than the maximum guaranteed rates set out in the insurance policy's COI Rate Table. To the best that plaintiffs can determine based on the limited information available to them, the COI Rate Increases were **NOT** made "in accordance with any procedures and standards on file with the Insurance Department of the jurisdiction in which" any of the Mutual Life Block of Policies were delivered. As a result, the COI Rate Increases are in breach of the terms of the policy language of the Mutual Life Block of Policies and are therefore invalid even if the COI Rate Increases were less than the guaranteed maximum increases set out in the policy's COI Rate Table.

SunAmerica fraudulently concealed that it had made the COI Rate Increases in violation of the relevant insurance policy's terms by misrepresenting to the named plaintiffs and their agents several times between 2001 and the present that the Rehabilitation Plan authorized it to make the COI Rate Increases. To the contrary, the truth, which SunAmerica knew or should have known, is that the COI Rate Increases were governed by the insurance policy language quoted above in ¶ 19. In addition, plaintiffs did not know, and in the exercise of reasonable diligence could not have known, whether SunAmerica made the COI Rate Increases in violation of the terms of their policy because SunAmerica has failed to disclose to them the method by which it calculates COI Rate Increases and the information is not available anywhere else.

## ARGUMENT

Because SunAmerica: (1) misstated the grounds upon which it could enact COI Rate Increases, (2) failed to disclose whether it followed the correct procedures for enacting COI Rate Increases, and (3) enacted COI Rate Increases far beyond what was

4

appropriate, plaintiffs have reasonably surmised that SunAmerica breached the policy and have adequately alleged such breach. Moreover, SunAmerica's conduct as evidenced by this deliberate pattern of excessive and deceptive COI Rate Increases also constitutes unfair or deceptive acts or practices to the extent that Counts II, III and/or IV require allegations of malfeasance.

SunAmerica bases its arguments for dismissal entirely on the notion that plaintiffs failed to adequately allege the basis for their claims, even though it knows that it engaged in the following pattern of deceptive communications with plaintiffs' representatives:

- From September of 2002 until prior to May 9, 2003, plaintiffs' insurance representative and SunAmerica engaged in oral communications regarding the reasons for the COI Rate Increases.

- On May 9, 2003, plaintiffs' insurance representative wrote to SunAmerica, noted that there have been ongoing discussions since "September of 2002," and asked SunAmerica to explain in writing why it enacted the COI Rate Increases (the May 9 Letter"). Exhibit 1.

- On May 28, 2003, SunAmerica answered the May 9 Letter, falsely claimed that it was authorized to enact the COI Rate Increases under the Rehabilitation Plan, and failed to disclose whether it followed the procedures on file with the MA DOI for enacting COI Rate Increases, as required by the policy (the "May 28 Letter"). Exhibit 2.

- On July 21, 2003, plaintiffs' insurance representative wrote back to SunAmerica and again asked for it to explain how it calculated the COI Rate Increases (the "July 21 Letter"). Exhibit 3.

5

- On August 5, 2003, SunAmerica answered the July 21 Letter, again falsely claimed that it was authorized to enact the COI Rate Increases under the Rehabilitation Plan, and again failed to disclose whether it followed the procedures on file with the MA DOI for enacting COI Rate Increases, as required by the policy (the August 5 Letter"). Exhibit 4.

- On February 18, 2005, plaintiffs' attorney served an MGLC 93A demand letter on SunAmerica alleged that it had enacted the COI Rate Increases in violation of the terms of the policy (the "93A Demand Letter"). Exhibit 5.

- On March 21, 2005, SunAmerica answered plaintiffs' February 18 letter, again falsely claimed that it was authorized to enact the COI Rate Increases under the Rehabilitation Plan, and again failed to disclose whether it followed the procedures on file with the MA DOI for enacting COI Rate Increases, as required by the policy (the "93A Response"). Exhibit 6.

## I.    The Legal Standard for Dismissal Favors Plaintiffs.

In considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must "accept as true the factual allegations of the complaint, construe all reasonable inferences there from in favor of the plaintiffs, and determine whether the complaint, so read, limns facts sufficient to justify recovery on any cognizable theory of the case." *Disabled Americans for Equal Access, Inc. v. Ferries Del Caribe, Inc.,* 405 F.3d 60, 64 (1st Cir. 2005) (Citations omitted).

## II.    Plaintiffs Have Adequately Alleged Breach of Contract Because Some of the Facts Surrounding that Breach Are Exclusively Within Defendant's Control and Defendant Has Failed to Explain Its Conduct.

Plaintiffs have alleged: (1) there is a contract (insurance policy in the Mutual Life Block of Policies) between SunAmerica and each Class member; (2) the policy language in the contracts in the Mutual Life Block of Policies sets forth the terms under which SunAmerica can make COI Rate Increases; (3) SunAmerica breached those contracts by apparently making COI Rate Increases in violation of the terms of the policies in the Mutual Life Block of Policies: (4) SunAmerica's breach directly and proximately damaged each Class member by raising his/her premiums in an amount approximately equal to the unauthorized increase in COI rates. Alleging the existence of a contract, its breach and damages are all that is required. *See, e.g., Instituto de Educacion Universal, Inc. v. Great Lakes,* 2001 WL 1636686 (D.P.R. 2001) at *2; *Petricca v. Simpson,* 862 F.Supp. 13, 17 (D. Mass. 1994).

In support of dismissing the contract claim on the merits, SunAmerica erroneously argues that plaintiffs "cannot identify a single contractual provision that AIG SunAmerica purportedly breached," Defendant's Memo at 4, ignoring the fact that plaintiffs quoted the breached provision in ¶19 of their Complaint. While SunAmerica makes much of plaintiffs alleging the breach "upon information and belief," it ignores the fact that it has failed to disclose information to plaintiffs that would confirm/deny whether the breach described by plaintiffs occurred. SunAmerica has continually misrepresented to plaintiffs that the COI Rate Increases were authorized by the Rehabilitation Plan. *See, e.g.,* 93A Response ("AIG SunAmerica implemented all increases in the Policy's cost of insurance ("COI") rate in accordance with the terms of

7

the Policy and the Rehabilitation Plan."). That misrepresentation is false because the

Rehabilitation Plan, by its express terms, does not govern the COI Rate Increases since

they occurred after the Rehabilitation Period terminated. *See* Sample Endorsement at

page 1 ("This Endorsement . . . shall remain in effect during the Rehabilitation Period.

Upon expiration of this Endorsement, the basis policy provisions shall control and the

provisions of this Endorsement shall have no further force or effect.") (Exhibit 7).[1]

SunAmerica also argues erroneously that the count should be dismissed because it

does not identify the "procedures" that should have been followed before increasing COI

Rates, Defendant's Memo at 4-5, but fails to inform the Court that it never disclosed those

"procedures" to plaintiffs beyond mentioning them in the insurance policy. Instead, it

argues without any basis in reality that plaintiffs could have obtained that information

from the Massachusetts Division of Insurance ("DOI") even though the DOI does not

keep copies of documents long enough for a person (such as Donald L. Silverman) who

purchased a policy in 1984 to check on the associated filings in 1999, when the first

suspicious increase occurred. SunAmerica ignores the fact that the MA DOI rarely

retains filed documents beyond 7 years.

