# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### (BOSTON)

| | |
|---|---|
| **Nancy Brooks and Joan Silverman**, as Trustees of the Irrevocable Trust of Donald L. Silverman and as Executrices for the Estate of Donald L. Silverman ) ) ) ) ) |  |
| Plaintiffs, ) | Civil Action No. 05-10994-WGY |
| v. ) | |
| **AIG SunAmerica Life Assurance Company,** ) ) | |
| Defendant. ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S LOCAL RULE 56.1 STATEMENT AND THEIR OWN LOCAL RULE 56.1 STATEMENT IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiffs Nancy Brooks and Joan Silverman, on behalf of themselves and all other similarly situated persons, hereby file their LR 56.1.

### Plaintiffs' Disputes with Defendant's Purported "Undisputed" Facts

1-7.    Plaintiffs agree with Defendant's facts in ¶¶1-8.

8.    Defendant:  Plaintiffs contend that the "procedures and standards" are found in an actuarial memorandum AIF SunAmerica filed with this Court on December 30, 2005 (the "Actuarial Memorandum")."

Plaintiffs:  To the extent that Defendant's ¶8 can be interpreted to say that Plaintiffs are arguing that the Actuarial Memorandum is the sole source of these "procedures and standards," Plaintiffs **disagree**.  Defendant has produce additional documents in this litigation showing that its predecessor filed a letter and attachments with MA DOI showing the "procedures and standards" by which any future changes in COI rates would be calculated.  *See* Plaintiffs' Undisputed Facts *infra* at ¶¶7-8.

9.    Plaintiffs agree with Defendant's facts in ¶9.

## Plaintiffs' Undisputed Facts

1.    Defendant promised in the Policies that "Any change in [COI] rates will be in accordance with any procedures and standards on file with the Insurance Department of the jurisdiction in which the policy is delivered." Defendant's Rule 56.1 Statement, Exh. B, §14.

2.    As part of getting authorization to sell the Policies in Massachusetts, Defendant's predecessor in interest filed an Actuarial Memorandum with the MA DOI similar in form to Exhibit A to the Friedman Affidavit. Friedman Affidavit, dated 29 December 2005, at ¶¶ 6, 7; Strunk Affidavit, dated 29December 2005, at ¶¶ 5, 6. A true and accurate copy of the Friedman Affidavit is attached hereto as Exh. A. A true and accurate copy of the Strunk Affidavit is attached hereto as Exh. B.

3.    MA DOI Regulations require insurers to file an Actuarial Memorandum to obtain approval to sell the Policies in Massachusetts. Strunk Affidavit at ¶ 3.

4.    The Actuarial Memorandum provided by Defendant contains "procedures and standards" for calculating **COI rates**. *See* Defendant's Rule 56.1 Statement, Exh. B, (Actuarial Memorandum) at pages 4-9 (discussing COI), and more specifically at page 7 (showing that "Formulas for Cash Value Calculation" are based in part on an underlying calculation of COI); *see also* Strunk Affidavit at ¶¶ 5-6 (confirming that Actuarial Memorandum contains calculation of COI).

5.    COI, COI rates, annual COI rates, monthly COI rates, and changes to any of the preceding are all algebraically related. For example, the monthly cost of insurance is just the annual cost of insurance divided by 12 (months). *See* Defendant's Rule 56.1 Statement, Exh. C, page 9 (monthly COI rates "assume that the monthly mortality rate is

one-twelfth the annual mortality rate"). Similarly, the cost of insurance is simply the COI

rate multiplied by the amount at risk (which is the death benefit minus the cash value).

*See* Defendant's Rule 56.1 Statement, Exh. C, page 5 ("monthly cost of insurance …

depends on the net amount at risk").

      6.    The Actuarial Memorandum contains "procedures and standards" that

Defendant has conceded it did not follow.  *See* Defendant's Reply in Further Support of

Its Motion to Dismiss at pages 2, 3-4 (AIG SunAmerica "does not know of any document

that constitutes the unidentified 'procedures and standards' upon which plaintiffs base

their entire Complaint.").  A true and accurate copy of Defendant's Reply is attached

hereto as Exh. C.

      7.    By letter dated 20 November 1998 and addressed to the MA DOI,

Defendant's successor in interest made "Filings related to the Conclusion of the Mutual

Benefit Life Insurance Company Plan of Rehabilitation."  Page 1.  According to that

letter/filing, "COI Rates will be the rates currently applicable to policies that qualify for

the preferred COI's under the Plan of Rehabilitation.  These rates have been in effect

since the form was first approved."  Page 2.  The letter further states that any changes to

COI rates will also be in accordance with §4.18 of the Purchase and Sale Agreement

between MBL Life Assurance Corporation and SunAmerica, Inc. (the "Purchase

Agreement").  Pages 1-2.  A true and accurate copy of the 20 November 1998 letter is

attached hereto as Exh. D.

      8.    Section 4.18.1, entitled Modified COI Scale, provides that COI rates

cannot be changed for any reason until 15 months after the Rehabilitation Period

Termination Date:

> Mortality charges may be changed on the policy anniversary beginning 15 months after the Rehabilitation Period Termination Date, to scales reflecting the greater of (a) actual mortality experience and (b) anticipated mortality experience based on the following formulas:
>
> *  *  *
>
> Such amounts may be further adjusted to reflect items such as: (i) an increase or anticipated increase in the reinsurance rates charged by Outward Reinsurers where such increase is made subsequent to the closing date and not considered in the Outward Reinsurance Adjustment Amount; (ii) changes in taxation; (iii) changes in Applicable Laws that increase the cost of administering the Reinsured Policies.

Purchase Agreement at page 46. A true and accurate copy of the relevant portion of the Purchase Agreement is attached hereto as Exh. E.

9.    The Rehabilitation Period Termination Date was 30 June 1999, First Zavez Affidavit at Exh. A, page 2, so the earliest date that Silverman's Policy COI rate could be increased was 1 May 2001, his next policy anniversary following 30 September 2000. *See* Defendant's Rule 56.1 Statement, Exh. B, page 4 of 19 (stating that Policy Year Date is 1 May 1984).

10.    Defendant increased COI rates from $5.14 per thousand dollars of coverage for 1998-99 to $6.52 per thousand of dollars of coverage for 1999-2000. True and accurate copies of the 5 August 2003 letter from AIG SunAmerica to Richard Sturtevant and the 28 May 2003 letter from AIG SunAmerica to Richard Sturtevant are attached hereto as Exh. F.

11.    Defendant increased COI rates in from $6.52 per thousand dollars of coverage for 1999-2000 to $7.12 per thousand of dollars of coverage for 2000-01. First Zavez Affidavit, Exh. F.