## III. Plaintiffs Have Adequately Alleged Counts II, III and IV.

### A. Plaintiffs Have Alleged a Breach of the Implied Duty.

With respect to Count II (Breach of the Implied Covenant of Good Faith and Fair

Dealing), plaintiffs alleged: (1) SunAmerica breached the implied covenant of good faith

and fair dealing contained in each Class Member's insurance policy by making the COI

Rate Increases and fraudulent concealing them; and (2) SunAmerica's breach directly and

---

[1] Exhibit 7 is addressed to "Green, Joe" even though it was sent to Mr. Silverman. It appears to be a generic name used for these generic documents instead of addressing them individually. It may be a reference to the Pittsburg Steelers legendary defensive lineman "Mean" Joe Green.

proximately damaged each Class member by raising his/her premiums in an amount approximately equal to the unauthorized increase in COI rates. These are the elements of a claim for breach of the implied duty of good faith and fair dealing. *See, e.g., Learning Express, Inc. v. Ray-Matt Enterprises, Inc.,* 74 F.Supp.2d 79, 84 (D. Mass. 1999) (Young, J.) ("plaintiff must show that there existed an enforceable contract between the two parties and that the defendant did something that had the effect of destroying or injuring the right of [the plaintiff] to receive the fruits of the contract") (citations omitted).

Contrary to what SunAmerica argues here, plaintiffs have met their burden of alleging bad faith by alleging in ¶22 of the Complaint that defendant fraudulently concealed that it had made the COI Rate Increases in violation of the policy's terms. *See Christensen v. Kingston School Committee,* 360 F.Supp.2d 212, 226 (D. Mass. 2005) (Young, J.) ("Harms suffered in a breach of the implied covenant of good faith and fair dealing generally involve deceit or 'unfair subterfuge' and usually are 'compounded by deceptive or unfair behavior that prevented-or at a minimum diverted-the injured parties from seeking immediate redress.'") (Citing *Boston Pilots v. Motor Vessel Midnight Gambler and E. Coast Excursions, Inc.,* 357 F.3d 129, 135 (1st Cir.2004)).

## B. Plaintiffs Have Alleged a Violation of MGLC 93A.

With respect to Count III (Violation of MGLC 93A), plaintiffs alleged: (1) by deceptively making unauthorized COI Rate Increases, SunAmerica committed an unfair or deceptive act or practice within the meaning of MGLC 93A; (2) plaintiffs served an MGLC 93A demand letter on SunAmerica but SunAmerica refused to make a reasonable offer of settlement either to the named plaintiffs or the Class; (3) SunAmerica's unfair or deceptive acts or practices have violated MGLC 93A and proximately injured the named

plaintiffs and the Class; (4) Because SunAmerica's violations of MGLC 93A have been willful and knowing and/or its refusal to grant class-wide relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated MGLC 93A, the named plaintiffs and the Class are entitled to treble damages, attorneys' fees and expenses. These are the elements of a claim for violation of MGLC 93A, §9.

Plaintiffs' allegation that "SunAmerica fraudulently concealed that it had made the COI Rate Increases in violation of the relevant insurance policy's terms by misrepresenting to the named plaintiffs and their agents several times between 2001 and the present that the Rehabilitation Plan authorized it to make the COI Rate Increases" Complaint at ¶22, is incorporated by reference into each of the Counts and easily fits within the statute's definition of "unfair or deceptive." *See Serpa Corp. v. McWare, Inc.,* 199 F.3d 6, 15 (1st Cir. 1999) ("For conduct to violate [MGLC 93A] it must (1) fall within the penumbra of some common-law, statutory, or other established concept of unfairness; (2) be immoral, unethical, oppressive or unscrupulous; and (3) cause substantial injury…") (Citations omitted). Not surprisingly, none of the cases relied upon by SunAmerica, *see* Defendant's Memo at 9, involved a consumer suing under MGLC, §9, a form contract of adhesion, and/or allegations that defendant concealed from plaintiff the facts necessary to determine whether it had breached the contract. Consequently, the cases SunAmerica cites are readily distinguishable from our case.

## C.     Plaintiffs Have Alleged a Violation of the CA Statute.

With respect to Count IV (Violation of California Unfair Business Practices Act), plaintiffs alleged: (1) SunAmerica's conduct in making excessive, undisclosed and

10

unauthorized COI Rate Increases constitutes and unlawful and/or unfair business practice within the meaning of the California Unfair Business Practices Act; (2) SunAmerica's conduct emanated from its corporate headquarters in Los Angeles, CA; (3) SunAmerica's conduct was unfair because it raised premiums without authorization for policyholders who had not choice but to pay the increases or surrender the policy; (4) SunAmerica's conduct was unlawful because it made COI Rate Increases in violation of the procedure it had on file with each state's Division of Insurance and/or unjustly enriched itself at the expense of the plaintiffs; (5) As a direct and proximate result of its conduct, SunAmerica has received, and continues to hold, ill-gotten gains that belong to the plaintiffs; (6) Plaintiffs are accordingly entitled to damages and equitable relief in the form of restitution and disgorgement of all earnings, profits, compensation and benefits obtained by SunAmerica as a result of such unfair and/or unlawful business practices. These are the elements of a claim for the violation of the California Unfair Business Practices Act. *See, e.g., Yamaha Corp. of America v. ABC International Traders Corp.,* 703 F.Supp. 1398, 1401 (C.D. Cal. 1988).

"As interpreted by the California Supreme Court, the scope of this statute is broad: 'The statutory language referring to "any unlawful, unfair or fraudulent" practice makes clear that a practice may be deemed **unfair** even if not specifically proscribed by some other law.'" *In re Relafen Antitrust Litigation,* 221 F.R.D. 260, 283 (D. Mass. 2004) (Young, J.) (emphasis added) (citing *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,* 973 P.2d 527, 539 (1999)). Acts or practices may be enjoined because unfair even if they fit no pattern previously condemned by statute or case law. *Allied Grape Growers v. Bronco Wine Co.,* 249 Cal. Rptr. 872, 882 (Cal. App. 1988). The *Cel-*

11

*Tech* court has accepted the Federal Trade Commission's revised definition of unfair, *id.* at 543-44, under which an act or practice is unfair if it "[1] causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or competition," 15 U.S.C. §45(n). Plaintiffs meet this standard because (1) the insured, Mr. Silverman, suffered substantial injury by having to pay tens of thousand of dollars in excess premiums, (2) there was nothing that Mr. Silverman could have reasonably done to avoid having to pay the COI Rate Increases and (3) there was no countervailing benefit for competitors or other consumers from enacting the COI Rate Increases.

The "unlawful" prong of the California statute makes the violation of virtually any federal or state statute, regulation or common law a *per se* violation of Section 17200. *Kasky v. Nike, Inc.,* 45 P.3d 243, 249-50 (Cal. 2002). Under this standard, SunAmerica's conduct was also unlawful because it violated the regulatory requirement that premium increases on flexible-premium polices such as the COI Rate Increase must be done in accordance with the procedures on file with the Massachusetts DOI. *See* 211 CMR 95.06(2) ("Each filing for approval of a variable life insurance policy form shall include … the mortality [*i.e.*, the cost of insurance], expenses and other risks which the insurer will bear under the policy.").

## IV.    Counts III and IV Are Timely.

### A.    The Legal Standard Governing Timeliness Favors Plaintiffs.

This Circuit disfavors motions to dismiss based on statute of limitations grounds. *See, e.g., Centro Medico del Turabo, Inc. v. Feliciano de Melecio,* 406 F.3d 1, 6 (1st Cir. 2005) ("it is sometimes permissible to grant a motion to dismiss based on … the statute

of limitations … 'when the pleader's allegations leave no doubt that an asserted claim is time-barred.'") (Citations omitted).

## B.   Plaintiffs Brought Suit Within the Four Year Statute of Limitations.

SunAmerica erroneously assumes that plaintiffs' injuries occurred in 1999, 2000 and 2001 apparently because that is when the challenged COI Rate Increases incurred. *See* Defendant's Memo at 13. The correct sequence of events, however, is that Mr. Silverman died in June of 2001 still owing over-due premiums on his policy. Those overdue premiums were not paid until sometime after his death. Therefore, the time between payment/injury (post June of 2001) and the filing of this Complaint (May of 2005) is less than the statute of limitations (4 years).