12.    The Silverman Policy says that "[m]onthly cost of insurance rates will be determined by us annually, by class, based on **future expectations as to investment earnings**, mortality, persistency and expenses, including taxes." Defendant's Rule 56.1 Statement, Exh. B, §14 (emphasis added).

13.    The Silverman Policy also says that "[a]ny change in [COI] rates will be in accordance with any procedures and standards on file with the Insurance Department of the jurisdiction in which the policy is delivered." Defendant's Rule 56.1 Statement, Exh. B, §14.

14.    Defendant did not include "future expectations as to investment earnings" as a basis for calculating COI rates in the Actuarial Memorandum it filed with MA DOI. *See* Defendant's Rule 56.1 Statement, Exh. C, page 6 ("The [monthly COI] rate depends on age at issue, policy duration, sex, smoking habits, and rating class of insured").

Respectfully submitted,

DATED: 9 February 2006

_____/s/_____
John Peter Zavez (#555721)
Noah Rosmarin (#630632)
ADKINS KELSTON & ZAVEZ, P.C.
90 Canal Street
Boston, MA  02114
Tel: (617) 367-1040
Fax:  (617) 742-8280

## CERTIFICATE OF SERVICE

I certify that on 9 February 2006, I caused a true copy of the foregoing document to be served electronically via the Court's electronic filing system on defense counsel.

_____/s/_____
John Peter Zavez

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
NANCY BROOKS AND JOAN SILVERMAN

                               :
               Plaintiffs,                  Civil Action
                               :   No. 05-10994-WGY
       v.
                               :

AIG SUNAMERICA LIFE ASSURANCE
COMPANY,                           :

               Defendant.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### AFFIDAVIT OF GAVIN D. FRIEDMAN

STATE OF CALIFORNIA      )
                         ) ss.
LOS ANGELES COUNTY     )

        GAVIN D. FRIEDMAN, being duly sworn, deposes and states as follows:

        1.     I am a member of the Bar of the State of California and am Associate General Counsel of AIG SunAmerica Life Assurance Company ("AIG SunAmerica").

        2.     I make this affidavit in further response to the Court's Order dated November 29, 2005 in the above-captioned action.  I have personal knowledge of the statements contained herein or, where indicated, upon information and belief and, if called as a witness, I would testify competently thereto.

        3.     After learning of the Court's November 29, 2005 Order, I began a search to locate the document referenced in paragraph 13 of the policy issued to Donald L. Silverman on or about May 1, 1984 (the "Policy").  I understand that this document is the Actuarial Memorandum that would have been filed by Mutual Benefit Life ("MBL") prior to AIG SunAmerica acquiring the Policy in 1999.

4.     I understand that the Policy is a restructured policy that Mr. Silverman received in 1994 during the rehabilitation of Mutual Benefit.  The restructured policies, including Mr. Silverman's Policy, are referred to as Form C193 ("C193").

5.     To date, neither I nor the people assisting me have been able to locate the document referenced in paragraph 13 of the Policy.  Our search included an extensive review of AIG SunAmerica's files.  We also contacted the Massachusetts Division of Insurance, which informed us that it only maintains such actuarial memoranda for a period of 2 years, and that it does not have a copy of the Actuarial Memorandum filed in connection with the Policy.

6.     During the search, we also contacted other states in which the C193 restructured policies were delivered.  The Texas Department of Insurance informed us that it had a copy of the Actuarial Memorandum filed by MBL in connection with the C193 policies.

7.     Attached hereto as Exhibit A is a true and correct copy of the Actuarial Memorandum on file with the Texas Department of Insurance.  I understand that Exhibit A is the document filed by MBL regarding the C193 form of policy.


Dated: December 29, 2005                           _____
                                                                       Gavin D. Friedman


Sworn and subscribed to
before me this 29 day of December, 2005.

_____
Notary Public

My Commission expires:

VIRGINIA N. PUZON
Commission # 1507027
Notary Public - California
Los Angeles County
My Comm. Expires Aug 10, 2008

2

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NANCY BROOKS AND JOAN SILVERMAN

                Plaintiffs,        :

                          :

       v.

AIG SUNAMERICA LIFE ASSURANCE
COMPANY,

               Defendant.    :

Civil Action
No. 05-10994-WGY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## **AFFIDAVIT OF GARY STRUNK**

STATE OF NEW JERSEY      )

                           ) ss.

PASSAIC COUNTY          )

      GARY STRUNK, being duly sworn, deposes and states as follows:

      1.     I am a Fellow of the Society of Actuaries, a member of the American Academy of Actuaries, and am currently a Vice President and Actuary with Hartford Life Private Placement, a subsidiary of Hartford Life, Inc. I was formerly an Associate Actuary with The Mutual Benefit Life Insurance Company ("Mutual Benefit Life"), and subsequently MBL Life Assurance Corporation ("MBL Life") (collectively "The MBL Entities"). MBL Life was the entity established pursuant to a rehabilitation plan approved by the Superior Court of New Jersey in 1991 (the "Rehabilitation Plan"). I was employed by The MBL Entities for 18 years. I have worked in the life insurance industry for 24 years. I have personal knowledge of the statements contained herein or where indicated, upon information and belief, and if called as a witness, I could testify competently thereto.

2.     I understand that the above-captioned litigation involves a life insurance policy issued to Mr. Donald Silverman on or about May 1, 1984. Pursuant to the Rehabilitation Plan, Mutual Benefit Life policyholders were provided the option of opting in and having their life insurance policies restructured to a common form policy, or of opting out and receiving a cash distribution. I understand that Mr. Silverman elected to opt in and subsequently received a restructured policy referred to as Form C193 ("C193"). That restructured policy is attached hereto as Exhibit A.

3.     I understand that this Court requested that AIG SunAmerica Life Assurance Company (AIG SunAmerica") provide the "statement of the method of calculation of values" referred to in paragraph 13 of the C193 policy, for the purpose of "determin[ing] whether it contains any procedures or standards for the calculation of COI insurance rates." This statement in paragraph 13 refers to the Actuarial Memorandum. Life Insurance issuers are required to file the Actuarial Memoranda with Departments of Insurance in states where the insurer intends to issue the product. I drafted the Actuarial Memorandum for C193.

4.     I understand that AIG SunAmerica has conducted a search of its files for the C193 Actuarial Memorandum filed with the Division of Insurance for the Commonwealth of Massachusetts ("Massachusetts DOI"), but has not located that specific document. I also understand that the Massachusetts DOI informed AIG SunAmerica that it maintains copies of Actuarial Memoranda for only two years, and does not have a copy of the Memorandum filed in connection with C193. AIG SunAmerica contacted me in connection with its attempt to locate the Actuarial Memorandum.