## C.   The MGLC 93A Claim Is Also Timely Under the Discovery Rule and the Doctrine of Fraudulent Concealment.

Plaintiffs meet the requirements of the discovery rule because they exercised reasonable diligence but failed to discover SunAmerica's misconduct earlier. Well within MGLC 93A's four year statute of limitations, they retained an insurance representative who communicated with SunAmerica in order to determine whether it had enacted the COI Rate Increases in accordance with the terms of the policy. *See* Exhibits 1, 3. SunAmerica's reply correspondence, however, demonstrates that it failed to disclose whether or not it had done so. *See* Exhibits 2, 4. There was no way for plaintiffs to independently verify whether SunAmerica had complied with the policy because it could not get copies of the "procedures and standards" for a 1984 policy in 1999. If SunAmerica had a copy of the "procedures and standards" for enacting COI Rate Increases and was complying with them, it could have easily provided them to plaintiffs. In any event, obtaining copies of the "procedures and standards" would not have been

sufficient to allow plaintiffs to determine whether they had been followed because they had no way to obtain information about the factors (such as mortality rates) that would be used to calculate the COI Rate Increases in accordance with those "procedures and standards."

In addition, SunAmerica fraudulently concealed that it had enacted the COI Rate Increases without following the policy's "procedures and standards." To keep plaintiffs from learning that it had enacted the COI Rate Increases in violation of the terms of the policy, SunAmerica (1) misrepresented that it was authorized to enact such Increases under the terms of the Rehabilitation Plan and (2) deliberately failed to give plaintiffs the information they needed (copy of the relevant "policies and standards" and underlying information about the costs of insurance for the policies at issue) to determine whether SunAmerica had breached the policy. Therefore, "the period prior to the discovery of [their] cause of action by [plaintiffs] shall be excluded in determining the time limited for the commencement of the action," MGLC 260, §12, and the 93A count is timely.

## D. The California Statutory Claim Is Also Timely Under the Doctrine of Fraudulent Concealment.

For the reasons set forth above in §IV.A, the California statutory claim is timely under the doctrine of fraudulent concealment.

## CONCLUSION

For the reasons set forth herein, the Court should **deny** Defendant AIG SunAmerica Life Assurance Company's Motion to Dismiss in its entirety. In the

14

alternative, the Court should give plaintiffs leave to re-plead any Counts that it finds to be currently inadequately alleged.

Respectfully submitted,

DATED: 8 August 2005

*John Peter Zavez*

John Peter Zavez (#555721)
Noah Rosmarin (#630632)
ADKINS KELSTON & ZAVEZ, P.C.
90 Canal Street
Boston, MA 02114
Tel: (617) 367-1040
Fax: (617) 742-8280

## CERTIFICATE OF SERVICE

I hereby certify that on 8 August 2005 a true copy of the foregoing pleading was served on counsel of record for defendant by mailing a copy to Attorney James R. Carroll, Skadden, Arps, Slate, Meagher & Flom, LLP, One Beacon Street, Boston, MA 02108.

John Peter Zavez

# EXHIBIT 1

# *Ultimate Benefits*

PO Box 421
Warren, RI 02885
Telephone 401 245-8438
Cell 401 261-7778

Richard P. Sturtevant CLU, ChFC, CLTC
President and CEO

May 9, 2003

Mrs. Josie Wright
Director of Claims
Anchor National Life Insurance Company
PO Box 19074
Greenville, SC 29602-9074

Re: Donald Silverman, Policy AL 101958
Via Fax to: 864-609-8089

Dear Mrs. Wright:

I am writing to you to outline all of the issues that remain with regards to the items you and I have been discussing since September of 2002. I would respectively request written answers to these issues **not later than May 28, 2003.**

Regarding the issue of Planned Premiums: The contract, which I will represent to you, is the governing legal document between the insurance company and the insured, stated that Mr. Silverman was to pay $41,666.67 in the first year, as an "Initial Premium" and then pay $18,415.59 as a Planned Premium to the maturity date of May 1, 2012, several years from today. As we know, in April of 1995, Mr. Silverman was billed a premium of $41,658.50 for the first time for a premium due on May 1, 1995. **ALL PREMIUMS REQUESTED BY THE INSURANCE COMPANY ON THIS CONTRACT WERE PAID AS BILLED. The issue is WHY was he asked to pay this specific amount of premium? What did he receive in return for paying this premium? Why did it change from the "Planned Premium" stated in the contract?**

As you and I have spoken, we have determined that Mutual Benefit Life went into rehabilitation on July 16, 1991. So the question remains. If it was not associated with the rehabilitation of Mutual Benefit, **what was offered to Mr. Silverman in exchange for him paying 2.26 times his normal planned premium?** Remember, these were good years in the stock market. It is unlikely Mr. Silverman would have seen fit to pay Mutual Benefit, a company in rehabilitation, $23,242.91 per year more simply to gain an increase in interest

from 4.10% to 5.10% on cash value growth. We know he was responding to a premium notice in the amount of $41,658.50. It was outlined to him as a "Threshold Premium" (this term is not defined in the insurance policy. See "Section 6 Premiums"). We also know that he had not paid his "planned premium" of $18,415.50 during the years 1992 and 1993 and that he was billed for $55,444.24 in April of 1994 and that this amount was paid. This premium was designed to repay the '92 and '93 premiums and pay the '94 premium of $18,415.59. In the same policy year, Mutual Benefit produced a premium notice for the $41,658.50 amount for the first time. **WHY? WHAT CAUSED THEM TO DO THIS? WHY IN THIS SPECIFIC AMOUNT? AND, WHAT WAS HE PROMISED FOR MAKING SUCH A PAYMENT?** These increases in "billed premiums" over "planned premium" represents a total of $139,457.46 ($23,242.91 times 6 years of payments). Without sufficient answers to these questions, the Silverman Family is asking that this amount be refunded to them, without delay. The other interesting fact is that once this increase in billed premium took place, the amount stayed the same. It did not vary with interest or cash value or expense charges or mortality charges. This would lead someone to believe that these other components of the policy were NOT important in determining the billed premium number. So what went into the development of this new "Threshold Premium"?

There is also a question about this "New Money Balance" that appears on some statements, but not all. I can see it is related to the amount paid as premium, but it seems odd that it is tracked separately as a line item. **Is this additional money due the family? Was this balance money loaned to Mutual Benefit, as part of their rehabilitation? Was it supposed to be paid in addition to the death benefit, like a side fund?** Mr. Silverman might have made an investment of this sort, if it was an attractive offer, according to the family. **Do you owe us an additional $263,736.74 (as of 5/1/99)? This was not part of the policy, so what was it and where is the "balance"?**

Now the issue of **overcharge of Mortality charges** on this contract. You and I have discussed the appearance of significant increases in the mortality charges under this policy in the years 1999 to 2000 and 2000 to 2001. These were years in which Anchor National had full responsibility for the administration for this contract (at least from July 1, 1999). In the prior years, (during MBL administration) the records show the mortality charges increasing gradually each month from month to month, anniversary to anniversary. On the annual statement produced by MBL for 5/94 to 4/95, the mortality charge was $32,798.09 for the year. On the statement for 5/95 to 5/96 the charges were $35,419.57. This represented a growth of **7.9%** approximately from the previous year. (Previous year mortality charge divided by the current year mortality charge minus 1) On the statement for 5/96 to 5/97, the charges were $39,489.98. This represented a growth of **10.3%** over the previous year. On the statement for 5/97 to 5/98, the charges were $44,605.77. This represented a growth of **11.5%** over the previous year. On the statement for 5/98 to 5/99, the charges were $48,980.43. This represented a growth of **8.9%**

over the previous year. On the statement for 5/99 to 5/00 the charge was $63, 236.71. This represented a growth of **22.5%** over the previous year. On the statement for the period 5/00 to 5/01, the charges were $80,924.04. This represents a **21.8%** growth over the previous year. This contract was **not** designed to accept these kinds of charges. Had someone been on top of what was about to happen to the mortality charges, it should have been reflected in a higher premium request from Mr. Silverman. The last billed premium was for the $41, 568.50, not a higher amount.