5.      Attached to the concurrently-filed Affidavit of Gavin D. Friedman is what I understand and believe to be a true and correct copy of the Actuarial Memorandum filed by Mutual Benefit Life regarding C193 with the Texas Department of Insurance. I understand that AIG SunAmerica obtained this document directly from the Texas Department of Insurance. As explained below, the Section on page 4 of this Actuarial Memorandum titled "Cost of Insurance" and Exhibits I and II to the Actuarial Memorandum that was filed with in Texas would have been the same as that filed with the Massachusetts DOI.

6.      The process of drafting and filing an Actuarial Memorandum at the MBL Entities was as follows: we would draft a generic memorandum that generally contained, among other items, a description of the policy's characteristics such as death benefits and premiums, a section setting forth in descriptive format the components used to derive the policy's values including the minimum guaranteed interest rate to be credited to the policyowner and the cost of insurance, and a section setting forth the formulae to calculate the policy's value at a given time. We would then take this generic Memorandum and, where required, tailor it to comply with certain states' requirements regarding the minimum interest rate a life insurer was entitled to credit a policyowner. The generic Memorandum for C193 would not have differed by state with respect to the calculation of COI rates. This is evidenced by the fact that (1) the maximum monthly cost of insurance rates for each attained age set forth in Exhibit I to the Texas actuarial memorandum (male non-smoker) and (2) the Net Single Premiums per $1000 set forth in Exhibit II to the memorandum (also male non-smoker) are identical to those set forth in what I understand to be Mr. Silverman's policy attached hereto as Exhibit A.

3

Dated: December 29, 2005

_____
Gary Strunk

Sworn and subscribed to
before me this 29th day of December, 2005.

_____
Notary Public

My Commission expires:

CATHERINE HERRE
Notary Public
State of New Jersey
My Commission Expires Jun 15, 2006

4

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NANCY BROOKS AND JOAN SILVERMAN,       **\*\*MOTION FOR LEAVE TO**

                                               :       **FILE THIS REPLY <u>GRANTED</u>**

              Plaintiffs,            **BY ELECTRONIC ORDER**

                                               :       **DATED AUGUST 26, 2005\*\***

       v.

                                               :       Civil Action

AIG SUNAMERICA LIFE ASSURANCE         No. 05-10994-WGY

COMPANY,                               : 

                    Defendant.       : 

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### REPLY MEMORANDUM OF LAW IN FURTHER <u>SUPPORT OF DEFENDANT AIG SUNAMERICA'S MOTION TO DISMISS</u>

#### <u>Preliminary Statement</u>[1]

      The dispositive legal issue on this motion boils down to no more than this: is the

conclusory "information and belief" allegation that AIG SunAmerica breached the terms of the

Policy by increasing monthly COI rates in violation of unknown and unplead "procedures and

standards" adequate to state a claim?  (Compl. ¶ 20.)  Plaintiffs do not identify -- either in the

Complaint or their opposition papers ("Opposition") -- <u>what</u> "procedures and standards" they are

referring to, or <u>how</u> those "procedures and standards" were purportedly breached.  Indeed,

plaintiffs concede that they do not possess -- and do not know the content of -- the very "proce-

dures and standards" on which their entire Complaint is based.[2]  Nor do plaintiffs even know if

---

[1]      Capitalized terms herein shall have the same meaning as in Defendant's Memorandum Of Law In Support Of Their Motion To Dismiss (Docket No. 7), which is cited herein as "Opening Brief at __."

[2]      Plaintiffs' Opposition To Defendant's Motion To Dismiss at 7 (Docket No. 8) (cited as "Opp. at __.").

such "procedures and standards" ever existed.  It should follow that a plaintiff cannot state a

claim for breach of a procedure or standard if the plaintiff (much like the defendant in this case)

does not even know what the procedure or standard says, or, indeed, if it ever even existed.

Guessing should not be enough.

       The Policy language concerning monthly COI rate increases does not mandate that

such "procedure and standards" exist, only that AIG SunAmerica abide by them if they do exist.

(See Compl. ¶ 19.)  AIG SunAmerica has searched its files and scoured the records at the

Massachusetts Division of Insurance ("MA DOI").  It does not know of any document filed by

any party with the MA DOI that constitutes the "procedures and standards" contemplated by the

Complaint.  Plaintiffs' conclusory assertions that AIG SunAmerica "failed to disclose the

underlying facts" is simply hollow in the absence of any suggestion of what these facts are.[3]

(Opp. at 1.)

       Nothing in the Complaint, and no explanation of the Complaint in plaintiffs'

Opposition, satisfies the requirement in this Circuit that facts supporting a breach of contract be

plead with substantial certainty.  Pure "information and belief" allegations of this sort are

insufficient as a matter of law, and fail to put AIG SunAmerica on notice of what it has allegedly

done wrong.

---

[3]    AIG SunAmerica cannot make heads or tails of the collection of correspondence attached to the Opposition with respect to how that correspondence purports to relate to the issue of "procedures and standards."  It does not appear to have any such relation.

**Reply Points**

1.    **Plaintiffs Concede That They Have Not -- And Cannot -- State With
      _Substantial Certainty_ Facts Sufficient To State A Claim For Breach Of Contract**

Plaintiffs argue that "[a]lleging the existence of a contract, its breach and damages
are all that is required [to state a claim for breach of contract]."  (Opp. at 7.)  But in <u>Doyle v.
Hasbro, Inc.</u>, the First Circuit <u>rejected</u> just that argument, holding that "[p]laintiffs-appellants are
mistaken in their belief that they 'need no more than to allege that the facts demonstrate a breach
of that contractual relationship."  103 F.3d 186, 194 (1st Cir. 1996).  To the contrary, the First
Circuit held that it was "essential" to plead with "substantial certainty" facts sufficient to
establish a defendant's failure to perform.  <u>Id.</u> at 194-95.

Rather than arguing that their failure to identify the "procedures and standards"
nevertheless satisfies their burden of pleading a breach of contract with the requisite substantial
certainty -- which, of course, it does not -- plaintiffs assert that AIG SunAmerica "failed to
disclose" the necessary information.  (Opp. at 7-8.)  That argument is without merit.

<u>First</u>, plaintiffs read too much into the Policy language on which they rely.  The
relevant contractual term provides that:

> Any change in [COI] rates will be in accordance with <u>any</u> proce-
> dures and standards on file with the Insurance Department of the
> jurisdiction in which this policy was delivered.