Having established the above pattern, I refer you to the letter to the owner of this contract dated May 31, 1999 announcing the "Value Share Enhancement" of $1,215.70. At the top of page two of this letter, in the first bullet, it states the following: <u>"Effective July 1, 1999, the Cost of Insurance rate for your MBL Life policy will be based on the "*preferred*" scale, meaning that the rate scale used to determine what you pay for your insurance coverage in the future will be the same or an even lower scale than the one used during the Rehabilitation period."</u> This letter is signed by Mr. Daniel Demko, Executive Vice President of SunAmerica Retirement Markets. Growth of 22.5% and 21.8% do not seem in line with this statement, in light of the previous growth patterns already established during the years of Rehabilitation.

There is an issue with regards to a small amount of money offered to this contract as Mutual Benefit was coming out of rehabilitation. There is an Endorsement that was added to this contract effective December 31, 1998. It offered additional "Policy Enhancement Amounts" to be added to the Account value of the contract on a vested basis. On January 1, 2000 there was to be added an amount of $303.93 and likewise on June 30, 2001, June 30, 2002 and June 30, 2003 a like type amount. **Since Mr. Silverman died on June 27, 2001 were these amounts added to the death benefit as vested interest payments due to death? If not, why not?**

Further, in a letter to Ann Marie Mazonson, dated December 28, 2000, Yvalondra Berry of your Special Services department wrote the following: <u>"Our records indicate the current cost of insurance for the policy listed above is $77,988.84 for the policy year 2000-2001."</u> She further went on to say: <u>"Below I have listed an estimate of the cost of insurance for the next five years. These estimates include all policy expense charges. 2001-2002 ....$85,842.16; 2002-2003....$93,891.89; 2003-2004.....$102,603,24; 2004-2005....$112,086.49; 2005-2006.....$122,121.08."</u> When just the mortality charges listed in Ms. Berry's letter are added together it equals $594, 533.70. Since Mr. Silverman had already paid $475,971.04 in total premiums to date, these amounts on top of that would have equaled $1,070,504.74 for a policy with a face amount of $850,000.00. This would hardly be considered an insurance policy. Furthermore, Ms. Berry's calculation only goes through the end of 2006 policy year. Remember, this contract had a Maturity Date stated on the Face Page of the contract of 2012. Any reasonable person could extrapolate "like type premiums" more than equally the face amount of the

policy in just the period of 2000 to 2012. Even a good straight 20 year term policy would cost less!

I want to point out that the amount of mortality charge Anchor National received under this contract totaled $144,160.75 in a two year period. Working backwards, it took MBL close to 4 years to collect the same amount. Mr. Silverman only got older one year at a time!

Focusing on the 2000 to 2001 statement, you will also note that the mortality charges were NOT increasing month to month, but rather remained the same. Also, Ms. Berry's number differs from the amount charged (80,924.04 – 77,988.84, a difference of $2,935.20). This seemly little discrepancy looms much larger when you take into account the entire sloppiness this contract and this insured received during his lifetime.

**Respectfully, I ask that Anchor National produce a year by year illustration of the contract as it was issued according to the face page of the contract, the governing legal document. This illustration should be from May 1, 1984 to the date of death of Mr. Silverman. I want this illustration to reflect the actual conditions under which this policy was administered as well as the projected conditions that existed prior to the rehabilitation of MBL.** I understand there is a question about records prior to 1994 and their availability to Anchor National. While this may reflect a reality you must overcome, you are asked to do exactly that since you are the legal guardians of the records you received from Mutual Benefit.

I believe Mr. Silverman overpaid or was overcharged for this contract. It was these overcharges and the misadministration of these contracts that caused these policies to lapse prematurely. We are only asking that these facts be looked at in a light most favorable to the policyholder, but I have been stalled by RBC Liberty Claims in determining what is actually owed to the Silverman family.

The Silverman family is grateful that you honored the claim for the face amount of the policy in 2002. However, if I did not have an insurance background, I would be more than confused by the communication given to Mr. Silverman. At his age of 83, he sought out assistance from other professionals and they were stalled in their efforts to get accurate, understandable information from MBL/Anchor/RBC Liberty Claim.

For over one year, Anchor National denied the sending of a death claim form to the family. You would not even send the form, never mind deny the claim. Anchor also did not respond properly to an attorney who contacted the company in an effort to assist the family. Amey Wood makes statements that are disturbing at best. Her comment to me last month (April 2003) that she "did not think this policy should have been reinstated" goes more to attitude than customer service. Her mistake in getting the correct Form 1099 to the

family in a timely way (it arrived just today, post 4/15/2003) so they can meet their tax obligations for 2002 is also further example of why the Silverman family are disturbed by the administration by Anchor National/ Royal Bank of Canada Liberty Claims. I have been working with you since my letter of August 28, 2002. Frustration is at it peak!

Josie, you and I have put many hours into trying to get this straightened out. I have enjoyed working with you and I do believe you want to see this settled in an equitable manner.  But, your requests for information from actuarial, and Kerr Beerly and MBL are not getting us anyplace. Therefore, I am going to insist that you, or your superior, respond to my May 28th deadline. If I do not get what I am looking for by that date, a copy of this letter will be submitted to the Insurance Department for the Commonwealth of Massachusetts requesting their assistance in getting this information. If the insurance department can not or will not help us, we will proceed with court action and seek maximum damages for any award we receive. Let's not let this get that far. Josie, let's work this out now!

Thank you.

Sincerely,


Richard P. Sturtevant, CLU, ChFC, CLTC

# EXHIBIT 2

**Service Center**
2000 Wade Hampton Boulevard
Greenville, South Carolina 29615-1064
Toll-Free: 1.800.821.7887
Fax: 1.864.609.4712

**Mailing Address**
PO Box 19074
Greenville, SC 29602-9074



May 28, 2003

Attention: Richard P Sturtevant
Ultimate Benefits
Post Office Box 421
Warren RI 02885

Re:    Policy Number:        AL101958
       Insured:              Donald Silverman

Dear Mr. Sturtevant:

This letter is in response to your correspondence asking for further clarification of certain issues pertaining to the policy listed above. The primary point of your letter was to assert that Mr. Silverman overpaid or was overcharged for his policy and that his family is owed more money. We disagree. We believe that his policy was administered properly, in accordance with the contract terms as altered by the Rehabilitation Plan.

The Superior Court of the State of New Jersey placed Mutual Benefit Life Insurance Company ("MBL") in Rehabilitation on July 16, 1991. As part of this process the 3rd amended Plan of Rehabilitation (the "Plan") was approved by the Superior Court in November 1993. As a result of this action by the Superior Court, all MBL policies were restructured to a common form. Thus, all contracts prior to this date were effectively replaced with the common form prescribed by the Plan. In this case, Mr. Silverman's universal life policy was replaced with another plan of universal life policy. As of June 30, 1999, the rehabilitation period ended and all business was converted to SunAmerica, Inc. a Los Angeles, California financial company.

In your letter, you first questioned the planned premiums on the policy. As you know, a Universal Life Policy offers flexible premiums and a flexible face amount. Within certain limits, the policy owner is given the flexibility to determine the amount of premium he or she wants to pay. I am enclosing the original policy illustration given to the policyowner at the time the policy was issued. You will see this illustration demonstrates policy values based on both the Guaranteed Factors and the (at the time) Current Factors, and is based on an interest-crediting rate of 12.50% per year. The illustration also states, "current factors are not guaranteed". The current COI rates effective July 1, 1999, were the same as the preferred scale COI rates used during the Rehabilitation period. This information was sent to all insureds in a letter mailed by Mr. Daniel Demko to all of the appropriate policyowners.