(Compl. ¶ 19 (emphasis added).)  The Policy does not provide that there "must" be or "shall"
be "procedures and standards" on file at the MA DOI.  Rather, use of the term "any" plainly
indicates that if such "procedures and standards" do in fact exist, then those will be complied
with.  AIG SunAmerica has searched its files and scoured the records at the MA DOI.  It does not

3

know of any document that constitutes the unidentified "procedures and standards" upon which plaintiffs base their entire Complaint.[4]

Second, plaintiffs' conclusory assertions that AIG SunAmerica "failed to disclose information to plaintiffs" and "continually misrepresented to plaintiffs that the COI Rate Increases were authorized by the Rehabilitation Plan" seem to be premised on a misreading of the Rehabilitation Plan. (Opp. at 7.) Plaintiffs assert that the restructuring of the block policies was "temporary" pursuant to the Rehabilitation Plan. (Opp. at 3, 8.) But the plain terms of the Rehabilitation Plan are to the contrary. The restructuring of the policies was permanent, and Mr. Silverman elected to receive a new policy by opting-into the Rehabilitation Plan. (See Policy attached to Opening Brief as Exhibit A.) Indeed, as the chart below demonstrates, if -- as plaintiffs argue -- the restructuring of Mr. Silverman's Policy was temporary, then this case should be dismissed for the alternative reason that Mr. Silverman's Original Policy does not even contain the provision that monthly COI rate increases will be made in accordance with "any procedures and standards" on file at the MA DOI. (See Original Policy at ¶ 12, attached hereto as Exhibit 1.)[5] Either way, there is no case.

_____

[4]    Pursuant to the Purchase and Sale Agreement between MBL Life and Anchor National (the "Agreement"), AIG SunAmerica could increase the monthly COI rates for the entire block of acquired policies by a specific percentage if the Aggregate Account Value of the block of policies fell below 95% of the aggregate value of those policies as of December 31, 1997. That provision, however, provided for a one time, contingent increase and does not appear to have any relationship to the unspecified "procedure and standards" upon which plaintiffs base their Complaint. Of course, there is no allegation in the Complaint that AIG SunAmerica did not comply with that provision of the Agreement, nor could there be.

[5]    Copies of documents such as this, that are central to plaintiffs' claims but were not attached to the Complaint, may be reviewed on a motion to dismiss without converting the motion into one for summary judgment. Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) ("When the complaint relies upon a document, whose

(continued...)

| **Restructured Policy Language** | **Original Policy Language** |
|---|---|
| The monthly cost of insurance rate is based on the sex, age, and rate class of the insured. Monthly cost of insurance rates will be determined by us annually, by class, based on future expectations as to investment earnings, mortality, persistency, and expenses, including taxes. <u>Any change in rates will be in accordance with any procedures and standards on file with the Insurance Department of the jurisdiction in which this policy is delivered.</u>  Such cost of insurance rates will not be greater than those shown in the table of maximum monthly cost of insurance rates on page 15.  (Opening Brief, Ex. A at ¶ 14 (emphasis added).) | The monthly cost of insurance rate is based on the sex, age, and rate class of the insured. Monthly cost of insurance rates will be determined by us from time to time based on our expectations of future mortality experience.  Such cost of insurance rates will not be greater than those shown in the table of maximum monthly cost of insurance rates on page 27.  (Ex. 1 at ¶ 12.) |

**2.**    **The Extraneous Materials Attached To The Opposition Add Nothing**

Plaintiffs attach extraneous materials to the Opposition, consisting of correspondence between a Mr. Richard P. Strutevant and AIG SunAmerica.  (Opp. at Exs. 1-4.)  Even if one deemed such correspondence as incorporated into the Complaint, none of it even touches upon the central issue of <u>what</u> are the "procedures and standards" that plaintiffs allege were violated.  None of that correspondence (not even plaintiffs purported Ch. 93A demand letter attached to the Opposition at Exhibit 5) even references the "procedures and standards," instead stating that the monthly COI rates were increased "without any justification."  (Opp., Ex. 5 at 1.)  But the contract requires no particular explanation or "justification."  Instead, it requires (i) that the rates not exceed the schedule included in the Policy, and plaintiffs have conceded that the monthly COI rate increases did not exceed the contractual limits (<u>see</u> Opp. at 4) and (ii) changes

---

[5]    (...continued)
authenticity is not challenged, such a document 'merges into the pleadings' and the court may properly consider it under a Rule 12(b)(6) motion to dismiss.")

in monthly COI rates will comply with "any procedures and standards" on file with the MA DOI. (Opening Brief, Ex. A at ¶ 14.)  Indeed, plaintiffs' theory of a breach of the mysterious "procedures and standards" was raised for the first time in the Complaint, not the attached correspondence.  Put simply, that correspondence adds nothing to this motion.

**3.    Plaintiffs' Conclusory Allegation Of Fraudulent Concealment Does Not Save
        Their Implied Covenant Of Good Faith And Fair Dealing Or Chapter 93A Claims**

In its Opening Brief, AIG SunAmerica argued that plaintiffs' claims for (i) breach of the implied covenant of good faith and fair dealing (Count II) and (ii) violation of Ch. 93A (Count III) failed as a matter of law because allegations of a breach of contract, without more, are insufficient to state a claim under those theories.  (Opening Brief at 8-9.)  Plaintiffs do not dispute that a mere allegation of a breach of contract is insufficient to state a claim for breach of the implied covenant of good faith and fair dealing or for a violation of Ch. 93A.  Instead, plaintiffs argue (without any supporting precedent) that their single allegation of fraudulent concealment is adequate to plead the bad faith and deceptive conduct necessary to sustain those claims.  (Opp. at 8-10.)  But that argument makes no sense.

Under Massachusetts law, the doctrine of fraudulent concealment operates to toll the limitations period for an <u>already accrued claim</u>:

> If a person <u>liable</u> to a personal action fraudulently conceals <u>the cause of such action</u> from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action.

Mass. Gen. Laws ch. 260, § 12 (emphasis added).  A plain reading of the text of the statute demonstrates that allegations of fraudulent concealment only operate to toll a cause of action, not create one.

6

In order to state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must not only plead a breach of contract, but also must plead "additional factual allegations of unfairly leveraging the contract terms for undue economic advantage." Christensen v. Kingston Sch. Comm., 360 F. Supp. 2d 212, 229 (D. Mass. 2005). Allegations that the statute of limitations are tolled through the doctrine of fraudulent concealment do not constitute "unfair[] leveraging" of the contract. Id. Similarly, while allegations of fraudulent concealment of previous deceptive conduct may be sufficient to toll the Ch. 93A limitations period, they do not serve as unfair or deceptive acts or practices in and of themselves.