You further indicated that the Annual Statements produced since April 1995 show that the planned premium of $18,415.59 was insufficient to cover the full cost of insurance. The Annual Statement stipulates, "If your current cash value is less than last year's you should contact your agent or the SunAmerica Service Center to re-illustrate your policy values to make sure that your planned premiums will continue to provide coverage for the period you desire". An Annual Statement is mailed to the policyowner, annually, on the policy anniversary date. This statement lists all financial transactions made on the policy for the previous year. It is imperative that the policyowner read the Annual Statement carefully and adjust the planned premium accordingly.

Richard P Sturtevant
May 28, 2003
Page 2

Mr. Silverman did not adjust his planned premium. His policy further suffered because he made no premium payments in 1992 and 1993. The cost of insurance continued to be deducted from the cash value of the policy. Moreover, the policy lost interest that would have been credited to the policy's cash value had he made the scheduled premium payments during the policy year.

You requested an explanation of the increase in premiums in 1994. This increase actually occurred in 1995 and was due to Mr. Silverman's decision to pay his Threshold Premium. The threshold premium was the premium that, if paid cumulatively each policy year during the Rehabilitation Period, entitled the policyowner to "preferred cost of insurance charges and preferred crediting rates". The Threshold Premium was a function of the Rehabilitation Plan, as approved by the Superior Court of the State of New Jersey, and had no meaning after June 30, 1999, the date the rehabilitation period ended. While this concept was unique to certain restructured policies, and was consistent with the Rehabilitation Plan, it did not automatically guarantee that a policy would remain in force to maturity.

With respect to the mortality charges on the restructured policy, I have listed below the mortality rates, per thousand dollars of insurance, charged for the referenced years:

| Year | Current Monthly COI Per $1,000 | Guaranteed Maximum Monthly COI Per $1,000 |
|------|------|------|
| May 1, 1999 – April 30, 2000 | 6.5200 | 9.47 |
| May 1, 2000 – April 30, 2001 | 7.1200 | 10.42 |
| May 1, 2001 – Date of Death | 7.9597 | 11.47 |

As you see, the cost of insurance rates charged on the policy in question never exceeded the maximum mortality rates allowable under the policy contract. Mr. Silverman was not "overcharged" his mortality charges.

You asked for a year-by-year illustration of the old contract as it was issued May 1, 1984, and the restructured contract to the date of Mr. Silverman's death. We are unable to recreate past illustrations. However, the original policy illustration given to the policyowner at the time the policy was issued is enclosed.

In reference to your concerns regarding New Money Balance, please note, this was also a function of the court approved Rehabilitation Plan and was not an additional benefit. As with the Threshold Premium, because it was a part of the Rehabilitation Plan, it had no meaning after the rehabilitation end date of June 30, 1999. The New Money Balance equaled the greater of zero and the excess of:

      A.  All cash premiums and other deposits received since the Closing Date, with respect to a Restructured Contract that is not an Accumulation Contract

                OVER

      B.  All Free Partial Withdrawals and the cash loans net of cash loan repayments with respect to a Restructured Contract that is not an Accumulation Contract since the Closing Date.

In regard to the value share enhancement, this was an enhancement developed as part of MBL's rehabilitation proceedings. MBL developed a methodology for attributing the value share on an individual policy basis. The New Jersey Superior Court approved the methodology and the formula used to establish the value share allocation. The value share represents an apportionment of the value MBL received through the sale of its assets between its major creditors and its policyholders.

Richard P Sturtevant
May 28, 2003
Page 3

The Value Share Enhancements for June 30, 2001 through June 30, 2003, were added to the death benefit paid for this policy.

I trust this information helps you in understanding the policy performance. It is our intention to provide you with all the information necessary to answer all the concerns of the family. If the family continues to have outstanding issues or concerns, please contact me. Of course, the family is also free to contact the Massachusetts Department of Insurance, One South Station 4th Floor, Boston, Massachusetts 02110.

Sincerely,

Keer Burley
Premium Accounting

# EXHIBIT 3

# *Ultimate Benefits*

PO Box 421
Warren, RI 02885
Telephone 401 245-8438

Richard P. Sturtevant CLU, ChFC, CLTC
President and CEO

Monday, July 21, 2003

Mr. Dubby Smith
Manager of Policy Service
Liberty Insurance Services
PO Box 19074
Greenville, SC 29602-9074

Re: Donald Silverman, Policy AL 101958
Via Fax to: 864-609-4713/ Attn: Dubby Smith

Dear Mr. Smith:

I have attempted several times to reach you and have asked you to provide to me the actual per thousand rate mortality charges for the aforementioned contract during the years prior to the assumption of this contract by Anchor National Life Insurance Company. To date, I have not received anything from you.

To clarify again, I am looking for the actual mortality charges assessed against this contract from July 1, 1999, BACKWARDS as far as you can provide, on a per thousand rate basis. This includes during the years of rehabilitation by MBL and prior to MBL going into rehabilitation.

If you have any question about this request, please feel free to contact me at the number above.

Sincerely,


Richard P. Sturtevant
CLU, ChFC, CLTC

cc: Bruce Powell, Sr. VP Operations, Nancy Brooks

# EXHIBIT 4

*Service Center*
2000 Wade Hampton Boulevard
Greenville, South Carolina 29615-1064
Toll-Free: 1.800.821.7887
Fax: 1.864.609.4712

*Mailing Address*
PO Box 19074
Greenville, SC 29602-9074



August 5, 2003


Mr. Richard P. Sturtevant
C/O Ultimate Benefits
PO Box 421
Warren, RI  02885

RE:  Donald Silverman – Policy No. AL101958

Dear Mr. Sturtevant:

Your letter dated July 21st, 2003 has been received.  The information requested in your letter is as follows:

| Year | Monthly Cost of Insurance per $1,000 |
|------|-------------------------------------|
| May '94 – Apr '95 | $3.36 |
| May '95 – Apr '96 | $3.72 |
| May '96 – Apr '97 | $4.17 |
| May '97 – Apr '98 | $4.71 |
| May '98 – Apr '99 | $5.14 |

Monthly cost of insurance rates per $1,000 from May, '99 until Mr. Silverman's date of death were previously provided in Keer Burley's letter dated May 28, 2003.

It is important to remember, Mr. Sturtevant, that these cost of insurance rates were approved by the Superior Court of the State of New Jersey as a part of the Plan for Rehabilitation that restructured the Mutual of Benefit policies to a common form.

If we can be of any more help, please let us know.

Sincerely,

Donald (Dubby) Smith, Sr. Director
Policy Administration

CC:  Bruce Powell – SR. Vice President, Business Processing Outsourcing Division

# EXHIBIT 5

## ADKINS, KELSTON & ZAVEZ, P.C.

TELEPHONE
617-367-1040

**ATTORNEYS AT LAW**
90 Canal Street, Fifth Floor
Boston, MA 02114

WEBSITE
www.akzlaw.com

FACSIMILE
617-742-8280

E-MAIL
akz@akzlaw.com

February 18, 2005
**By certified mail**
**Return receipt requested**

General Counsel
American International Group, Inc.
70 Pine Street
New York, NY 10028

Re:    **Mass. General Laws Ch. 93A Demand Letter on behalf of Donald L. Silverman**

Dear Sir/Madame:

This is a demand for relief pursuant to Massachusetts General Laws Chapter 93A, §9 on behalf of our clients Nancy Brooks and Joan Silverman, as executrices of Donald L. Silverman's estate, and all similarly situated persons (the "Class") who (1) purchased a life insurance policy from Mutual Benefit Life Insurance Company (MBL), (2) converted their policy to a common form policy during the rehabilitation of MBL and (3) immediately following that rehabilitation, had their policies assumed by Anchor National Life Insurance Company ("Anchor") on June 30, 1999. It is our understanding that AIG is the successor-in-interest to Anchor. Prior to his death in June 2001, Mr. Silverman was a resident of Swampscott, Massachusetts, and was the insured under policy AL101958, which had a Policy Issue Date of May 1, 1984.