## 4. Plaintiffs' Opposition Demonstrates The Inadequacy Of The Complaint's UCL Allegations

Plaintiffs effectively concede -- as they must -- that to state a claim pursuant to the "unlawful" prong of the UCL, they must allege a violation of some law independent of the UCL. (Opp. at 12.) Although the Complaint does not identify any such violation, plaintiffs argue that the purported breach of the Policy violated 211 Mass. Code Regs. 95.06(2). (Id.) That regula-tion provides, in part, that "[e]ach filing for approval of a variable life insurance policy form shall include . . . the mortality, expenses and other risks which the insurer will bear under the policy." 211 Mass. Code Regs. 95.06(2) (emphasis added). But the Complaint's allegations concern the purported wrongful increase of monthly COI rates, not Defendant's seeking approval from the MA DOI of the form of the Policy. That regulation is simply inapposite.

Plaintiffs' argument that their allegations satisfy the "unfair" prong of the UCL is equally unavailing. (Opp. at 11-12.) Under California law, conduct is "unfair" under the UCL only if that conduct has the effect of violating a specific constitutional, statutory or regulatory provision. (Opening Brief at 12.) While plaintiffs assert that conduct can be "unfair" under the

7

UCL even if it is technically permissible, they do not argue that the alleged breach of contract "violates the policy or spirit of [a law] because [the breach is] comparable to or the same as a violation of the law . . . . <u>Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.</u>, 973 P.2d 527, 544 (Cal. 1999). Plaintiffs have not even attempted to allege a violation of any specific such provision.

## <u>CONCLUSION</u>

For all of the foregoing reasons, and for the reasons cited in Defendant's Opening Brief (Docket No. 7), AIG SunAmerica's Motion to Dismiss should be granted in its entirety.

Dated: August 26, 2005
      Boston, Massachusetts

Respectfully submitted,

/s/ James R. Carroll
James R. Carroll (BBO #554426)
Michael S. Hines (BBO #653943)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
(617) 573-4800

Counsel for Defendant
AIG SunAmerica Life Assurance Company

8

# EXHIBIT D



# MBL Life Assurance Corporation
520 Broad Street, Newark, NJ 07102-3111
XXXXXXXXXX
Phone: 973-481-8789    Fax: 973-266-4390    e-mail: MeolaR@MBLLife.com

**Ralph Meola**
*FSA, MAAA, CLU, ChFC*
Senior Vice President &
Corporate Actuary

November 20, 1998

The Honorable Linda Ruthardt, Commissioner
Division of Insurance
Commonwealth of Massachusetts
470 Atlantic Avenue, Sixth Floor
Boston, MA 02210-2223

Re:  Filings related to the Conclusion of the Mutual Benefit Life Insurance Company Plan of Rehabilitation.

Informational filing regarding the Cost of Insurance and Crediting Rate changes with respect to the Policy Forms C193, JL93 and MAL93, contemplated in the Purchase and Sale Agreement between MBL Life Assurance Corporation (MBLLAC) and SunAmerica Inc., et.al., dated July 15, 1998 (the "Purchase Agreement").

Dear Commissioner Ruthardt:

Policy Forms C193 and JL93 are non-participating flexible factor universal life policies that were issued by Mutual Benefit Life Insurance Company, in Rehabilitation, to accommodate the restructuring of life insurance policies under its Plan of Rehabilitation.  JL93 (also known as Heirloom) is a second to die universal life policy.  These forms were previously approved by your Department.  Form MAL93 is a clone of C193 approved for use by MBLLAC in situations where a new policy is issued under term conversions, guaranteed insurability options, etc.

The policies issued under Form C193 and JL93 were assumed by MBLLAC on April 30, 1994 in accordance with the Plan of Rehabilitation and will now be assumed, along with the policies issued on form MAL93, by Anchor National Life Insurance Company (Anchor) pursuant to the Purchase Agreement as the final step in the rehabilitation process.  (A copy of the Purchase Agreement was forwarded to you earlier.)

Section 5.10.3 of the Purchase Agreement deals with the non-guaranteed elements of the policies in general.  This section states, among other things, "In establishing such non-guaranteed elements, the Purchaser may take into consideration all relevant factors, including the presence or absence of surrender charges, actual and anticipated persistency, the interest rate environment in which the premium was received and in which crediting rates were established, actual and

SUN 000599

November 20, 1998
Page 2

anticipated mortality, reinsurance premiums charged by third party reinsurers, administrative expenses and Taxes . . ." This provision is consistent with the terms of the policy forms.

Section 5.10.6 of the Purchase Agreement establishes the initial non-guaranteed elements applicable immediately after the end of Rehabilitation as follows (the "Rehabilitation Period Termination Date" is currently anticipated to be June 30, 1999):

- Cost of Insurance Rates will be the rates currently applicable to policies that qualify for preferred COI's under the Plan of Rehabilitation. These rates have been in effect since the form was first approved.
- Crediting rates will be initially established at 5% based on the United States Treasury Rate (five year maturity) on March 12, 1998. The initial crediting rate will be adjusted to reflect any change in the Treasury Rate on the last business day of the fourth month preceding the Rehabilitation Period Termination Date as compared to the March 12, 1998 rate. The adjusted rate will be rounded upward to the nearest 25 basis points if such Treasury Rate declines, or downward to the nearest 25 basis points if such rate increases.
- First year crediting rates on funds paid into a contract after the Rehabilitation Period Termination Date will be initially established at the end of the Rehabilitation Period at a level at least 50 basis points higher than the generally applicable rate with respect to that policy. Such rate, once established, will remain in effect through December 31, 1999 and will apply to funds received prior to such date for one year from the date of receipt.

Section 4.18 of the Purchase Agreement provides a formula (reproduced below) to be used to calculate an increase in Cost of Insurance rates if persistency is worse than the baseline assumption. In such case of poor persistency, it is anticipated that the lapses in excess of baseline will consist of a disproportionate percentage of healthy lives. This will result in a worsening of the expected mortality for the remaining policies. The formula is designed to approximate the impact of this worsening mortality and adjust the cost of insurance rates to track the revised expectation for the underlying mortality.

| (A) Aggregate Account Value of all Reinsured Life Policies in effect One Year following the Rehabilitation Period Termination Date as a percent of aggregate Account Values on 12/31/97 | (B) Increase in COI's |
|---|---|
| 95% or more | 0% |
| Less than 95% | .7% for each 1% that the Aggregate Account Values percentage in column (A) is less than 95% |

If the persistency one year after the Rehabilitation Period Termination Date is such that the formula produces a Cost of Insurance increase, the Cost of Insurance rates will be increased on Policy Anniversaries beginning three months later. If the Rehabilitation Period Termination Date is June 30, 1999 as currently contemplated, the earliest date that Cost of Insurance charges could be increased under this formula would be September 30, 2000.