Anchor committed unfair or deceptive acts or practices in violation of MGLC 93A, §9 by dramatically raising the cost of insurance ("COI") on Mr. Silverman's policy from $5.14/1000 per month of coverage for the period May 1998 – April 1999 to $6.52/1000 per month for the period May 1999 – April 2000 for the net amount at risk. Anchor imposed that COI increase of $1.38/1000 (24%) without any justification; in fact, Anchor represented that this COI increase had been approved by the New Jersey state court overseeing the rehabilitation of MBL, but failed to produce any written proof of this purported court approval when we requested it. In addition, after imposing the 24% COI increase, Anchor did not take any steps to warn Mr. Silverman that his policy would lapse in short period of time unless he paid dramatically higher premiums. This unsubstantiated representation combined with a failure to warn of a likely policy lapse constitutes a misrepresentation for the purpose of tending to induce the lapse of Mr. Silverman's insurance policy in violation of MGLC 176D, § 3(1)(f), and thus constitutes a separate, per se violation of MGLC 93A, §9.

## ADKINS, KELSTON & ZAVEZ, P.C.

Because increases in COI are typically the same for all similarly grouped policies, we believe that the above-described unfair and deceptive acts and practices were widespread and affected hundreds or thousands of Class members in the same way. Finally, based upon the manner in which Anchor administered Mr. Silverman's policy, we believe that the Company's conduct was been willful and knowing.

Ms. Brooks and Ms. Silverman hereby demand relief on behalf of Mr. Silverman and all other similarly situated persons. Specifically, they demand that AIG place Mr. Silverman and all similarly situated persons in the same position that they would have been in if the 24% COI increase had not occurred. This would include, at a minimum, refunding all excess premiums paid and reinstating any lapsed policies whose lapse is attributable to the 24% increase. My clients further demand that MBL pay their attorneys' fees incurred in the investigation and pursuit of this claim on their behalf and the behalf of the class of similarly situated policyholders.

In accordance MGLC 93A, §9(3), we are available to discuss any reasonable offer of a class-wide settlement by MBL within thirty (30) days. If such an offer is not tendered, we will file a complaint including, among other claims, claims for violations of MGLC 93A, and will seek treble damages and an award of attorneys' fees and costs as provided by the Statute.

Sincerely,

John Peter Zavez

cc.     Ms. Nancy Brooks
        Ms. Joan Silverman
        Mr. Richard P. Sturtevant

2

 **AIG SunAmerica**
Life Assurance Company

AIG SunAmerica
Life Assurance Company
1 SunAmerica Center
Los Angeles, CA 90067-6022

P.O. Box 54299
Los Angeles, CA 90054-0299

March 21, 2005

*VIA OVERNIGHT MAIL*

John Peter Zavez, Esq.
Adkins, Kelston & Zavez, P.C.
90 Canal Street
Boston, Massachusetts 02114

> Re:    AIG SunAmerica Life Assurance Company Life Insurance Policy No.
> AL101958, Formerly Owned by Donald L. Silverman (the "Policy")

Dear Mr. Zavez:

I am writing in response to your February 18, 2005 letter regarding the Policy and am writing on behalf of AIG SunAmerica Life Assurance Company ("AIG SunAmerica"), formerly known as Anchor National Life Insurance Company, the entity that – as described below – assumed the Policy. Please direct all future communications regarding this matter to me at the address listed above. We have reviewed your allegations on behalf of Nancy Brooks and Joan Silverman, the executrices of Mr. Silverman's estate (the "Executrices"), concerning the Policy. As more fully set forth below, each assertion in your letter is without merit.

To properly understand the issues involved in this matter, it would be useful to provide you with some background information regarding the Policy. The Mutual Benefit Life Insurance Company ("Mutual Benefit") originally issued the Policy on May 1, 1984. Mr. Silverman was the insured on the Policy, as well as the Policy's original owner and beneficiary. Mr. Silverman changed the ownership and beneficiary of the Policy to the Donald Silverman Trust 12-24-90 (the "Trust") on March 6, 1991.

In April 1994, after Mutual Benefit was in financial distress, the New Jersey Commissioner of Insurance assumed control of Mutual Benefit. The New Jersey Commissioner adopted a rehabilitation plan (the "Rehabilitation Plan") in which substantially all of Mutual Benefit's assets, and certain liabilities, were assigned to MBL Life Assurance Corporation ("MBL Life"). The New Jersey Superior Court approved the Rehabilitation Plan in May 1994.

*Member of American International Group, Inc.*

John Peter Zavez, Esq.
March 21, 2005
Page 2

In connection with the Rehabilitation Plan, Mutual Benefit granted the owners of
the policies that were set to be transferred to MBL Life two options. The policy-owners
could either: (1) opt out of the Rehabilitation Plan, in which case they would receive
approximately forty percent of the cash surrender value of their policies; or (2) opt in to
the Rehabilitation Plan, in which case the policies would be restructured, the full value of
the policies would be maintained, the policies would be transferred to MBL Life, and
non-benefit-related claims against MBL Life would be permanently released. In 1994,
Mr. Silverman opted in to the Rehabilitation Plan. As a result, the full value of the Policy
was maintained and, pending Mr. Silverman's contributions of required premiums, the
Policy would remain in-force.

In 1998, in a transaction approved by the New Jersey Commissioner and
supervised by the New Jersey Superior Court pursuant to the Rehabilitation Plan, AIG
SunAmerica acquired the MBL Life block of policies that MBL Life had acquired from
Mutual Benefit in 1994. AIG SunAmerica has administered the Policy at all times
thereafter. Mr. Silverman died on June 27, 2001. AIG SunAmerica paid the Policy's
death benefit ($855,459.17) to the Trust on September 18, 2002 and paid $2,442.69 in
interest on the death benefit to the Trust on September 26, 2002.

With respect to your specific allegations, first, there is no merit to the
Executrices' claims because AIG SunAmerica implemented all increases in the Policy's
cost of insurance ("COI") rate in accordance with the terms of the Policy and the
Rehabilitation Plan. With respect to the Policy, the policy illustration given to Mr.
Silverman in connection with the issuance of the Policy provided that the current COI
rates were not guaranteed. Specifically, the illustration stated, "Current factors are
current cost of insurance rates and interest rate of 12.50 % per year. Current factors are
not guaranteed." When the Policy was issued, it was contemplated by the parties that the
COI rates could increase over time.

With respect to the Rehabilitation Plan, preferred COI rates were to be applied to
the restructured policies. Thus, Mutual Benefit policy-owners, including Mr. Silverman,
were sent an "Information Statement" in January 1994 that informed them of their
options under the Rehabilitation Plan and stated that "Life insurance policies for which
Policyholders pay at least the Threshold Premium will be charged for insurance costs at a
preferential rate … ." Policy-owners were also provided with a mortality table showing
the maximum COI rate that could be charged in a given year. Pursuant to Sections
2.1(a)(iii) & (a)(vii) of the Rehabilitation Plan, because Mr. Silverman paid the required
"Threshold Premium", the preferred COI rates, as shown below, were applied to the
Policy at all times thereafter.

The following chart demonstrates that the preferred COI rates that were applied to
the Policy for the time periods you specified – $5.14/1000 and $6.42/1000 – were far
below the maximum allowable COI – $8.62/1000 and $9.47/1000. Indeed, the same is
true throughout the history of the Policy.