SUN 000600

November 20, 1998
Page 3

Section 4.18 also provides that if actual mortality experience is greater than that anticipated in the above formula, such higher mortality will form the basis for the Cost of Insurance rates. Furthermore, Cost of Insurance rates may be adjusted to reflect changes in certain reinsurance costs, changes in taxation and changes in applicable laws that may increase the cost of administering the policies.

Please call me at the number above if you have any questions about the Cost of Insurance issues raised in this letter or about the Purchase Agreement. Any questions or concerns about the format/completeness of this filing may be directed to Ann Alegret at 973-481-7730 or Lisa Comick at 973-481-7215. Enclosed is a duplicate of this letter along with a return envelope. Please return the duplicate with the Department's official stamp for our records.

Sincerely,

Ralph Meola, FSA, MAAA
Senior Vice President &
Corporate Actuary

Enclosures

SUN 000601



# MBL Life Assurance Corporation

520 Broad Street, Newark, NJ 07102-3111

Insurance Operations Services

November 24, 1998

Division of Insurance--SRB
c/o Bank of Boston
P.O. Box 3812
Boston, MA 02241-3812

Re:    Massachusetts Division of Insurance Rate Filing
       Informational filing regarding the Cost of Insurance and Crediting Rate

Dear Sir or Madam:

Enclosed is a check in the amount of $150, representing the Massachusetts Division of Insurance rate filing fee and the corresponding SRB-LB-1 form.

Please call Ms. Ann Alegret at (973) 481-7730, if you have any questions or require any additional information.

Sincerely,

Lisa E. Comick
Senior Policy Analyst

copy:    Ann Alegret
         Massachusetts Division of Insurance

SUN 000602

**MASSACHUSETTS DIVISION OF INSURANCE**
**LOCK BOX FILING FEE FORM [SRB-LB-1 (09/96)]**

_822_ GROUP #    COMPANY: _MBL Life Assurance Corporation_

_69728_ NAIC #    CONTACT: _Ann Alegret_

_98/11/24_ DATE    PHONE #: _(973) 481-7730_ (ext: )
(YY) / (MM) / (DD)    FAX #: _(973) 265-4341_
(E.g. Sept. 7, 1996 = 96/09/07)    E-MAIL ADDRESS (if available):
                Toll Free - _1-800-821-7887_

1. **Line of Insurance**                    _Enter_ H, P, or L:  |L|

    H = Accident & Health    P = Property/Casualty    L = Life

2. **Filing Type**                    _Enter_ a **Form** or **Rate** code from below: |2|

    Form Filing Codes: (Fee $75.00)

    INDIVIDUAL FORM FILING:

        A = Policy/Contract with Associated Materials    C = Application/Certificate Only
        B = Rider, Endorsement, or Amendment Only        D = Other

    GROUP FORM FILING:

        E = Master Policy/Contract with Associated Materials    G = Application/Certificate Only
        F = Rider, Endorsement, or Amendment Only              H = Other

    Rate Filing Codes: (Fee $150.00)

        1 = New Filing Rates         3 = Rate Decrease
        2 = Rate Increase            4 = Other

3. **Filing Sub-Type**        _Enter_ code selected from sub-type list (enclosed): |UL|

_No Forms Filed_
4. **Form Number(s)**    _Enter_ Policy/Contract Form Number(s):  [          ]

[            ]    [            ]    [            ]

**To Be Completed by Division of Insurance Personnel Only:**

SRB File #: _____    [          ]

Status: _____  Date: _____  Reviewer's Initials: _____
Status: _____  Date: _____  Reviewer's Initials: _____
Status: _____  Date: _____  Reviewer's Initials: _____
Status: _____  Date: _____  Reviewer's Initials: _____
Status: _____  Date: _____  Reviewer's Initials: _____

SUN 000603

Disapproval Paragraphs: _____  _____  _____  _____  _____

 **MBL Life Assurance Corporation**
520 Broad Street, Newark NJ 07102

| MO | DAY | YEAR |
|----|-----|------|
| 11 | 23 | 98 |

CHECK NO.
**5001037129**

| EXPLANATION | AMOUNT |
|-------------|--------|
| COI FILING · IND | *********150.00 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COMMONWEALTH OF MASSACHUSETTS
DIVISION OF INSURANCE - SRB
C/O BANK OF BOSTON
PO BOX 3812
BOSTON MA 02241-3812

PLEASE DETACH & KEEP THIS STUB FOR YOUR RECORDS          CW000502

ETACH HERE                                                                    DETACH HE

THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER

**MBL Life Assurance Corporation**
520 Broad Street, Newark NJ 07102
COI FILING · IND

5001037129

11/23/98

80-161
319

PAY  ONE  HUNDRED  FIFTY  AND  00/100  --------------------------  DOLLARS

$ *******150.00

TO THE
ORDER
OF

COMMONWEALTH OF MASSACHUSETTS
DIVISION OF INSURANCE - SRB
C/O BANK OF BOSTON
PO BOX 3812
BOSTON MA 02241-3812

First Union National Bank of Pennsylvania
Chester, PA 19013

229705

THE BACK OF THIS DOCUMENT CONTAINS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

SUN 000604

⑈5001037129⑈ ⑆031901686⑆ 20799500 11178⑈

**MBL Life Assurance Corporation**

## CHECK REQUISITION
(Shaded information to be completed by Expense Accounting)

Special Instructions/Mailing Instructions

*Please call Ann Alegret (x7720)*
*to pick check up*

**COMPANY**
05010C

**CHECK AMOUNT** $150.00

**VENDOR CODE**

**CHECK DATE**

**SOURCE**

**AUTHORIZATION**

**TAX ID**

**CHECK NO.**

**BATCH**

**CHECK REQUEST NUMBER:**
229709

**STATE** 1099  STAT  USE TAX

**PAYEE NAME AND ADDRESS** (MAX 30 CHARACTERS PER LINE)

LINE 1 Commonwealth of Massachusetts

LINE 2 Division of Insurance — SBD

LINE 3 c/o Bank of Boston

LINE 4 P.O. Box 3812

LINE 5 Boston, MA 02241-3812

LINE 6

**CHECK DESCRIPTION** (MAX 60 CHARACTERS)
COI Filing Fee

### ACCOUNTING DETAIL (ATTACH SEPARATE SHEET FOR ADDITIONAL ENTRIES)

| | ACCOUNT NUMBER | AMOUNT | D/C | COST CENTER | DESCRIPTION/POLICY NUMBER |
|---|---|---|---|---|---|
| 1 | 5000017 | 150.00 | D | 999000 | MA Filing Fee |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |

**PREPARED BY:** Ann Alegret    **DATE:** 11.23.98

**AUTHORIZED BY:** Xidayai Ceoni    **DATE:** 11/23/98

**EMPLOYEE ID:** 10037

### TO BE COMPLETED BY AUTHORIZING EMPLOYEE

IF ITEM IS CHARGED TO AN EXPENSE ACCOUNT (ACCOUNT NUMBER BEGINS WITH "5"), IS THIS A BUDGETED ITEM?
☑ Yes  ☐ No

If "No", if the item exceeds $2,000, Executive Vice President authorization is required.