John Peter Zavez, Esq.
March 21, 2005
Page 3

| Year | Preferred Monthly COI Per $1,000 | Guaranteed Maximum COI Per $1,000 |
|------|-----------------------------------|------------------------------------|
| May 1994 – April 1995 | $3.36 | $6.01 |
| May 1995 – April 1996 | $3.72 | $6.58 |
| May 1996 – April 1997 | $4.17 | $7.19 |
| May 1997 – April 1998 | $4.71 | $7.87 |
| May 1998 – April 1999 | $5.14 | $8.62 |
| May 1999 – April 2000 | $6.52 | $9.47 |
| May 2000 – April 2001 | $7.12 | $10.42 |
| May 2001 – Date of Death | $7.95 | $11.47 |

Moreover, your claim that Mr. Silverman was never given notice of the increases in the COI rates and the potential that the Policy would lapse if additional premiums were not paid is unfounded. As mentioned above, annual statements were sent to Mr. Silverman each year on the Policy's anniversary date – May 1 – and the COI charges incurred, as well as financial activity on the Policy, are reflected on the annual statements. The 2000 annual statement also provided that, "If your current cash value is less than last year's you should contact your agent or the SunAmerica Service Center to reillustrate your policy values to make sure that your planned premiums will continue to provide coverage for the period you desire." Thus, Mr. Silverman was put on notice that he may have needed to pay additional premiums on the Policy to keep it in-force. In any event, despite the increases in the annual COI rates, the Policy was in-force at the time the death benefit was paid. AIG SunAmerica paid the Trust a total of $857,901.86 in death benefits in September 2002.

Second, assuming that the Executrices' claims are meritorious, the claims are barred by the statute of limitations. In particular, Mass. Gen. Laws ch. 260, §5A requires that any claim pursuant to Mass. Gen. Laws chapters 93A and 176D be commenced within four years after the cause of action accrues. E.g., Loguidice v. Metropolitan Life Ins. Co., 336 F.3d 1, 14-15 (1st Cir. 2003) (affirming dismissal of ch. 93A insurance claims on statute of limitations grounds); Indus. Tech. Serv. v. Phoenix Home Life Mut. Ins. Co., 866 F. Supp. 48, 51 (Mass. Dist. Ct. 1994) (same); Schwartz v. The Travelers Indem. Co., 740 N.E. 2d 1039, 1043-44 (Mass. App. Ct. 2001) (affirming dismissal of ch. 93A and 176D insurance claims on statute of imitations grounds).

Here, you have alleged that AIG SunAmerica violated the terms of the Policy by increasing the Policy's COI rate from $5.14/1000 per month for the period of May 1998 through April 1999 to $6.52/1000 per month for the period of May 1999 through April 2000. AIG SunAmerica sent Mr. Silverman annual statements for the Policy each year on the anniversary date of the Policy's issuance – May 1. These annual statements provide the total COI charges for the prior twelve month period, as well the COI charges incurred on a month-by-month basis. The COI charged for the May 1999 through April 2000 time period was reflected in the 2000 annual statement that was sent to Mr. Silverman in May 2000.

John Peter Zavez, Esq.
March 21, 2005
Page 4

I enclose copies of the above-mentioned: (1) original Policy illustration;
(2) mortality table; (3) Information Statement; (4) Rehabilitation Plan; and (5) the
Policy's annual statements from 1995 to 2000 sent to Mr. Silverman.

In conclusion, AIG SunAmerica rejects your demand for payment. If you have
any questions, please contact me at (310) 772-6531.

Sincerely,

Cary L. Schatz
Counsel

Enclosures

cc: Ernest Patrikis, Esq. (w/o enclosures)

# EXHIBIT 6



## Mutual Benefit Life
520 Broad Street, Newark, NJ 07102-3111

Policy Number:   **AL162943**

Insured:          **GREEN, JOE**

## ENDORSEMENT

This Endorsement shall be referred to as the "Rehabilitation Endorsement". It is attached to and made a part of the Policy. The Policy together with this Endorsement is a Restructured Contract which is consistent with the Third Amended Plan of Rehabilitation of The Mutual Benefit Life Insurance Company (the "Plan") and the Third Amended Agreement in Connection with the Rehabilitation of The Mutual Benefit Life Insurance Company (the "Agreement") between Mutual Benefit Life Insurance Company in Rehabilitation ("MBL") and MBL Life Assurance Corporation ("MBLLAC") which are effective by Order of the Superior Court of the State of New Jersey.

This Endorsement is effective on the Closing Date. It shall remain in effect during the Rehabilitation Period. Upon expiration of this Endorsement, the basic policy provisions shall control and the provisions of this Endorsement shall have no further force or effect.

During the Rehabilitation Period, the terms of the Agreement, the Plan, and any Order entered by the Superior Court of the State of New Jersey shall govern the content and interpretation of the Policy.

Neither the filing of this Endorsement nor its issuance by MBL shall be deemed to preclude MBL from modifying the within provisions as may be required to be consistent with the Plan and the Agreement. MBL therefore reserves the right to make such amendment(s) to this Endorsement which may be necessary to conform fully to the terms of the Plan, the Agreement, or any governing Court Order. As may be required, such amendment(s) shall be filed with the applicable State Insurance Department.

The issuance of this Policy does not signify a new delivery of a policy. Therefore, any "Free Look" provision is not applicable.

A detailed statement of 1) the method of calculation of the Guaranteed Account Value and the Restructured Account Value from the Filing Date through the end of the Rehabilitation Period; and 2) a description of the method of applying preferred and non-preferred rates with respect to policy events has been filed with the insurance official in the jurisdiction in which the Policy has been delivered.

The following Policy provisions are amended and/or supplemented as set forth herein:

## SECTION 1

### Policy Terms

***Account Value*** means the account value of this Policy as of the Filing Date, defined as follows:

   (a) with respect to a permanent traditional life contract, the sum of (i) the interpolated statutory reserve for such contract as of the Filing Date, which statutory reserve includes base contract reserves, reserves for any paid up additions, and reserves for

**Moratorium Amount** means a deduction applied to certain withdrawals or surrenders. It is equal to (a) with respect to full surrenders, the greater of zero and the lesser of (i) the product of (A) the Moratorium Percentage, and (B) the excess of (1) the Restructured Account Value, over (2) the Premium Balance, and (ii) (A) the Restructured Account Value, less (B) the Restructured Contract Loan Balance, less (C) the Premium Balance, plus (D) the Net New Loans Taken; and (b) with respect to Partial Surrenders, a percentage of the Moratorium Amount that would apply for a full surrender, equal to the percentage the Restructured Account Value is reduced and (c) with respect to Free Partial Withdrawals, zero. For purposes of this calculation, the Moratorium Percentage means:

(a) 32.6% from the Closing Date to December 31, 1994; (b) 27.1% for the next following calendar year; (c) 21.7% for the next following calendar year; (d) 16.3% for the next following calendar year; (e) 10.9% for the next following calendar year; and (f) 5.4% for the next following calendar year.

**Net Amount at Risk** means on any date the death benefit on that date discounted for interest for one month, less the Restructured Account Value on that date. The interest rate we will use to discount the death benefit is 3.5%. During the Rehabilitation Period, the interest rate of 4% as shown on page 3 or 4 of the Policy shall not be applicable. For purposes of computing the Net Amount at Risk, the cash value will be deemed to be the Restructured Account Value.

**Net New Loans Taken** means the excess of (a) cash loans received since the Filing Date over (b) cash loan repayments since the Filing Date, which amount may be less than zero.