If "Yes", Does this item exceed the budget by $2,000 or more?
☐ Yes  ☐ No

If "Yes", Executive Vice President authorization is required.

WHITE COPY: ACCOUNTING    YELLOW COPY: ORIGINATOR

3676 (4-94)

SUN 000605

# EXHIBIT E

PURCHASE AND SALE AGREEMENT

By and Among

MBL LIFE ASSURANCE CORPORATION
on the one hand

and

SUNAMERICA INC.,

ANCHOR NATIONAL LIFE INSURANCE COMPANY

and

FIRST SUNAMERICA LIFE INSURANCE COMPANY
on the other hand

Dated as of July 15, 1998

SUN 000607

(i)    The Competitive Bidder will secure and deliver to the Seller, not later than the date it submits the mark-up referred to in paragraph (a) above, a surety bond in an amount equal to 10% of the ceding commission under the Acquisition Proposal as a guarantee of payment of such ceding commission.

(j)    If one or more Acquisition Proposals meet all of the above requirements, the Seller will select the highest and best to consider.  If the Seller commences consideration of such Acquisition Proposal, the Seller will, within ten Business Days, deliver to Purchaser a copy of the executed definitive agreement relating to such Acquisition Proposal, which will provide that the Seller may not amend or modify such agreement in any material respect except in a manner that would make it more favorable to the Seller and which will be subject to the Purchaser's right to match as set forth in this paragraph.  The Seller will be obligated to terminate such definitive agreement and proceed to consummate the Transactions with the Purchaser if the Purchaser agrees, within ten Business Days of its receipt of the definitive agreement relating to the Acquisition Proposal, to modify this Agreement to meet (without any requirement that the Purchaser exceed such terms) the material terms thereof.

(k)    If the Purchaser does not elect to meet the material terms of the Acquisition Proposal as finally proposed by the Competitive Bidder pursuant to paragraphs (h) and (j) above, the Purchaser will be entitled, upon notice to the Seller to such effect, to immediate payment of the amounts required pursuant to **Sections 4.14.1, 4.14.2 and 4.22.**

4.17    **Calculation of Impairments**.  As soon as reasonably practicable, but not later than the earlier of (i) October 15, 1998, and (ii) fifteen days after the end of the second calendar month preceding the Closing Date (or, if the Closing Date is December 31, 1998, November 30, 1998), the Seller will deliver to the Purchaser a preliminary calculation of the Impairment as of the last day of the month immediately preceding the date of delivery for each Reinsured Policy and each other Eligible Policy, which calculation will include the effect of the Account Values True-Up Amount that has accrued through the date of calculation, together with all supporting documentation used by the Seller as a basis for its calculation.

4.18    **COI**.

4.18.1 **Modified COI Scale**.  The Seller will use its commercially reasonable efforts to file and obtain all Permits necessary to permit changes to mortality charges as set forth below (the "**Modified COI Scale**").  Mortality charges may be changed on the policy anniversary beginning 15 months after the Rehabilitation Period Termination Date, to scales reflecting the greater of (a) actual mortality experience and (b) anticipated mortality experience based on the following formulas:

SUN 000662

| (A) | (B) |
|---|---|
| Aggregate Account Values of all Reinsured Life Policies in effect One Year following the Rehabilitation Period Termination Date as a percent of aggregate Account Values on 12/31/97 | Increase in COIs |
| 95% or more | 0% |
| Less than 95% | .7% for each 1% that the Aggregate Account Values percentage in column (A) is less than 95% |

Such amounts may be further adjusted to reflect items such as: (i) an increase or anticipated increase in the reinsurance rates charged by Outward Reinsurers where such increase is made subsequent to the Closing Date and not considered in the Outward Reinsurance Adjustment Amount; (ii) changes in taxation; and (iii) changes in Applicable Laws that increase the cost of administering the Reinsured Policies. In no event will any change in the Cost of Insurance scale increase the Cost of Insurance rate for any Reinsured Policy above the guaranteed COI rate contained in such Reinsured Policy.

**4.18.2 COI Adjustment Amount.** The COI Adjustment Amount will be calculated by the Purchaser as of the first anniversary of the Rehabilitation Period Termination Date and such calculation, together with a detailed statement explaining how such calculation was made, will be delivered to the Seller within 30 days after the first anniversary of the Rehabilitation Period Termination Date. The Seller will then have ten Business Days to dispute the Purchaser's calculation. If the Seller does not give timely notice of any dispute regarding the Purchaser's calculation, the Purchaser will be entitled to payment of such amount out of the COI Adjustment Escrow Account. If the Seller gives timely notice of any dispute regarding the Purchaser's calculation, the Purchaser will file a notice of its COI Adjustment Escrow Claim pursuant to the Escrow Agreement, and the parties will proceed to resolve such dispute by submitting such dispute to the Independent Party in accordance with **Section 8.5**.

**4.19 Acquisition Agreement Regarding Broker/Dealer**. The Seller and the Purchaser will negotiate in good faith to reach an agreement prior to the Closing for the acquisition by the Purchaser or any Subsidiary designated by the Purchaser of the assets of the Seller's Subsidiaries First Priority Investment Corp. and Mutual Benefit Marketing Group d/b/a Financial Partners Marketing Group for a purchase price of $125,000.

**4.20 Grandfathering Ruling**. On or before the date on which the Petition for Court Approval is filed, the Seller will file a request for a ruling which describes the facts

SUN 000663

# EXHIBIT F

*Service Center*
2000 Wade Hampton Boulevard
Greenville, South Carolina 29615-1064
Toll-Free: 1.800.821.7887
Fax: 1.864.609.4712

*Mailing Address*
PO Box 19074
Greenville, SC 29602-9074



August 5, 2003


Mr. Richard P. Sturtevant
C/O Ultimate Benefits
PO Box 421
Warren, RI  02885

RE:  Donald Silverman – Policy No. AL101958

Dear Mr. Sturtevant:

Your letter dated July 21st, 2003 has been received.  The information requested in your letter is as follows:

| Year | Monthly Cost of Insurance per $1,000 |
|------|--------------------------------------|
| May '94 – Apr '95 | $3.36 |
| May '95 – Apr '96 | $3.72 |
| May '96 – Apr '97 | $4.17 |
| May '97 – Apr '98 | $4.71 |
| May '98 – Apr '99 | $5.14 |

Monthly cost of insurance rates per $1,000 from May, '99 until Mr. Silverman's date of death were previously provided in Keer Burley's letter dated May 28, 2003.