**New Money Balance** means the greater of zero and the excess of (a) all cash premiums (excluding premiums credited pursuant to a disability benefit) and other deposits received since the Closing Date over (b) all Free Partial Withdrawals and the cash loans net of cash loan repayments since the Closing Date.

**New Money Bonus Credit** means the additional interest credited at the end of the Interim Period and annually thereafter at the end of each Rehabilitation Period Year to the Policy, based on the monthly average Premium Balance (but not greater than the Restructured Account Value) during such period for which the credit is to be applied at an annualized rate equal to the excess of (a) the Market Rate, over (b) the Preferred Crediting Rate. The New Money Bonus Credit applied to Net New Loans Taken may be reduced if the excess of the Market Rate over the Preferred Crediting Rate is greater than 2%.

**Partial Surrender** means a proportionate surrender of a Restructured Contract, which can occur only after all available Free Partial Withdrawals have been taken. The percentage surrendered shall be equal to the amount of cash paid as a percentage of the total amount payable upon full surrender. A Partial Surrender shall result in the same percentage reduction in the Restructured Account Value, Restructured Contract Loan Balance, Premium Balance, New Money Balance, and Net New Loans Taken.

**Preferred Cost of Insurance** means a cost of insurance that is charged based on payment of the cumulative Threshold Premium.

**Preferred Crediting Rate** means a Crediting Rate applicable based on payment of the cumulative Threshold Premium.

**Premium Balance** means the excess of all cash premiums (excluding premiums credited pursuant to a disability benefit) and other deposits received since the Filing Date over all Free Partial Withdrawals since the Filing Date.

**Rehabilitation Period** means the period beginning on the Closing Date and ending on December 31, 1999, or such earlier date as may be ordered by the Court or as provided in the Plan or the Agreement.

## SECTION 2

### Periodic Reports

As of the end of each policy year the owner shall receive a report which shows:

   a) the current cash value, loan balance, Moratorium Amount, New Money Balance, and net surrender value;

   b) the amounts and dates of all charges and credits to the cash value since the prior report, including the crediting and cost of insurance rates, assumed death benefit amount, and any changes in coverage under the Policy;

   c) the amounts and dates of all charges and credits to the loan balance since the prior report, including rates of interest charged; and

   d) any other information required by the Insurance Department of the jurisdiction in which the Policy was delivered.

Information regarding transactions during the Interim Period shall be available upon request.

## SECTION 6

### Premiums

To the extent required to meet Threshold Premium requirements, additional premiums may be paid during the Rehabilitation Period. The Preferred Crediting Rate and Preferred Cost of Insurance Rate shall be applied during the Rehabilitation Period if the New Money Balance is greater than or equal to the cumulative Threshold Premium due to date. As shown on page 3 of the Policy, policies which were contractually paid up as of the Closing Date of the Agreement shall not be required to make premium payments. They shall automatically receive the Preferred Crediting Rate and the Preferred Cost of Insurance Rate.

On the Closing Date, if the Restructured Account Value net of any policy loan is insufficient to cover the monthly deductions, 90 days notice shall be given to make at least the required payment. Otherwise, the Policy shall terminate at the end of the 90-day period.

## SECTION 11

### Changes in Specified Amount

Changes in Specified Amount are not permitted during the Rehabilitation Period.

## SECTION 12

### Change in Death Benefit Option

Changes in death benefit options are not permitted during the Rehabilitation Period.

## SECTION 13

### Cash Value

The Restructured Account Value net of policy loans on the Closing Date shall not be less than zero.

The Cash Value means the Restructured Account Value or the Guaranteed Account Value, as applicable. The guaranteed minimum Cash Value interest rate of 4% as shown in the Policy shall not be applicable during the Rehabilitation Period. The minimum rate

Once all calculations for the Free Partial Withdrawal have been completed, any additional amounts shall be made as a Partial Surrender. Free Partial Withdrawals shall result in a percentage reduction in the Restructured Account Value, the New Money Balance, and the Premium Balance. Partial Surrenders shall result in a percentage reduction in the Restructured Account Value, the Restructured Contract Loan Balance, the Premium Balance, the New Money Balance, and the Net New Loans Taken. The percentage reduction shall be equal to the amount of cash paid as a percentage of the total amount payable upon full surrender. The amount paid shall be reduced by the Moratorium Amount, and any reduction in policy loan.

If death benefit option A is in effect, the specified amount will be reduced by the amount of any Free Partial Withdrawal.

The Moratorium Amount shall not apply to Free Partial Withdrawals.

Surrender requests shall be paid within 90 days of receipt. However, during the first 12 months of the Rehabilitation Period, the period for payment may be extended to 180 days.

## SECTION 22

### Payment of Proceeds

If this Policy has a maturity date, shown on page 3 of the Policy, which occurs during the Rehabilitation Period, the policy will be continued with no further premiums required. The death benefit will be equal to the excess of (A) the greater of the Restructured Account Value and the Guaranteed Account Value, as applicable, of this Policy, over (B) any Restructured Contract Loan Balance. This amount will be accumulated at a rate of interest, as determined from time to time, but not less than the interest rate applicable to the Guaranteed Account Value. This amount may be applied as a premium (net of applicable premium taxes) to acquire an annuity of ten years or longer without application of the Moratorium Amount. The annuity benefits shall be determined from the Retirement Annuity Rate Tables.

Notwithstanding the foregoing, in the event a policy has a maturity date at age 96 or older, then, upon the insured's attaining such age, the policyholder shall be entitled to withdraw the excess of a) the greater of the Restructured Account Value and the Guaranteed Account Value, as applicable, over b) any Restructured Contract Loan Balance, without application of the Moratorium Amount.

The following provisions shall supplement the existing terms of the Policy during the Rehabilitation Period:

## SECTION 25

### Annuitization Option

At any time during the Rehabilitation Period, the policyowner may elect to surrender the Policy and apply the excess of (a) the greater of the Restructured Account Value and the Guaranteed Account Value, as applicable, over (b) any Restructured Contract Loan Balance, as a premium to acquire an immediate annuity for 10 years or longer duration. The annuity premium shall be determined from the Liquidation Annuity Rate Tables included in the Agreement, as those tables may be modified from time to time. Such premium shall be net of any applicable premium taxes.

*(i)* such other emergency situation of an unusual nature that MBL deems appropriate based on the application and supporting documents.

The following limitations apply to withdrawals for each applicant in a Hardship Case:

1.  Under (g) above, the maximum distribution for each applicant is the lesser of 25% of the purchase price of the residence and $25,000; and

2.  Under (h) above, distribution is limited to $10,000 each calendar year,

provided that the dollar limitations described in 1 and 2 above, shall be increased as of January 1 of each calendar year (commencing with January 1994) by that percentage by which the Consumer Price Index for the month of December immediately preceding such January (commencing with December 1993) shall exceed the Consumer Price Index for the immediately preceding month of December (commencing with December 1992). As used herein, "Consumer Price Index" means the index for urban wage earners and clerical workers, all items, for U.S. city average (1982-84 = 100), published by the Bureau of Labor Statistics, U.S. Department of Labor (or in the event such index is discontinued, another appropriate index.)

Except for Hardship Cases based on terminal illness (category (e) above) each applicant shall submit a notarized affidavit declaring that such applicant meets the relevant criteria and that the applicant has no other financial resources reasonably available to meet such need. The affidavit shall include such other specific and relevant information as may be requested.

The applicant may appeal a denial of the Hardship request by filing a Verified Petition with the Superior Court of the State of New Jersey. MBL shall provide instructions for the filing of the Petition.

## SECTION 28

### Withdrawals at End of Rehabilitation Period

As of the end of the Rehabilitation Period, individuals shall be entitled to withdraw the greater of the Restructured Account Value less any policy loan and Guaranteed Account Value, as applicable, of the Restructured Contract, without application of the Moratorium Amount.

Chief Executive Officer                              Secretary