It is important to remember, Mr. Sturtevant, that these cost of insurance rates were approved by the Superior Court of the State of New Jersey as a part of the Plan for Rehabilitation that restructured the Mutual of Benefit policies to a common form.

If we can be of any more help, please let us know.

Sincerely,

Donald (Dubby) Smith, Sr. Director
Policy Administration

CC:  Bruce Powell – SR. Vice President, Business Processing Outsourcing Division

*Service Center*
2000 Wade Hampton Boulevard
Greenville, South Carolina 29615-1064
Toll-Free: 1.800.821.7887
Fax: 1.864.609.4712

*Mailing Address*
PO Box 19074
Greenville, SC 29602-9074



May 28, 2003

Attention: Richard P Sturtevant
Ultimate Benefits
Post Office Box 421
Warren RI  02885

Re:    Policy Number:        AL101958
       Insured:              Donald Silverman

Dear Mr. Sturtevant:

This letter is in response to your correspondence asking for further clarification of certain issues pertaining to the policy listed above. The primary point of your letter was to assert that Mr. Silverman overpaid or was overcharged for his policy and that his family is owed more money. We disagree. We believe that his policy was administered properly, in accordance with the contract terms as altered by the Rehabilitation Plan.

The Superior Court of the State of New Jersey placed Mutual Benefit Life Insurance Company ("MBL") in Rehabilitation on July 16, 1991. As part of this process the 3rd amended Plan of Rehabilitation (the "Plan") was approved by the Superior Court in November 1993. As a result of this action by the Superior Court, all MBL policies were restructured to a common form. Thus, all contracts prior to this date were effectively replaced with the common form prescribed by the Plan. In this case, Mr. Silverman's universal life policy was replaced with another plan of universal life policy. As of June 30, 1999, the rehabilitation period ended and all business was converted to SunAmerica, Inc. a Los Angeles, California financial company.

In your letter, you first questioned the planned premiums on the policy. As you know, a Universal Life Policy offers flexible premiums and a flexible face amount. Within certain limits, the policy owner is given the flexibility to determine the amount of premium he or she wants to pay. I am enclosing the original policy illustration given to the policyowner at the time the policy was issued. You will see this illustration demonstrates policy values based on both the Guaranteed Factors and the (at the time) Current Factors, and is based on an interest-crediting rate of 12.50% per year.  The illustration also states, "current factors are not guaranteed".  The current COI rates effective July 1, 1999, were the same as the preferred scale COI rates used during the Rehabilitation period.  This information was sent to all insureds in a letter mailed by Mr. Daniel Demko to all of the appropriate policyowners.

You further indicated that the Annual Statements produced since April 1995 show that the planned premium of $18,415.59 was insufficient to cover the full cost of insurance. The Annual Statement stipulates, "If your current cash value is less than last year's you should contact your agent or the SunAmerica Service Center to re-illustrate your policy values to make sure that your planned premiums will continue to provide coverage for the period you desire". An Annual Statement is mailed to the policyowner, annually, on the policy anniversary date. This statement lists all financial transactions made on the policy for the previous year. It is imperative that the policyowner read the Annual Statement carefully and adjust the planned premium accordingly.

Richard P Sturtevant
May 28, 2003
Page 2

Mr. Silverman did not adjust his planned premium. His policy further suffered because he made no premium payments in 1992 and 1993. The cost of insurance continued to be deducted from the cash value of the policy. Moreover, the policy lost interest that would have been credited to the policy's cash value had he made the scheduled premium payments during the policy year.

You requested an explanation of the increase in premiums in 1994. This increase actually occurred in 1995 and was due to Mr. Silverman's decision to pay his Threshold Premium. The threshold premium was the premium that, if paid cumulatively each policy year during the Rehabilitation Period, entitled the policyowner to "preferred cost of insurance charges and preferred crediting rates". The Threshold Premium was a function of the Rehabilitation Plan, as approved by the Superior Court of the State of New Jersey, and had no meaning after June 30, 1999, the date the rehabilitation period ended. While this concept was unique to certain restructured policies, and was consistent with the Rehabilitation Plan, it did not automatically guarantee that a policy would remain in force to maturity.

With respect to the mortality charges on the restructured policy, I have listed below the mortality rates, per thousand dollars of insurance, charged for the referenced years:

| Year | Current Monthly COI Per $1,000 | Guaranteed Maximum Monthly COI Per $1,000 |
| --- | --- | --- |
| May 1, 1999 – April 30, 2000 | 6.5200 | 9.47 |
| May 1, 2000 – April 30, 2001 | 7.1200 | 10.42 |
| May 1, 2001 – Date of Death | 7.9597 | 11.47 |

As you see, the cost of insurance rates charged on the policy in question never exceeded the maximum mortality rates allowable under the policy contract. Mr. Silverman was not "overcharged" his mortality charges.

You asked for a year-by-year illustration of the old contract as it was issued May 1, 1984, and the restructured contract to the date of Mr. Silverman's death. We are unable to recreate past illustrations. However, the original policy illustration given to the policyowner at the time the policy was issued is enclosed.

In reference to your concerns regarding New Money Balance, please note, this was also a function of the court approved Rehabilitation Plan and was not an additional benefit. As with the Threshold Premium, because it was a part of the Rehabilitation Plan, it had no meaning after the rehabilitation end date of June 30, 1999.  The New Money Balance equaled the greater of zero and the excess of:

    A.  All cash premiums and other deposits received since the Closing Date, with respect to a Restructured Contract that is not an Accumulation Contract

OVER

    B.  All Free Partial Withdrawals and the cash loans net of cash loan repayments with respect to a Restructured Contract that is not an Accumulation Contract since the Closing Date.

In regard to the value share enhancement, this was an enhancement developed as part of MBL's rehabilitation proceedings. MBL developed a methodology for attributing the value share on an individual policy basis.  The New Jersey Superior Court approved the methodology and the formula used to establish the value share allocation. The value share represents an apportionment of the value MBL received through the sale of its assets between its major creditors and its policyholders.

Richard P Sturtevant
May 28, 2003
Page 3

The Value Share Enhancements for June 30, 2001 through June 30, 2003, were added to the death benefit paid for this policy.

I trust this information helps you in understanding the policy performance. It is our intention to provide you with all the information necessary to answer all the concerns of the family.  If the family continues to have outstanding issues or concerns, please contact me. Of course, the family is also free to contact the Massachusetts Department of Insurance, One South Station 4th Floor, Boston, Massachusetts 02110.

Sincerely,

Keer Burley
Premium Accounting